<u>PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY</u>

Name ___Rouse_____Nathaniel_____N.R.R._____
       (Last)            (First)              (Initial)

Prisoner Number ___C-03721_____

Institutional Address ___San Quentin State Prison, Ca. 94974_____

---

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

Nathaniel Ray Rouse

**CV 08        2426 SBA**

Full Name of Petitioner

**(PR)**

Case No.(To be provided by the clerk of court)

vs.

R. Ayers Jr., Warden

PETITION FOR A WRIT OF HABEAS CORPUS

Name of Respondent
(Warden or jailor)

---

<u>Read Comments Carefully Before Filling In</u>

<u>When and Where to File</u>

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a)  Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Alameda County Suprior Court                              Oakland
_____          _____
                   Court                                                    Location

(b)    Case number, if known ___67046_____
(c)    Date and terms of sentence __7 to Life_____
(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes    No

Where? ___San Quentin State Prison_____
              (Name of Institution)                    .              (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Murder First
_____

_____

_____

3.    Did you have any of the following?

Arraignment: Yes X No __  Preliminary Hearing: Yes X No __ Motion to Suppress: Yes __ No __

4.      How did you plead?

Guilty __X__     Not Guilty _____     Nolo Contendere _____

Any other plea (specify) _____

5      If you went to trial, what kind of trial did you have?

Jury _____     Judge alone _____     Judge alone on a transcript _____

6.      Did you testify at your trial?   Yes __   No __

7.      Did you have an attorney at the following proceedings:

(a)     Arraignment   Yes _X_          No __
(b)     Preliminary hearing     Yes  X        No __
(c)     Time of plea   Yes _X_        No __
(d)     Trial   Yes __        No __
(e)     Sentencing     Yes _X_        No __
(f)     Appeal          Yes ___       No X
(g)     Other post-conviction proceeding     Yes __        No __

8.      Did you appeal your conviction?     Yes __   No __

(a)     If you did, to what court(s) did you appeal?

Court of Appeal          Yes __        No __     _____
                                                 (Year)                 (Result)

Supreme Court of
California                Yes __        No __     _____
                                                 (Year)                 (Result)

Any other court          Yes __        No __     _____
                                                 (Year)                 (Result)

(b)     If you appealed, were the grounds the same as those that you are raising in this
petition?                              Yes __   No __

(c)     Was there an opinion?          Yes        No

(d)     Did you seek permission to file a late appeal under Rule 31(a)?
                                       Yes        No

4

If you did, give the name of the court and the result:

9.      Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?      Yes          No X

This wirt concerns the reversal of Board decision to grant me parole.
I exhausted all state court remedies.  And claims in this wirt were raised
in the state courts.

Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged
the same conviction you are challenging now and if that petition was denied or dismissed with prejudice,
you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order
authorizing the district court to consider this petition.  You may not file a second or subsequent federal
habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following
questions for each proceeding.  Attach extra paper if you need more space.

I.    Name of Court  Superior Court, Alameda County _____

Type of Proceeding  Writ of Habeas Corpus _____

Grounds raised (Be brief but specific):

a.    Denial of Due Process _____

b.    _____

c.    _____

d.    _____

Result  a. Informal Show Cause issued on July 25, 2007.
b. Writ denied _____    Date of Result  Denied 12-24-2007

II.   Name of Court  California Court of Appeal case # (A120246) _____

Type of Proceeding  Writ of Habeas Corpus _____

Grounds raised (Be brief but specific):

a.  Denial of Due Process _____

b.    _____

c.    _____

d.    _____

Result  a. Informal Order of Show Cause issued January 15, 2008.
b. Writ denied _____    Date of Result  Writ denied 2-19-2008.

III.  Name of Court  Supreme Court of California _____

6

Type of Proceeding ___Petition for Review filed 2/29/2008 case # S161315___

Grounds raised (Be brief but specific):

a. ___Denial of Due Process___

b. _____

c. _____

d. _____

Result ___Denied_____ Date of Result ___April 30, 2008___

      (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __  No __

___Appeal on Prior Governor reversal of parole pending in 9th Circuit___

(Name and location of court)

## B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: ___SEE ATTACHED_____

Supporting Facts: _____

_____

_____

_____

Claim Two: _____

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

_____

_____

_____

Do you have an attorney for this petition?    Yes ___  No  X

If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on *May 6, 2008*                      *Nathaniel R. Rouse*
             Date                                  Signature of Petitioner

( rev. 5/96)

9

Nathaniel Rouse (Petitioner) asserts that the decision of April 30, 2007 by
Governor Schwarzenegger reversing his finding of parole suitability violated
his State and Federal Due Process Rights.

The Governor, in his letter (**Attached as Exhibit A)** characterized the crime
as "exceptionally brutal and callous" and relied on that as the basis for
reversing his finding of parole suitability by the Board.

Petitioner was found suitable by the Board on December 20, 2006. The
Board considered Petitioner's programming summarized in his Life
Prisoner Evaluation Report (**Attached as Exhibit B)** and his current
Mental Health Evaluation (**Attached as Exhibit C)** which found him to
present a low risk of current dangerousness if released.

Petitioner had been found suitable for parole twice before. Former Governor
Davis reversed a Board finding of parole suitability on January 17, 2003.
(**Letter Attached as Exhibit D)**. Governor Schwarzenegger reversed an
earlier panel's finding of parole suitability on February 22, 2006 (**Letter
Attached as Exhibit E)**

The Governor's reversal of Petitioner's parole date, misapplied California
law as interpreted by the Supreme Court and California Court of Appeal and
was not supported by some evidence.

The Governor's reliance on a crime that took place in 1978 to reverse the
Board's grant of parole for the third time violates his Due Process rights.

The California Court of Appeal in *In re Sandra Davis Lawrence on Habeas
Corpus 2007 Cal. App. LEXIS 803 (Cal. Ct. App. 2007)* stated:
"[T]he Governor's reversal of [the Board's] recommendation must be upheld
if there is 'some evidence' to support his contrary conclusion that parole
should be denied. But as explained earlier in discussing the standard of
review, it is not just 'some evidence' to support the Governor's findings, but
'some evidence' sufficient to satisfy the statute's ultimate test, that is. 'some
evidence' the release of [petitioner] would subject society to an
'unreasonable risk' of danger to public safety." Lawrence at p. 35.

The Lawrence Court explained that over time the crime no longer amounts
to 'some evidence' supporting a denial of parole. The Court discussed the
Court of Appeal decision in **In re Elkins (2006) 144 Cal. App. 4th 475.**

1

"The Elkins court then addressed the single factor militating against parole the Governor found sufficient to reverse the Board's recommendation-the 'heinous, atrocious or cruel' nature of the murder. Despite the violence of the act-striking the victim multiple times with a baseball bat-even coupled with the robbery motive for the crime, dumping the body down a steep embankment deep in the wilderness, and then fleeing the state to escape responsibility, the court found this commitment crime failed to supply 'some evidence' Elkin's release posed "'an unreasonable risk of danger to society." It then concluded, "Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amounted to 'some evidence' supporting denial of parole." **Lawrence at p. 44**.

The Lawrence Court also clarified that the 'some evidence' test applied in Elkins and other decisions by California Courts of Appeal requires "that the commitment offense must supply 'some evidence' supporting a finding the prisoner's release at the present time would represent an 'unreasonable risk' of danger to public safety. The Court rejected an interpretation of the 'some evidence' standard that would allow 'some evidence' of one of the factors listed in the regulations as militating against release as being sufficient to justify the Governor's reversal of a recommended release on parole. **Lawrence at p. 45.**

Whatever predictive value the commitment offense and petitioner's juvenile record may have had has dissipated given Petitioner's rehabilitation over the ensuing years. **See In re Tripp, 150 Cal. App. 4th 306, 320 (Cal. Ct. App. 2007)**

The California Court of Appeal **in In re Sandra Davis Lawrence on Habeas Corpus 2007 Cal. App. LEXIS (Cal. Ct. App. 2007)** noted at page 52:

"And in the experience of this Division in regularly reviewing parole board and gubernatorial denials of parole to murderers over the past few years, it is seldom either a board or governor classifies a murder, first or second degree, as less than "atrocious, heinous, or callous" or the equivalent. Indeed they usually add a qualifier such as "extremely" or "vicious" to the description.

The California Supreme Court has clarified California's "some evidence" test in this respect however. To be used as the primary basis of a denial of parole, a commitment offense must involve more than the minimum

2

elements of the crime." Nor every first degree murder can be found to be "atrocious, heinous, or callous" or the equivalent without doing violence to the Supreme Court's articulation of the "some evidence" test.

"The floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal.'" Bracey v. Gramely (1977) 520 U.S. 899, 904-905, quoting Withrow v. Larkin (1975) 421 U.S. 35, 46

The Governor's arbitrary exercise of his authority violates the essence of due process. See Accardi v. O'Shaughnessy, 347 U.S. 260, 267-268 (1984). The requirement of an impartial decision-maker transcends concerns for diminishing the likelihood of error. As the Supreme Court clearly held in Edwards v. Balisok, 520 U.S. 641, 648 (1977) a decision made by a fact-finder who has predetermined the outcome is per se invalid-even where there is ample evidence to support it.

Petitioner includes as **Attachment 1** Factual findings in In re Donnell E. Jameison on Habeas Corpus (Santa Clara County Superior Court No. 71194, January 2007) which lends support to his claim of arbitrariness by the Board and Governor in characterizing virtually every commitment offense as exceptional. Petitioner notes that the Superior Court considered a statistically significant sample in making its findings.

There was no evidence to support the Governor's reversal of Petitioner's parole date and his decision was contrary to California law and Federal Due Process guarantees.

Federal Due Process concerns are at issue here as well since Petitioner was sentenced to a term of seven years to life and at the time of the Governor's reversal of his parole suitability had served about 29 years, well over the minimum

Petitioner is sentitled to Federal protection of his due process rights under Irons v. Carey  (9th Cir. 2007) 479 F. 3d 658 which expressly embraced the rationale in Biggs v. Terhune (9th Cir. 2003) 334 F. 3d 910 that "*A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could* result in a due process violation." Biggs v. Terhune at 916-17

3

The Governor has three times invoked the crime and conduct prior to imprisonment to reverse a finding of suitability for parole by the Board. The crime lacks any predictive value of current dangerousness after 29 years and therefore provides no evidence in support of unsuitability for parole. Petitioner's State and Federal Due Process rights have been violated by the Governor's reversal of his parole date based upon his commitment offense.

CONCLUSION

Petitioner asks for an evidentiary hearing so that he may substantiate his claim that the Board and governor routinely and arbitrarily characterize virtually all murders as exceptional so as to deny parole; he asks that the court grant his petitioner and order his immediate release.

DATED: _5 - 7 - 08_          Respectfully submitted:

Nathaniel Rouse

4

7. Ground 2 or Ground _____ *(If applicable):*

The Bard failed to provide me with a transcript of my hearing of December 20, 2007.

a. Supporting facts:

I was never provided with a transcript of my hearing at which I was found suitable. I am asking that this court order the Board to provide me with a transcript and order that one be provided to this court so that my petition may be supplemented with the transcript.

b. Supporting cases, rules, or other authority:

MC-275 (Rev. January 1, 1999)    PETITION FOR WRIT OF HABEAS CORPUS    Page four of six

8.  Did you appeal from the conviction, sentence, or commitment?  ☐ Yes. ☒ No.  If yes, give the following information:

a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_____

b.  Result:  _____ N/A _____   c.  Date of decision:  _____ N/A _____

d.  Case number or citation of opinion, if known:  _____

e.  Issues raised:  (1)  _____ N/A _____

(2)  _____

(3)  _____

f.  Were you represented by counsel on appeal?  ☐ Yes. ☒ No.  If yes, state the attorney's name and address, if known:

_____

9.  Did you seek review in the California Supreme Court?  ☐ Yes. ☒ No.  If yes, give the following information:

a.  Result:  _____ N/A _____   b.  Date of decision:  ____ N/A _____

c.  Case number or citation of opinion, if known:  _____

d.  Issues raised:  (1)  _____

(2)  _____

(3)  _____

10.  If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____ N/A _____

_____

11.  Administrative Review:

a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____ No Administrative Appeals Available _____

_____

_____

_____

_____

_____

_____

_____

b.  Did you seek the highest level of administrative review available?  ☐ Yes. ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 1999]      **PETITION FOR WRIT OF HABEAS CORPUS**      Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____
_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    N/A _____

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No. If yes, state the attorney's name and address, if known:

_____
_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes. ☒ No. If yes, explain:

_____
_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 1-9-07                    ▶ _Nathaniel R. Reese_
                                   (SIGNATURE OF PETITIONER)

MC-275 (Rev. January 1, 1999)        PETITION FOR WRIT OF HABEAS CORPUS

# EXHIBIT "A"



# OFFICE OF THE GOVERNOR

May 18, 2007

***Via Facsimile and U.S. Mail***

Mr. Nathaniel Rouse, C-03721
***California State Prison at San Quentin***
N198U
Post Office Box C-03721
San Quentin, California  94974

Dear Mr. Rouse:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

LOUIS MAURO
Chief Deputy Legal Affairs Secretary

Attachment

cc:  Board of Parole Hearings (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**NATHANIEL ROUSE, C-03721**
**FIRST-DEGREE MURDER**

AFFIRM:                          _____

MODIFY:                        _____

REVERSE:                     _____X_____

On March 31, 1978, Nathaniel Rouse beat Rooholah Faryabidoust to death during a test drive of a car.

Mr. Rouse and his girlfriend Marion Thorpe planned to go to a car dealership, test drive a car and then kill the dealership employee riding with them so they could steal the car. On the day of the murder, Mr. Rouse and Ms. Thorpe went to Mr. Faryabidoust's used-car dealership and asked him to take them on a test drive in a Monte Carlo. Mr. Faryabidoust left with Mr. Rouse and Ms. Thorpe around 8:30 a.m. At approximately 5:30 p.m., Mr. Faryabidoust's secretary telephoned police and reported Mr. Faryabidoust missing.

Four days later, Mr. Rouse and Ms. Thorpe were arrested driving the Monte Carlo. Mr. Rouse had pawned Mr. Faryabidoust's watch. In the car, police found the pawn-shop receipt. They also found Mr. Faryabidoust's license, credit cards, credit card receipts, and other items.

Mr. Rouse admitted to police that he "struck" Mr. Faryabidoust, and he identified where he disposed of Mr. Faryabidoust's body, which was later recovered from a field. Mr. Faryabidoust's hands had been bound behind his back with rope and tape, and his head had been covered with plastic secured by an electrical cord wrapped around his neck.

Mr. Rouse, who was 20 years old at the time of the life offense and had no other criminal record, was charged with murder with special circumstances, robbery, kidnapping for robbery, and taking a vehicle without the owner's consent. Pursuant to a negotiated plea, he pled guilty to first-degree murder, and he was sentenced to an indeterminate term of life with the possibility of parole.

I considered various positive factors in reviewing whether Mr. Rouse is suitable for parole at this time. In addition to remaining discipline-free for approximately 28 years now, he made efforts in prison to enhance his ability to function within the law upon release. As I noted in my 2006 decision reversing the Board, he earned a GED and an Associate of Arts degree. He also took religious-study courses and courses related to infectious diseases. He is a certified welder, and he held institutional jobs such as data processor, clerk, teacher's aide, hospital porter, and welder, among other things. He availed himself of an array of self-help and therapy, including Impact, Kairos, Alternatives to Violence, Making It Work, Positive Support Systems, Self

Nathaniel Rouse, C-03721
First-Degree Murder
Page 2

Esteem, Criminal Thinking, Rational Behavior Training Group, Reality and Decision Making Group, Anger Control, Category X, and Millati Islami. He also participated in extracurricular activities such as Squires and Trust, working with troubled children.

Furthermore, Mr. Rouse maintains seemingly solid relationships and close ties with supportive family and friends, and he received favorable evaluations from various correctional and mental-health professionals over the years. He also made plans upon his release to live with his former sister-in-law and to work for a construction company in Santa Clara County, the county to which the Board approved his parole.

Despite the positive factors I considered, the first-degree murder for which Mr. Rouse was convicted was exceptionally brutal and callous. According to Mr. Rouse's 2002 written statement, he admitted that, sometime during the test drive, he hit Mr. Faryabidoust in the head as hard as he could. Mr. Rouse told the 2006 Board that Mr. Faryabidoust was not unconscious after the first hit, so Mr. Rouse hit him "[m]aybe five, six or eight" times. At one point, after Mr. Rouse bound Mr. Faryabidoust's hands, Mr. Faryabidoust regained consciousness, so Mr. Rouse hit him again. The doctor who performed Mr. Faryabidoust's autopsy identified at least four separate blows, and said that if a fist had been used to inflict the blows, then the person inflicting the blows struck Mr. Faryabidoust as hard as possible. According to the 1979 statement by the District Attorney, Mr. Faryabidoust died from "hemorrhage due to severe blunt trauma to the head and face." Although Mr. Rouse told his 2004 mental-health evaluator that he recalled that Mr. Faryabidoust uttered the word "no," Mr. Rouse nonetheless admitted, according to his 2002 statement, that he decided to place a plastic bag over Mr. Faryabidoust's head "to make sure he was dead." Mr. Rouse left the car and walked to a nearby store, where he obtained an extension cord and a plastic bag. He put the bag over Mr. Faryabidoust's head and secured it with the extension cord. He then put Mr. Faryabidoust's bound and beaten body in the trunk of the car and drove around looking for a place to dump him.

Mr. Rouse's actions also demonstrated an extraordinary level of calculation and dispassion. Mr. Rouse told the 2006 Board that he planned for several days to steal a car during a test drive, and to kill the car-dealership employee that rode along. He and his crime partner decided to "find an out-of-the-way car lot, someplace that people wouldn't notice, just an old place that you can get a car, and take the car for a ride and then take his life." Mr. Rouse also admitted to the Board that he planned to kill Mr. Faryabidoust so that there would be "no witnesses." In his 2002 written statement, Mr. Rouse stated that although he initially drove the car, he "pretend[ed] as if the car wasn't handling well." He then "got in the back seat . . . because it allowed me to be in the back with Mr. Faryabiddist [sic]." Mr. Rouse admitted to the 2006 Board that he was not angry with Mr. Faryabidoust, but that during the test drive, Mr. Faryabidoust "started talking in his language," and Mr. Rouse "used that as a pretence to become violent with him."

As the sentencing court in this case said, "[t]his is one of the most brutal cases that this Court in its long experience in court has ever encountered. It was a particularly brutal crime. It was, in the Court's opinion, a planned crime. It is just an utter and complete senseless taking of the life of a good human being. Now there is a possibility of this man getting a parole . . ., but I am

Nathaniel Rouse, C-03721
First-Degree Murder
Page 3

going to tell you, Mr. Rouse, that if there is anything that I can do to prevent your parole, the Court is going to do it. There appears to be in this case no mitigating circumstances whatsoever." The gravity of the first-degree murder committed by Mr. Rouse is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk. The Alameda County District Attorney's Office agrees, registering opposition to parole with the 2006 Board based, in part, on the gravity of the offense.

At age 49 now, after being incarcerated for approximately 29 years, Mr. Rouse made some creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Rouse presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Rouse.

Decision Date: 4/30/2007

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT "B"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
DECEMBER CALENDAR 2006

I.    COMMITMENT FACTORS:

   A.    Life Crime:

      Commitment Offense:      Murder in the first degree, PC187
      County of commitment:    Alameda
      Case Number:             #67046
      Sentence:                7 years to Life
      Received in CDCR:        04-11-79
      MEPD:                    4-5-85
      Victim:                  Rooholah Faryabidoust, age 49

      1.    Offense Summary:

      On 3-31-78, Rouse and his crime partner, Ms. Marion Thorpe (AKA Danielle
      Blake), went to an Oakland, California used automobile dealer and expressed
      interest in a vehicle. The victim, Rooholah Faryabidoust accompanied Rouse
      and Thorpe on a test drive.  At some point after leaving the dealership, Mr.
      Faryabidoust was beaten to death and robbed.  His hands were tied behind his
      back and his head was covered with plastic, which was secured around his
      neck with electrical cord. The cause of death was determined to be blunt force
      trauma to the head and face.  Rouse and Thorpe dumped Mr. Faryabidoust's
      body in a field near Antioch, California. They then called Mr. Faryabidoust's
      automobile dealership and told them that he had dropped them off and that
      they would return later to purchase the vehicle.   Rouse pawned Mr.
      Faryabidoust's watch the next day.

      Four days later, Rouse and Thorpe were arrested in King City, California and
      were in possession of property belonging to the victim.  The next day, Rouse
      gave a statement to the Oakland Police wherein he described what had
      happened to the victim.

      2.    Prisoner's Version:

      I, Nathaniel Ray Rouse declare that the below statement is the truth.  I make
      this declaration with the full understanding of my guilt.  I further declare I
      accept as well, full responsibility for my past action in taking the life of Mr.
      Rooholan Faryabidoust.

In April of 1978, Danielle Blake and I drove through Oakland looking for an out of the way car dealership or a small car dealership to take a car from. It was thought that a small out of the way dealership would aid in our escape and lessen the chances of our getting caught for the crime. We never had any intentions of paying for the car. We needed the car because Danielle Blake had an accident in the car we had. We had not planned before then to take a car from anyone.

After about a week of talking we decided on taking a car from someone. We drove around until we saw Mr. Faryabidoust's car lot, which looked dumpy. Our thinking was no one would know if he was missing. I spoke to Mr. Faryabidoust and told him we were looking for a car. He asked us how much we were looking to spend. I told him about $1500.00, and he showed us a Green and Tan Monte Carlo, which he accepted. We went for a test drive. I started out driving with Danielle Blake in the front seat and Mr. Faryabidoust in the back seat to my right. Danielle Blake was in the front seat with me. It was raining very hard that day. I used that to pretend as if the car wasn't handling well. That was my excuse for allowing Danielle Blake to drive. So I pulled over on the side of the highway and got in the back seat behind the driver's side rather than exchanging places with Danielle Blake, because it allowed me to be in the back with Mr. Faryabidoust to my right.

After driving for about ten minutes Danielle Blake began to complain about how the car was handing. She was cussing at Mr. Faryabidoust while she spoke. Mr. Faryabidoust began, out of anger, to speak in his native tongue; I took the opportunity to act as if he said something crazy to Danielle Blake. I was sitting behind Danielle Blake, which put Mr. Faryabidoust on my right side. Before he realized or could respond, I hit Mr. Faryabidoust on the left side of his head as hard as I could. He was still able to raise his hands and arms up after I hit him, but I didn't stop, because we had decided to kill who ever we took the car from. The only thing was, we didn't have a plan as one would if sitting down and knowing what was supposed to happen from point A to point Z. Things happened as they went.

Mr. Faryabidoust hit his head on the right side of his temple on the door handle while I was hitting him. He went unconscious. I used his belt to tie his hands behind his back. Danielle Blake pulled over into an old abandon gas station. We drove around the backside and I got out of the car. The windows were fogged due to the body heat, so no one could see inside while we were fighting. I took the car keys and opened the trunk of the car. There I found some rope and took the belt off and replaced it with the rope.

Afterwards I didn't know how to kill a person. Everything in my head was moving so fast. Mr. Faryabidoust began to move again and I started hitting him until he went out again. Danielle Blake and I started looking around in

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          2

the trunk of the car for something to kill him with. She found a big set of scissors in the trunk. Danielle Blake suggested that I stab him with them, but I couldn't bring myself to do that. I just started pacing, not knowing what to do. I ended up standing over Mr. Faryabidoust's body just looking down at him. He just looked dead to me, but I wasn't sure and it was at that moment that I decided to place a plastic bag over his head to make sure he was dead. Somehow in my mind I thought it was an easy way out of this for me. I walked to a near by store and brought a small extension cord, I stole a plastic bag while in the store. I put the plastic bag over his head and tied it around his neck with the extension cord. We put his body in the trunk of the car and we drove around until we found a place to place his body.

After we dumped his body, we headed for San Diego. Danielle Blake pawned his watch and we used his credit card for gas and food. We also bought some other things, but I can't remember them. A week or two weeks later we were arrested in King City.

When the Oakland Police Department talked to us, I confessed to the Murder. I started making up all kind of excuses. I said, I was high, that Mr. Faryabidoust talked crazy to Danielle Blake, which made me so mad I started hitting him and he accidentally hit his head killing himself. I lied to everyone trying to make it seem as if it was Mr. Faryabidoust's fault, for my accidentally killing him when in truth, it was I, who was to blame for his murder. The plain truth is we needed a car. In my ignorance, I reduced Mr. Faryabidoust's life to the price of a car.

That was 23 years ago, I had just turned 20 years old, lost and emotionally out of control. I was a person in truth, as well who took what I wanted. I wasn't an unfeeling person, but I was someone who could turn his feelings off. Today, however, I can't turn my feelings off at will because of Mr. Faryabidoust. A man I killed willfully for his car. I killed a man who trusted me. I killed a man who looked into my eyes and without spoken words asked me not to take his life. I killed a man whose only mistake was to trust me.

I can find no written words, which would express the depth of my shame and sorrow for killing Mr. Faryabidoust. He was a man, he was a son, a husband, a father, and a grandfather, and above all, an innocent man. I thought myself to be a man, but in truth I didn't know what being a man was, but I did know how to willingly allow myself to be used to cover up my own ignorance.

It has been only through renewed faith in God and the many self help groups I have been involved in that I can face the world and myself. I give life back to Mr. Fayabidoust in the only way I know how, and that is by dedicating my life to do as much good I can do for others. Tonight I have come full circle, because I have put into written words what my heart and soul longed to reveal.

Please forgive me Mr. Faryabidoust.

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          3

B.    **Aggravating/Mitigating Circumstances:**

1.    **Aggravating Circumstances:**

-Prisoner had the opportunity to cease but continued with the crime.
-Murder was senseless and served no purpose in completing the crime.
-The victim was abused, tied, bound, and suffocated with a plastic bag.
-Rouse and his crime partner went to great lengths to avoid detection, they hid the body and phoned the car dealership to deflect suspicion regarding the victim's whereabouts.
-Murder was committed to prevent detection of another crime (Vehicle Theft)
-The prisoner actively planned and conspired to kill the victim and steal his car.
-The nature of the crime exhibited viciousness cruelty or callousness.

2.    **Mitigating Circumstances:**

Rouse had no prior adult arrest or conviction.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:**

Rouse states that he was placed on Probation for stealing a ring from a department store.

B.    **Adult Convictions and Arrests:**

The life crime is the only adult arrest or conviction.

C.    **Personal Factors:**

Rouse was born on June 9,1957 in Newark, New Jersey. He is the second of four children born to the marriage of Vernon Rouse and Vivian Rouse. His parents separated when Rouse was around nine years old and he had little contact with his father since that time. A year or so later, his mother relocated the family to North Carolina. Rouse dropped out of school in August 1976 when he was in the tenth grade to join the Job Corps.

III.  **POSTCONVICTION FACTORS:**

A.  **Special Programming Accommodations/Disability:**

None.

B.  **Custody History:**

04-11-79    Rouse was received, by the California Department of Corrections at the California Medical Facility (CMF).

05-23-79    Rouse was transferred to California Training Facility-Central (CTF-C).  On 5-23-79, Rouse was placed in MCU per 114D, stating that he was placed in MCU, due to the inmate or the general material in the central file that may be hazardous to the inmate or the general population.  On 6-6-79, Rouse appeared before CTF MCU–overflow pending evaluation into Gang affiliation and enemy information custody was increased to Max B.  On 6-13-79, Rouse appeared before MCC and he was released to the General Population.  On 6-21-79, Roused appeared before UCC, his custody was reduced to Medium A, and he was placed on the school waiting list.  On 11-23-79, Rouse was assigned as the laundry clerk and barber.  On 3-24-80, Rouse appeared before UCC for Initial Classification after returning from out to court from Alameda county, custody was reaffirmed at Medium A, and he was assigned as a Barber.  On 6-24-80, Rouse appeared for UCC for CSR referral for Transfer to San Quentin.

07-24-80    Rouse was transferred to Folsom.  On 7-30-80, Rouse appeared before Folsom UCC, his custody was reaffirmed at Medium A, and he was assigned to the Garage.  On 10-30-80, per 114D, Rouse was placed in Administrative Segregation due to possible involvement in the stabbing of an inmate Heffley B-93858.  On 11-4-80, ICC reviewed Rouse' case after placement in Administrative Segregation (Ad seg) pending investigation.  Rouse was released to the General Population after the investigation was completed deeming non-involvement.  On 12-3-81, Rouse appeared for his Annual Review, custody reaffirmed at Medium A and he received a work assignment to LPF (License Plate Factory) as a lead man.  On 6-1-82, Rouse appeared for Annual Review and he was assigned to ILP (Educational program).  On 3-8-83, Rouse appeared before UCC for transfer consideration; his case was referred to the CSR with recommendation for transfer to DVI.

3-23-83    Rouse was transferred to DVI.  On 3-25-83, Rouse appeared before UCC for Initial Classification and he was assigned to Education.  On 5-18-84, Rouse appeared before Post Board and he was assigned to PIA.  On 2-1-85, Rouse was reclassified in absentia for work assignment evaluation and as a result, he was assigned to Industries, with daytime hours only, due to being a lifer without a date.  On 5-23-86, Rouse appeared for Post Board; his case was referred to the CSR for transfer to California Men's Colony-East to attend therapy (Cat X).

ROUSE, NATHANIEL        C-03721        CSP-SQ        DECEMBER 2006        5

08-12-86    Rouse was transferred to CMC-East. On 8-26-86, Rouse appeared before UCC for Initial Classification and his case was referred to the CSR with recommendations to return to DVI upon completion of the Category X Program. On 9-30-86, Rouse was assigned to dietary services. On 3-24-87, Rouse's case was submitted to the CSR for return to DVI, due to completion of the Category "X" Program, and he was assigned to Vocational Welding.

05-14-87    Rouse was transferred to DVI. On 5-26-87, Rouse appeared before UCC for Initial Classification and he was assigned to Vocational Welding waiting list. On 7-17-87, Rouse was assigned to the Laundry. On 8-12-87, Rouse was assigned to the Laundry. On 8-12-87, Rouse received an assignment change from Pre-Vocational Welding to Vocational Welding. On 4-20-88, Rouse appeared for Annual Review and CSR referral to transfer to the California Medical Facility for Psychotherapy programming per BPT Recommendation. On 6-28-88, Rouse appeared for UCC again for transfer consideration. His case was referred CSR with recommendations to transfer to (CMF) California Medical Facility or California Men's Colony (CMC) per the Board of Prison Terms recommendations.

08-25-88    Rouse was received at San Quentin, custody was maintained at Medium A, and he was assigned to the PM Diet Kitchen.

08-24-89    Rouse was transferred back to DVI. On 8-30-89, Rouse appeared for Annual Review, and he was assigned to Industries waiting list. On 1-31-90, Rouse appeared before Post Board, his case was referred to the CSR for transfer to CMF. On 6-13-90, Rouse appeared before UCC for Post Board; his case was referred to the CSR again for recommendations for transfer to CMF or CMC.

07-25-90    Rouse transferred to CMC-East. On 8-2-90, Rouse appeared for Initial Classification, he was placed on the Academic/Vocational Waiting List. On 8-28-90, Rouse was assigned as a Hospital Porter. On 12-18-91, Rouse appeared for Post Board Review, and he was assigned to ABE II. On 5-13-92, appeared for Annual Review, his was assigned to Adult High School. On 4-14-93, Rouse appeared before UCC for a Program/Annual Review, his case was referred to the CSR for recommendations of a transfer to San Quentin or CTF, he was assigned to the Education Office.

05-03-93    Rouse was transferred to San Quentin. On 5-25-95, Rouse appeared for UCC for Initial Classification, and he was assigned to the Infirmary. On 8-2-94, Rouse was assigned to Food Service. Rouse appeared on 5-11-99, for Annual Review and he was assigned to Education as a clerk. On 11-23-99, Rouse appeared before UCC for Post Board Review; he was assigned to the Assignment Lieutenant's Clerk. On 8-8-01, subject appeared before the Board of Prison Terms, his parole was denied for one year. On 8-21-02, subject appeared before the Board of Prison terms for his parole hearing. On 8-28-02, subject appeared before UCC for Post Board, parole was granted pending governors' review. On 1-17-03, the Governor invoked his authority to reverse the Boards decision to grant parole. On 5-07-03 subject appeared for

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          6

Annual Review, and UCC elected to continue his present program. On 10-09-03 subject appeared before the BPT for his parole hearing. On 10-23-03 subject appeared before UCC for Post Board Review with no program changes noted. On 03-29-04 subject appeared before UCC for Post Board Review with no program changes noted. On 5-20-04 subject's case was reviewed in absentia by UCC for an Annual Review with no program changes noted. On 6-08-05 subjects case was reviewed in absentia by UCC for an Annual Review with no program changes noted. On 10-13-05 subject appeared before UCC for Post Board Review with no program changes noted. Rouse has remained disciplinary free, has 19 Points and Med A custody. He remains assigned as a clerk in the Assignment Lieutenants Office with excellent work supervisor reports.

C. **Therapy & Self-Help Activities:**

Self-Help and Therapy-

| Date | Activity |
|------|----------|
| 01-13-93 | Criminal Thinking |
| 01-20-95 | Pre Release/Reentry Video |
| 02-25-00 | Arts in Corrections |
| 03-19-99 | Arts in Corrections Volunteer |
| 04-08-98 | AVP-Training Co-facilitators Workshop |
| 04-09-92 | 8 week Anger Control Class |
| 04-10-00 | SQUIRES |
| 04-21-98 | (IEAC)-Inmate Educational Advisory Committee |
| 04-22-94 | Category X completion |
| 05-02-97 | AVP-Alternatives to Violence |
| 05-07-03 | SQUIRES |
| 05-21-03 | Milati Islami |
| 05-23-02 | SQUIRES |
| 05-23-02 | IMPACT |
| 05-23-05 | IMPACT- session 1- Relationships |
| 05-29-06 | KAIROS (server for retreat) |
| 05-29-98 | Basics Alternatives to Violence Workshop |
| 06-01-92 | 8 week Anger Control Class |
| 06-04-01 | SQUIRES |
| 06-10-92 | Anger Control |
| 06-23-92 | 8 week Reality and Decision Making |
| 06-27-05 | IMPACT- session 2- Relationship Dynamics |
| 07-01-05 To 09-30-05 | Responsibility, Rehabilitation and Restoration Roundtable |
| 07-03-03 | SQUIRES |
| 07-21-96 | Making it Work |

| 08-01-05 | IMPACT- session 3 Cultivating Successful Relationships |
|---|---|
| 08-07-01 | SQUIRES |
| 08-09-96 | Development of positive support systems |
| 08-09-96 | Development of Job Skills and Resources |
| 08-22-97 | AVP-Advanced Alternatives to Violence |
| 08-24-92 | Criminal Thinking |
| 08-28-92 | Participation in a study |
| 09-01-92 | 8 week Rational Behavior Training Group |
| 09-08-97 To 09-15-97 | Communication Training |
| 09-26-05 | IMPACT- Facilitator, session 4 Specific Relationships |
| 10-06-99 | (SQUIRES)San Quentin Utilization of Inmate Resources Experience Studies |
| 10-09-90 | Anger Control |
| 11-10-92 | Labach Literacy Tutor Certification |
| 11-18-91 | Reality and Decision Making |
| 12-15-93 | Self Esteem Enhancement |
| 12-18-86 To 03-04-87 | Category X Program |
| 3-96 | HIV Peer Education |
| Un dated | Transcendental Meditation |

Education:

| Date | Activity/Class/ Certificate/ Etc. |
|---|---|
| 08-15-88 | Welding Certificate |
| 10-19-92 | GED |
| 07-15-96 | Sociology |
| 10-1-96 | Sociology |
| 12-30-96 | American History |
| 06-25-97 | Psychology |
| 09-08-97 | English |
| 04-22-98 | Philosophy |
| 05-03-98 | Intro into Literature |
| 09-08-98 | Ethics |
| 12-17-98 | Art |
| 01-05-99 | Literacy |
| 01-08-99 | Microsoft Word, Excel and File maker Training |
| 04-27-99 | Computer Literacy |
| 05-05-99 | American Government |
| 01- 08-99 | Computer Literacy Assistant Teaching |
| 09-28-99 | Computer Design |

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          8

| 11-10-99 | Algebra |
| 01-18-00 | History |
| 01-18-00 | Literary Studies of the Bible |

Rouse received his Associate of Liberal Arts Degree in 2002 from Patten College.

Laudatory:

| Date | Chrono |
|------|--------|
| 01-02-89 | PIA |
| 02-24-94 | Work |
| 02-28-94 | Work Infirmary |
| 06-09-97 | Work Education |
| 03-01-87 | Vocational Welding II |
| 05-06-97 | Work Education |
| 07-23-98 | Laudatory Library |
| 07-30-99 | Work |
| 09-01-99 | Work |
| 12-26-00 | Work Education |
| 01-30-01 | Work Ethics |
| 08-02-01 | Muslim Program -Volunteer |
| 12-28-01 | Laudatory |
| 08-07-01 | Inmate Assignment Work Skills |
| 06-11-02 | Work Skills |

D.    **Disciplinary History:**

| Date | Document | Charge | Disposition |
|------|----------|--------|-------------|
| 03-27-79 | CDC 128 A | Staff manipulation | Not Applicable |
| 09-30-91 | CDC 128 A | Failure to Report | Not Applicable |
| 10-31-88 | CDC 128 A | Refusal to Work | Not Applicable |

IV.    **FUTURE PLANS:**

A.    **Residence:**

Rouse plans to reside with his fiancé, Pamela D. Williams.
585 Douglas Avenue
Oakland, CA 94603
(510) 568-5597

Rouse has a back up plan.

Rouse plans to reside with his sister in law, Jewel Showers.
800 Hills Dale Avenue, Apt. 514
San Jose, CA 95136
(408)445-8598

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          9

**Employment:**

Rouse has many options for employment. He is a Certified Welder, he is skilled in clerical work, Microsoft, Excel and Data Entry, he is also a Certified Literacy Tutor. He earned his Associate of Liberal Arts Degree while incarcerated. Rouse is interested in Counseling Youth when he paroles. Rouse should have no difficulty finding employment as his work reports while incarcerated have all showed him to excel in any position he has been assigned to.

## V.    SUMMARY:

A.    Rouse has made exceptional adjustment to his incarceration. His work reports continue to be exceptional in nature. He continues to maintain professional relationships with staff and inmates. Rouse has utilized his incarceration to reflect on his actions, improve himself Spiritually, Educationally and Vocationally. He gives back to society with his involvement in the SQUIRES program and he utilizes his life experiences to try to deter troubled youth from following a similar path. Rouse has remained disciplinary free for many years and he has a positive outlook on life. Rouse accepts full responsibility for his crime and expresses sincere remorse for his actions. Despite Rouse's disappointment of the Governor reversing the Board of Prison Terms Decision to release him on parole, he maintains a positive outlook and continues to program positively. Prior to his release from prison, Rouse would benefit by continuing his positive programming and remaining disciplinary free.

B.    This report is based on a through review of the Central File and a personal interview with Rouse.

C.    Rouse was afforded the opportunity to conduct an Olsen review of his Central file on 09-20-06 and the Chrono reflecting this review was placed in the central file.

D.    No accommodations were required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

V. Zanni CCI          9/20/06
V. Zanni CCI
Correctional Counselor I


K. Hilliard CCII(A)
Correctional Counselor II


C. Belshaw CC III
Correctional Counselor III, C&PR

ROUSE, NATHANIEL          C-03721          CSP-SQ          DECEMBER 2006          11

STATE OF CALIFORNIA
BOARD OF PRISON TERMS
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☐ PAROLE CONSIDERATION HEARING
☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-31-05 To 08-31-06 | | | **Placement:** San Quentin II, General Population, North Block. **Custody/Classification:** Medium A, Classification Score 19 points. **Academics:** None noted in this time frame. **Work Record:** Assigned as the Assignment Lieutenants Clerk. With exceptional work supervisor reports. **Group Activities:** 07-01-05 to 09-30-05 responsibility, Rehabilitation, and Restoration Roundtable, 08-01-05 IMPACT, 05-29-06 KAIROS. **Psychiatric Treatment:** None noted. **Prisoner Behavior:** Excellent remains disciplinary free. **Other:** None. |
| 09-01-06 TO Present 09-18-06 | | | **Placement:** San Quentin II, General Population, North Block. **Custody/Classification:** Medium A, Classification Score 19 points. **Academics:** None. **Work Record:** Assigned as the Assignment Lieutenants Clerk. With exceptional work supervisor reports. **Group Activities:** None. **Psychiatric Treatment:** None. **Prisoner Behavior:** Excellent remains disciplinary free. **Other:** None. |

CORRECTIONAL COUNSELOR SIGNATURE        DATE 9-18-06

_Wlamni CCI_

STATE OF CALIFORNIA
BOARD OF PRISON TERMS

ORDER:
☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed conditions affirmed.
☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

ROUSE, NATHANIEL        C03721        CSP-SQ        DECEMBER 2006

PAGE 1 OF 1

BPT 1004 (REV 7/86)

# EXHIBIT "C"

ROUSE, Nathaniel            C-03721            January 20, 2004

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## JANUARY 2004 LIFER HEARING
## SAN QUENTIN PRISON

This report of a psychiatric evaluation was prepared by the undersigned for the purpose of the Board of Prison Terms Lifer Hearing. Mr. Rouse is a 46 year old, African-American male first termer serving a 7 year to life sentence for first degree murder. The index offense occurred on 3-31-78. Mr. Rouse entered into the CDC at on 4-11-79. The following report is based on a detailed review of his medical records and central file and a 1 hour interview with the inmate on 1-6-04. Prior to my interview with Mr. Rouse, I informed him of the lack of confidentiality of the assessment. He indicated he understood this issue and agreed to proceed with the evaluation. I respectfully reserve the right to change or modify my opinion should pertinent records become available in the future.

Mr. Rouse's psychosocial history may be obtained from previous reports (please refer to Dr. Dupre's note dated 9-9-99) and will not be restated here.

### Clinical Assessment

XII.    Current Mental Status/Treatment Needs.  The inmate was alert, appropriately groomed in inmate attire and cooperative and engageable throughout the interview. His eye contact was good. His speech was normal in rhythm, rate and prosody. He evidenced no unusual motor mannerism. His mood was "okay". His affect was euthymic. His thought process was linear and coherent. He showed no evidence of psychosis, a thought disorder, paranoid ideation or delusions. He denied suicidal or homicidal ideation, auditory or visual hallucinations. His insight and judgement were good. His cognition was intact.

Diagnosis:
Axis I: none
Axis II: deferred
Axis III: none
Axis IV: incarceration
Axis V: 75

ROUSE, Nathaniel                    C-03721                    January 20, 2004

XIII.    Review of Life Crime. Mr. Rouse demonstrates significant remorse about his crime. Through his detailed description of the crime and his emotions associated with the incident, he indicates he has put some considerable thought into his actions and the character traits that led to his current incarceration. Mr. Rouse states that he had simply reduced the life of another person to the value of a car. Through his participation in several self help groups and his own private thinking, he believes his actions were the result of a motivation "to not be like his father". His father mistreated his mother by cheating on her and physically hitting her on one occasion. Mr. Rouse had a poor relationship with his father whom he felt treated him differently from his siblings. His felt his father emotionally neglected him. Mr. Rouse "decided I would not treat my woman that way".  He did not want to disappoint his girlfriend at the time who expressed a need for a car. Mr. Rouse was careful not to appear as if he was blaming his girlfriend. He states that he takes full responsibilty for the crime and did not want to specifically talk about his girlfriend's influence on the crime. He says he did not have an understanding of limits to guide him in his behavior. He clearly recalls the man's face before he died and remembers him uttering the word "no". Mr. Rouse says he often sees the image of his face and the word "no" repeatedly. Although he sees the face less often, he can't erase them from his mind. He states that these memories serve to remind him of the past and help him to continue to be the "best person I can be". He says he does not know how to honor the victim except by "being the best person I can be". Mr. Rouse says the victim has changed his life. He did not understand the permanency of death until this incident. No whe realizes that life is "one of the most precious gifts". When asked how he has changed, he says he has "learned what motivates me". He also now realizes that he will "have to pay for things I do/don't do for people in the end" Recently, the Counselor asked him to write out his crime. Although Mr. Rouse was initially unhappy about this request, he now says "it was a good thing because it made me think about it again". In this process of looking back at the crime and into himself, he says he keeps asking himself "why didn't I follow my heart and not my mind". Mr. Rouse says he knew in his heart it was the wrong thing to do but did not stop because of a misguided motivation to "not be like my father".

    XIV.    Assessment of Dangerousness. Please note that the following is a violence risk assessment and cannot be used to predict future dangerousness with complete accuracy. The undersigned uses the information in this evaluation to identify risk factors associated with violence. However, violence is a product of a specific individual in a specific situation.  An individual's risk of violence moves along a spectrum based on an interaction of static factors such as specific individual character traits and dynamic factors such as environmental supports and influence of substances.

ROUSE   C-03721                    San Quentin                    1/20/04

ROUSE, Nathaniel              C-03721              January 20, 2004

     Mr. Rouse has a few risk factors associated with future violence including male gender and a history of violent behavior. However, he has more protective factors that reduce his risk of future violence including absence of prior legal history (except for one incidence as a juvenile involving stealing a ring), absence of childhood physical or sexual abuse, absence of substance abuse and absence of mental illness. Mr. Rouse's participation in various self-help groups including Anger Management, Squires and Impact and his practice of the Muslim religion since 1986 demonstrate a willingness and desire to examine and change his self defeating character traits. Mr. Rouse's own detailed description of his thought process about the crime and himself indicate he is remorseful and has insight into himself and his behavior. He appears to have changed some of the self defeating character traits that led to his current incarceration. He has been free of disciplinary actions except for one 128 action in 1979 and he received an outstanding laudatory chronos for his work in 10-01-03. Furthermore, Mr. Rouse has a stable and supportive extended family that will assist him in dealing with life stressors if paroled. If paroled, Mr. Rouse plans to live with his mother-in-law and work as a mechanic or welder. He also plans to continue participation in Squires and Impact. Based on these factors, Mr. Rouse's risk of future violence is placed in the low range as compared to the average inmate.

XV.    Clinician Observation/Comments/Recommendations.

There is no evidence of psychosis, major affective disorder, anxiety or cognitive deficits in Mr. Rouse. His record during his years of incarceration reflects an inmate who has made progressively positive changes in maturation. He has acquired job skills that he reportedly applies extremely well within the workplace setting. Furthermore, he has a stable support system willing to help him when he is released to the community. As stated previously, his violence potential is judged to be low. Case factors other than psychiatric factors should be considered in granting him parole. The undersigned recommends that Mr. Rouse continue to pursue enhancement of his vocational skills and education and participation in self-help groups in order to continue with the positive changes he has made within himself as well as to better prepare him for a successful life outside of this institution.

A. KUO, M.D.
Psychiatry Fellow

# EXHIBIT "D"



# OFFICE OF THE GOVERNOR

January 17, 2003

<u>VIA FACSIMILE AND U.S. MAIL</u>

Mr. Nathaniel Rouse, C-03721
*California State Prison at San Quentin*
3 North – 68L
P. O. Box C-03721
San Quentin, California 94974

Dear Mr. Rouse:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Prison Terms concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to <u>reverse</u> the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Prison Terms.

Sincerely,

BARRY P. GOODE
Secretary of Legal Affairs

cc: Ms. Carol A. Daly, Chairperson
The Board of Prison Terms

GOVERNOR GRAY DAVIS • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

NATHANIEL ROUSE, C-03721
FIRST DEGREE MURDER

NO ACTION: _____

MODIFY: _____

REVERSE: _____X_____

On March 31, 1978, Nathaniel Rouse, then 20, and his girlfriend, Marian Thorpe, went for a test drive in a vehicle from a small used car lot. The owner of the lot, Rooholah Faryabidoust, accompanied them.

Ms. Thorpe later called Mr. Faryabidoust's business and stated that Mr. Faryabidoust had dropped her and Mr. Rouse off and that they would come by the business later to purchase the vehicle. A few hours later, Ms. Thorpe called again to say that they had changed their minds and would not return to purchase the car. When Mr. Faryabidoust did not return after several hours, the police were called.

The next day, Mr. Rouse pawned Mr. Faryabidoust's watch. Mr. Rouse and Ms. Thorpe were arrested on April 4, 1978, with Mr. Faryabidoust's property, including the car, in their possession.

On April 5, 1978, Mr. Rouse gave a taped statement to police regarding the disposal of Mr. Faryabidoust's body. The body was discovered in a field on April 17, 1978. Mr. Faryabidoust's hands were bound behind his back with rope and tape, and his head was covered with two pieces of plastic secured by electrical cords wrapped around the neck. The cause of death was severe blunt trauma to the head and face.

Mr. Rouse was charged with murder with special circumstances, robbery, kidnapping, and automobile theft. He pled guilty to one count of first degree murder. The other charges were dismissed. He was sentenced to a term of seven years to life in prison.

Mr. Rouse did not have a prior adult criminal history and he has made gains during the more than 24 years that he has been in prison. He has obtained his GED and an

Associate of Arts degree. He has participated in a number of therapy and self-help programs, and he has received laudatory reports for his work, education and volunteer activities. This progress, however, continues to be overshadowed by the factors that demonstrate that Mr. Rouse is not suitable for parole at this time.

This was a horrible, senseless, premeditated murder, in which the owner of a small business was brutally beaten, tied, bound, and suffocated with a plastic bag to avoid detection for the stealing of a car. Mr. Rouse and his crime partner traded a man's life for a car. They showed no remorse after the murder, hiding the body to avoid detection, calling the businessman's company twice to deflect suspicion regarding his whereabouts, pawning his watch, and using his car and credit cards. The murder was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering.

At the time of sentencing on April 4, 1979, the judge made the following statement:

> This is one of the most brutal cases that this Court in its long experience in court has ever encountered. It was a particularly brutal crime. It was, in the Court's opinion, a planned crime. It is just an utter and complete senseless taking of the life of a good human being.

> Now there is a possibility of this man getting a parole and this Court cannot do anything about the sentence of Miss Thorpe, who is going to be sentenced right after Mr. Rouse, but I am going to tell you, Mr. Rouse, that if there is anything that I can do to prevent your parole, the Court is going to do it. There appears to be in this case no mitigating circumstances whatsoever.

This is a situation in which the circumstances of the offense are clearly more aggravated or violent than the minimum necessary to sustain a conviction for first degree murder. Not only was this murder premeditated and committed in the course of a robbery, it was a particularly brutal crime. Moreover, Mr. Rouse and his crime partner showed no remorse for the crime after it occurred and instead attempted to cover up the crime and pawned the victim's property and used his car and credit cards.

In addition, Mr. Rouse's gains are relatively recent. Mr. Rouse did not participate in therapy and self-help for the first 12 years of his incarceration. It was not until 1995 that he admitted that the murder was premeditated, and not until 1997 that the BPT panel presiding over his parole consideration hearing felt that he was being honest with them. In 1995, Presiding Commissioner Guaderrama told Mr. Rouse,

"[Y]ou need to go back and read all of the transcripts and make some sense out of all the information that's in it and try to reconcile the life offense because you've told so many lies and every transcript is different in terms of what you told the people on the panel." In 1997, Presiding Commissioner Bentley stated, "[W]e really appreciated that you were honest with us today. That's very important. It has taken you a long time to do that." Mr. Rouse acknowledged, "Very long time." The Deputy District Attorney opposed Mr. Rouse's parole in 2002 in part because Mr. Rouse's insight is "new and of recent vintage" and because he believes Mr. Rouse "needs an additional period of incarceration to demonstrate that he can maintain these gains in prison over a longer period of time." I agree that Mr. Rouse needs to be honest and consistent in describing his role in the murder for a longer period of time before he will be suitable for parole.

I am also concerned that Mr. Rouse's parole plans are not realistic. He has a residential offer in San Jose and a job offer in Berkeley. I disagree with Mr. Rouse's attorney's statement that the residential and job offers are within realistic commuting distance for Mr. Rouse. A commute of over one-hour each way by public transportation would be a tremendous additional stress factor for a person already burdened with making a difficult transition into society after a 19-year incarceration. Mr. Rouse needs to have residential and employment offers in the same community, or even neighboring communities, for his parole plans to be realistic.

Each of the factors identified above demonstrates that Mr. Rouse would pose a significant risk of danger to society if released on parole. Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Rouse.


Decision Date: _Jan 17, 2003_            _Gray Davis_

                                         GRAY DAVIS
                                         Governor

# EXHIBIT "E"

Red March 6.006



# OFFICE OF THE GOVERNOR

March 3, 2006

*Via Facsimile and U.S. Mail*

Mr. Nathaniel Rouse, C-03721
*California State Prison – San Quentin*
3N – 68
CDC# C-03721
San Quentin, California  94974

Dear Mr. Rouse:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case.  The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail.  Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

Attachment

cc:  Board of Parole Hearings (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**NATHANIEL ROUSE, C-03721**
**FIRST-DEGREE MURDER**

AFFIRM:                    _____

MODIFY:                    _____

REVERSE:                   ____X_____

On March 31, 1978, 20-year-old Nathaniel Rouse intentionally beat to death 49-year-old Rooholah Faryabidoust to steal a car.

Earlier that week, Mr. Rouse and his girlfriend Danielle Blake (a.k.a. Marion Thorpe) devised a plan to go to a car dealership, test-drive a car, and kill the dealership employee who rode along with them in order to steal the car. On the day of the murder, the two carried out their plan.

Mr. Rouse and Ms. Blake took a Monte Carlo from a small used-car lot in Oakland for a test-drive. The owner of the lot, Mr. Faryabidoust, accompanied them. As Mr. Rouse drove, Ms. Blake rode in the front passenger seat and Mr. Faryabidoust in the back. At some point, Mr. Rouse pretended the car was not running well and pulled the car to the side of the road. He then got into the back seat with Mr. Faryabidoust and Ms. Blake drove. Mr. Rouse subsequently used his hands to hit Mr. Faryabidoust until he was unconscious, and then used Mr. Faryabidoust's belt to tie his hands behind his back.

Ms. Blake and Mr. Rouse later stopped at an abandoned gas station where Mr. Rouse used rope that he found to replace the belt tying the victim's hands. When Mr. Faryabidoust started moving, Mr. Rouse struck him with his hands until he stopped.

After discussing with Ms. Blake how to kill Mr. Faryabidoust, Mr. Rouse walked to a nearby store where he bought an extension cord and got a plastic bag. He subsequently tied the cord around Mr. Faryabidoust's neck and put him in the trunk. Mr. Rouse and Ms. Blake then drove around, ultimately dumping Mr. Faryabidoust in a field before pawning his watch and using his credit cards.

Mr. Rouse and Ms. Blake were arrested days later in King City. Mr. Faryabidoust's body was later recovered from a field in Antioch. When found, his hands were bound behind his back with rope and tape, and his head as covered with plastic secured by an extension cord wrapped around his neck. The cause of death, as reported in the District Attorney's letter to the probation officer, was severe blunt trauma to the head and face.

Mr. Rouse was charged with murder with special circumstances, robbery, kidnapping, and auto theft. He had no other criminal record at the time and, under a plea agreement, pled guilty to

Nathaniel Rouse, C-03721
First-Degree Murder
Page 2

first-degree murder in exchange for the other charges against him being dismissed. He was
sentenced to an indeterminate life term in prison for Mr. Faryabidoust's murder.

In prison, Mr. Rouse has been counseled a handful of times for minor misconduct, the most
recent incident occurring in the mid-1990s, and he has never been disciplined for any acts
involving violent or assaultive behavior. He has upgraded himself educationally by earning his
GED in 1992 and an Associate of Arts degree in 2002. He also has completed communications
and computer training, participated in Literary Studies of the Bible, completed vocational
welding, became a certified computer operator, and has held various skilled jobs within the
institutional setting. He has availed himself of an array of therapy and self- help, including
Category X , Alcoholics Anonymous, Narcotics Anonymous, Anger Control Group, Criminal
Thinking Group, Kairos Men's Retreat, 12 Step Program, Transcendental Meditation, HIV Peer
Educator Training Program, Advanced Alternatives to Violence, and Reality and Decision
Making. He has actively participated in working with other inmates and at-risk kids through the
SQUIRES, IMPACT, and T.R.U.S.T. Fellows programs, and he has received favorable reports
and evaluations from various correctional and mental-health professionals.  He has maintained
family ties, has confirmed housing arrangements with his sister-in-law in Alameda, the county to
which the Board approved his parole, and has a viable offer for employment with California
Building and Development.  These are all factors supportive of Mr. Rouse's release from prison
to parole.

Despite his institutional efforts and gains, however, the nature and atrocious circumstances of the
murder Mr. Rouse committed cannot be overlooked.  Mr. Rouse and his accomplice took a car
for a test-drive with the intent of stealing it and murdering Mr. Faryabidoust.  By his own
admission, which he presented in the form of a written statement to both the 2002 and the 2005
Board, Mr. Rouse said he reduced the value of a man's life to that of a car. He also told the 2005
Board that, when carrying out the murder plan, "the idea was not to have any witnesses."
Whether the motive for killing Mr. Faryabidoust was to steal a car, a materially less significant
reason than those that conventionally drive one to commit premeditated murder and/or was for
the purpose of eliminating a witness, a special circumstance that can elevate a murder sentence to
a death sentence, either make the first-degree murder for which Mr. Rouse was convicted
especially grave.  And this factor alone is enough for me to conclude presently that Mr. Rouse
would pose an unreasonable public-safety risk if release from prison.

Moreover, at his 2002 parole hearing, Mr. Rouse admitted that he beat Mr. Faryabidoust with his
hands—despite Mr. Faryabidoust's pleas for mercy—demonstrating an exceptionally callous
disregard for human suffering. He also described his attack as a "fight" because
"[Mr. Faryabidoust] made an attempt to stop me from hurting him." Moreover, when
Mr. Faryabidoust continued to move and moan, Mr. Rouse not only beat him again but put
plastic over his head and tied an extension cord. When asked by the 2002 Board whether
Mr. Faryabidoust was dead when he did this, Mr. Rouse admitted that he did not know but
wanted to ensure his death. At Mr. Rouse's sentencing, the judge commented on the record that
"This is one of the most brutal cases that this Court in its long experience has ever encountered.
It was a particularly brutal crime ... It is just an utter and completely senseless taking of the life

Nathaniel Rouse, C-03721
First-Degree Murder
Page 3

of a good human being. Now there is a possibility of this man getting a parole ... but I am going to tell you, Mr. Rouse, that if there is anything that I can do to prevent your parole, the Court is going to do it. There appears to be in this case no mitigating circumstances, whatsoever." Although Mr. Rouse has admitted since after his arrest to killing Mr. Faryabidoust, and he today says that he accepts responsibility and is remorseful for what he did, his version of events has changed substantially over the years. In 1979, he claimed that the murder occurred after Mr. Faryabidoust attacked him. Mr. Rouse told a probation officer at that time that he was trying to administer cardiopulmonary resuscitation Mr. Faryabidoust, whom he said had a bad heart and was slumped over, and that Mr. Faryabidoust misunderstood and attacked him. In a prison interview with a correctional counselor in 1984, Mr. Rouse "was unable to explain exactly why [the murder] occurred" and "had no intentions of murdering the victim." According to a 1994 mental-health evaluation, Mr. Rouse killed Mr. Faryabidoust, unintentionally, while trying to defend his girlfriend from Mr. Faryabidoust's strange behavior. It was not until 1995 when Mr. Rouse finally admitted to a correctional counselor that the murder itself was premeditated, although the manner in which it was committed was not. Mr. Rouse admitted to the 2005 Board that he felt no remorse until 1986—approximately eight years after the murder—for what he had done to Mr. Faryabidoust.

At age 48 now, Mr. Rouse has made some progress. But some of his gains are too recent to tip the scales toward parole suitability. And after carefully considering the very same factors the Board must consider, I find that the gravity of the first-degree murder Mr. Rouse committed presently outweighs any positive factors tending to support his parole. Accordingly, because I believe he would pose an unreasonable risk of danger to society if paroled at this time, I REVERSE the Board's 2005 decision to parole Mr. Rouse.

Decision Date: 2/22/06

ARNOLD SCHWARZENEGGER
Governor, State of California

# ATTACHMENT "1"

FILED

JAN 1 2 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____ Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re

    DONNELL E. JAMEISON,

On Habeas Corpus

No.: 71194

POST FINDINGS AND ORDER
FURTHER DISCOVERY ORDER

Factual Findings

    Based upon the evidence presented at the hearing, the Court makes the following factual findings:

    1) During the months of October through December of 2003 the Board conducted 470 parole suitability hearings.  For all of the 470 inmates considered, the Board determined at those hearings or in prior hearings that the commitment offense was 'exceptional' under $2402(c)(1)$.[1]

    2) The number of cases examined (470) is a statistically significant sample from which conclusions can be extrapolated for the entire year and for several years before and after.

---

[1] In over 90% of cases the inmates were denied parole at that hearing and the 'exceptional' nature of the commitment offense was a basis for that decision. In the remaining 10% of cases, inmates had been denied parole at a previous hearing in which the commitment offense was also found to be 'exceptional.'

1

3)  The number of cases examined (470) is statistically sufficient to make conclusions about a population of 20,000, and thus the actual population of all inmates serving life sentences and currently subject to the Board's interpretation of § 2402(c)(1).[2]

Discussion

The applicable law is articulated in the following passage from *Dannenberg*, explaining its holding in *Rosenkrantz*:

> [In *Rosenkrantz*] we cautioned, sole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date "shall normally be set" under "uniform term" principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, "for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 683.) Quoting *In re Ramirez* (2001) 94 Cal.App.4th 549, 570, we suggested that, in order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should "normally" be granted, an offense must be "particularly egregious" to justify the denial of parole. (*Rosenkrantz, supra*, at p. 683.)
>     (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095. See also *In re Weider* (2006) C.D.O.S. 11137, D.A.R. 15795, LEXIS 1916, quoting this language.)

Thus, the general rule is that a parole date should normally be set. Using the crime itself as grounds for a parole denial is permissible but should not "swallow" that rule. While there does not need to be intra case comparison for the purposes of assuring proportionality, or uniformity, of the sentence, the requirement that "an offense must be 'particularly egregious' to justify the denial of parole" necessarily envisions some sort of comparison. It is for

---

[2] Professor Kafai testified that a "sample size of 470 would [] still be a reliable sample" for "a population of 20,000." (TX at p. 51.) According to the Board's official website (www.corr.ca.gov) there are 20,916 inmates serving life sentences as of the June 30, 2006, "Prison Census." Since not all of those inmates are currently eligible for parole hearings it can safely be said that there are less than 20,000 inmates who could possibly come before the Board for parole hearings as are at issue here

1  this reason that it was essential to the *Dannenberg* holding that "the

2  regulations do set detailed standards and criteria for determining

3  whether a murderer with an indeterminate life sentence is suitable

4  for parole." (*Dannenberg* at p. 1080.  See also page 1096, footnote

5  16: "the Board must apply detailed standards when evaluating whether

6  an individual inmate is unsuitable for parole on public safety

7  grounds.")

8      Admittedly, the Board's decision making processes, guided by the

9  "detailed standards and criteria" need not be so regimented that

10  different panels may not see *some* cases differently. However, if the

11  § 2402(c)(1) factor truly constitutes an exception to the rule, then

12  there must be a substantial number of cases to which the exception

13  does not apply. The fact that 100% of cases are deemed to be

14  'exceptionally egregious' in the findings of the Board reveals not

15  only a mere violation of the rule that a parole date shall normally

16  be set, but also that the "detailed standards and criteria" are being

17  applied in such a way that they have no meaning whatsoever.

18      In formulating a proper remedy in this case, it must be noted

19  that the sample/point estimate from 2003 may not be ~~not~~ valid for

20  drawing conclusions about the behavior of the Board today.  With a

21  different Governor, and different commissioners, there may have been

22  some effort to apply the § 2402(c)(1) criteria in a meaningful (as

23  opposed to blanket) manner.  It therefore appears that a more recent

24  sampling is necessary to definitively and conclusively resolve the

25  issue before the court.  Absent this determination, there is no way

26  to guarantee that an order requiring the Board to conduct a new

27  hearing will ensure due process or provide any real solution at all.

28      The significance of the question before the Court cannot be

3

1  overstated.  If Petitioner proves, as it so far appears, that the

2  Board has uniformly applied § 2402(c)(1) to deny parole in every

3  case, Petitioner will have also proved the invalidity of the Board's

4  supposedly "detailed standards" and the existence of a bias which

5  permeates the Board's processes.

6      Because of the far reaching implication of these findings and

7  conclusions, the Board shall have every opportunity to demonstrate

8  good faith efforts to operate within the "detailed standards"

9  mandated by the California Supreme Court.[3]  Respondent shall

10  therefore provide discovery, in the same manner as already provided,

11  for the month of June 2006.

12  Separation of Powers

13      Counsel for Petitioner has indicated that he will seek a court

14  order that Petitioner be released on parole if this Court invalidates

15  the Board's criteria and methods and decides to independently review

16  the matter guided by the controlling Penal Code sections instead of

17  the Title 15 guidelines.  Respondent has objected "it's a separation

18  of powers issue for a petitioner to ask the Court to grant him

19  parole."  Respondent has correctly identified the issue presented,

20  and the question should be fully briefed.

21      The separation of powers doctrine provides "that the legislative

22  power is the power to enact statutes, the executive power is the

23  power to execute or enforce statutes, and the judicial power is the

24  power to interpret statutes and to determine their

25  constitutionality."  (*Lockyer v. City and County of San Francisco*

26

27  [3] Along these lines, Respondent may want to have the Commissioners themselves offer
an explanation for the evidence thus far gathered.  Because the Board performs a
"quasi-judicial function" in this regard, (*Hornung v. Superior Court* (2000) 81

28  Cal.App.4th 1095, 1099,) Petitioner may not inquire into the Board members mental
processes.  However that does not mean Respondent is precluded from offering such
direct evidence if they want to testify as to their good faith and conscientious
efforts.

1  (2004) 33 Cal.4th 1055, 1068.)  If the evidence proves that the Board

2  is not executing/enforcing the legislature's statutes as intended it

3  will be the court's duty to intervene.  The question to be answered

4  in that case is whether the Board is violating the separation of

5  powers doctrine by appropriating to itself absolute power over parole

6  matters and disregarding the limits and guidelines placed by the

7  statute.[4]

8       "Government Code section 11342.2 provides: 'Whenever by the

9  express or implied terms of any statute a state agency has authority

10  to adopt regulations to implement, interpret, make specific or

11  otherwise carry out the provisions of the statute, no regulation

12  adopted is valid or effective unless consistent and not in conflict

13  with the statute and reasonably necessary to effectuate the purpose

14  of the statute.'  Administrative regulations that alter or amend the

15  statute or enlarge or impair its scope are void and courts not only

16  may, but it is their obligation to strike down such regulations."

17  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

18  Cal.App.4th 1315, 1341, citations omitted.)

19       The vice of overbroad and vague regulations such as are at issue

20  here is that they can be manipulated, or 'interpreted,' by executive

21  agencies as a source of unfettered discretion to apply the law

22  without regard to the intent expressed in the legislature's enabling

23  statutes.  In short, agencies may usurp unlimited authority from

24  vague regulations and become super-legislatures that are

25

26  [4] "It is settled that Administrative regulations that violate acts of the
    Legislature are void and no protestations that they are merely an exercise of
    administrative discretion can sanctify them.  They must conform to the legislative
27  will if we are to preserve an orderly system of government.  Nor is the motivation
    of the agency relevant: It is fundamental that an administrative agency may not
    usurp the legislative function, no matter how altruistic its motives are."
28  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
    Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
    San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

5

1 unaccountable to the people.  As it has sometimes been framed and

2 addressed in the case law, a vague or all encompassing standard runs

3 the risk of "violat[ing] the separation of powers doctrine by

4 'transforming every [executive decisionmaker] into a "mini-

5 legislature" with the power to determine on an ad hoc basis what

6 types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

7 (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

8 *(Caswell)* 1988) 46 Cal.3d 381, 402.)

9     "It is concern about 'encroachment and aggrandizement,' the

10 [United States Supreme Court] reiterated, that has animated its

11 separation of powers jurisprudence.  'Accordingly, we have not

12 hesitated to strike down provisions of law that either accrete to a

13 single Branch powers more appropriately diffused among separate

14 Branches or that undermine the authority and independence of one or

15 another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

16 472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

17 382.)

18     This articulation of the principle seems to speak directly to

19 the situation at hand.  The Board, by its enactment and

20 interpretation of Title 15, § 2402, has appropriated to itself

21 absolute and unreviewable power over parole decisions for inmates

22 serving life terms.  Extending far beyond the letter and spirit of

23 the Penal Code provisions, Title 15, § 2402, gives the Board the

24 power to declare every crime sufficient to deny parole forever.

25 "[I]t is an elementary proposition that statutes control

26 administrative interpretations."  (*Ohio Casualty Ins. Co. v.*

27 *Garamendi* (2006) 137 Cal.App.4th 64, 78.) Title 15 § 2402 as applied,

28 however, has no controls or limitations.

1    The PC § 3041(b) exception to the rule that parole shall be

2  granted can only be invoked when the "gravity of the current

3  convicted offense or offenses, or the timing and gravity of current

4  or past convicted offense or offenses, is such that consideration of

5  the public safety requires a more lengthy period of incarceration for

6  this individual."  The word "gravity" is a directive for comparison

7  just as "more lengthy" indicates a deviation from the norm.  While

8  *Dannenberg* held there does not need to be intra case comparison for

9  the purposes of term uniformity or proportionality, there necessarily

10 has to be some sort of comparison for the purposes of adhering to the

11 legislative mandate that parole is available.  The evidence so far

12 presented strongly supports a finding that the Board employs no

13 meaningful yardstick in measuring parole suitability.  This would be

14 a violation of the separation of powers doctrine.  (*People v. Wright*

15 (1982) 30 Cal.3d 705, 712-713.  And see *Terhune v. Superior Court*

16 (1998) 65 Cal.App.4th 864, 872-873.)

17 Due Process Considerations

18    The same evidence shows a fundamental violation of due process.

19 Although the Board's Title 15 criteria are not on par with

20 legislative enactments, there is no reason a vagueness challenge,

21 such as has been presented in this case, should not be analyzed

22 identically.  When distinguishing between murders for purposes of the

23 death penalty the United States Supreme Court has stated: "Our

24 precedents make clear that a State's capital sentencing scheme also

25 must genuinely narrow the class of persons eligible for the death

26 penalty.  When the purpose of a statutory aggravating circumstance is

27 to enable the sentencer to distinguish those who deserve capital

28 punishment from those who do not, the circumstance must provide a

1 principled basis for doing so.  If the sentencer fairly could

2 conclude that an aggravating circumstance applies to every defendant

3 eligible for the death penalty, the circumstance is constitutionally

4 infirm."  (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard*

5 *v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating

6 circumstance that 'an ordinary person could honestly believe'

7 described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420,

8 428-429: "A person of ordinary sensibility could fairly characterize

9 almost every murder as 'outrageously or wantonly vile, horrible and

10 inhuman.'")

11    The evidence here demonstrates the lack of any "principled

12 basis" for distinguishing between cases.  It has been shown that the

13 Board has applied the criteria in a way that results in finding that

14 "an aggravating circumstance applies to every defendant eligible" for

15 parole.  There is no demonstration of any effort by the Board to

16 narrow the group of inmates who may be denied parole because of their

17 parole eligible crime.

18    In the same vein, the United States Supreme Court has also

19 stated: "In evaluating a facial challenge to a state law, a federal

20 court must, of course, consider any limiting construction that a

21 state court or enforcement agency has proffered."  (*Kolender v.*

22 *Lawson* (1983) 461 U.S. 352, 355, quoting *Hoffman Estates v. Flipside,*

23 *Hoffman Estates, Inc.* (1982) 455 U.S. 489, 494, n. 5 (1982).)  No

24 'limiting construction' of the regulations has been offered to rebut

25 the conclusion that the Board employs § 2404 to in a way that

26 provides for limitless power and unrestricted authority.

27 Orders

28    The parties shall submit further briefs, on or before March 2,

8

1  2007, addressing the three points outlined above.  ([1] Whether,
2  based on all the evidence, the Board has knowingly violated the
3  statutory directive that parole should be the rule and not the
4  exception, [2] Whether the Board standards and criteria are invalid
5  as violating the separation of powers doctrine, and, [3] Whether the
6  Board standards and criteria are void for vagueness and a due process
7  violation.)

8      Respondent is further ordered to provide discovery to Petitioner
9  of the transcripts of the parole denials of every life term inmate
10  who had a parole hearing in June of 2006.  Respondent shall first
11  examine the list of hearings and results for June 2006, and for those
12  inmates who were denied parole shall provide a copy of that
13  transcript to Petitioner.  For those inmates who were granted parole
14  Respondent shall provide a copy of the transcript of the prior
15  hearing at which parole was denied.

16      Respondent is to comply with the first part of this discovery
17  order (the inmates who were denied parole in June, 2006,) within 25
18  days.  Respondent is to comply with the remainder of the discovery
19  order (the prior parole denials for those who were granted parole in
20  June, 2006,) within 15 days thereafter.

21

22

23  DATED:    January 11, 2007        _Linda R. Condron_
24                                    LINDA R. CONDRON
                                      JUDGE OF THE SUPERIOR COURT
25

26  cc:  Petitioner's Attorney (Jacob Burland)
27        Attorney General (Jessica Blonien)

28

9

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

PEOPLE OF THE STATE OF CALIFORNIA )
                             Plaintiff, )

VS )

Donnell Jameison, )

CASE NO. 71194

PROOF OF SERVICE BY MAIL OF: ORDER

CLERKS CERTIFICATE OF MAILING;

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF THIS DOCUMENT WAS MAILED FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW AND THE DOCUMENT WAS MAILED AT SAN JOSE, CALIFORNIA ON ___JAN 1 2 2007___

Dated: ___JAN 1 2 2007___

KIRRI TORRE
County Clerk

By: _Lydia Gonzalez_
Lydia Gonzalez

Law Officer of Jacob Burland
5055 Avenida Encinas Suite 100
Carlsbad, CA 92008


CJIC/Hall of Justice
190 W. Hedding Street
San Jose, CA 95110
(placed in inter-office box)

Deputy Attorney General
455 Golden Gate Ave Suite 11000
San Francisco, CA 94102-7004
Attn: Jessica Blonien D.A.G.

Research Attorney's/Hall of Justice
190 W. Hedding Street
San Jose, CA 95110
(placed in inter-office box)

# ATTACHMENT "2"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

|  |  |
|---|---|
| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number: C-03721 |
| Hearing of: ) | |
| ) | |
| NATHANIEL ROUSE ) | |
| _____) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

DECEMBER 20, 2006

1:50 p.m.

PANEL PRESENT:

Janice Eng, Presiding Commissioner
Debra Star, Deputy Commissioner
Ronald Herron, Deputy Commissioner

OTHERS PRESENT:

Nathaniel Rouse, Inmate
John Stringer, Attorney for Inmate
Jill Klinge, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No          See Review of Hearing
_____   Yes         Transcript Memorandum

**V. Oliver    Northern California Court Reporters**

ii

INDEX

|                             | Page |
| --- | --- |
| Proceedings | 1 |
| Case Factors | 19 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 57 |
| Parole Plans | 75 |
| Closing Statements | 107 |
| Recess | 125 |
| Decision | 126 |
| Adjournment | 138 |
| Transcriber Certification | 139 |

--oOo--

1

1          P R O C E E D I N G S

2          **PRESIDING COMMISSIONER ENG:**  Hearing for

3     Nathaniel Rouse, R-O-U-S-E.  Did I pronounce that

4     correctly?

5          **INMATE ROUSE:**  Yes, you did, ma'am.

6          **PRESIDING COMMISSIONER ENG:**  CDC number C-03721.

7     Today's date is December 20th, 2006, and the time is

8     1:50 p.m.  We are located at San Quentin State Prison.

9     The inmate was received on April 11th, 1979, from

10    Alameda County.  The life term began on April 11th,

11    1979, and minimum eligible parole date is April 8th,

12    1985.  The controlling offense for which the inmate has

13    been committed is murder one, case number 67046, count

14    one Penal Code 187.  The inmate received a total term

15    of 7 years to life.  This hearing is being tape-

16    recorded.  For the purpose of voice identification each

17    of us will be required to state our first and last

18    names, spelling out our last name.  And when it comes

19    to your turn, sir, after you spell out your last name

20    please provide us with your CDC number.  I'll begin and

21    we'll move to my right.  My name is Janice Eng, E-N-G,

22    Commissioner.

23          **DEPUTY COMMISSIONER STAR:**  I'm Deputy

24    Commissioner Debra Star, S-T-A-R.

25          **DEPUTY COMMISSIONER HERRON:**  I'm Ronald

26    Herron, Deputy Commissioner, H-E-R-R-O-N.

27          **INMATE ROUSE:**  Nathaniel Rouse, C-03721.

2

1          PRESIDING COMMISSIONER ENG:  Ms. Klinge?

2          DEPUTY DISTRICT ATTORNEY KLINGE:  Jill

3      Klinge, Jill Klinge, K-L-I-N-G-E, Deputy District

4      Attorney, Alameda County.

5          ATTORNEY STRINGER:  John Stringer, S-T-R-I-

6      N-G-E-R, attorney.

7          PRESIDING COMMISSIONER ENG:  Okay.  For

8      the record, we have two correctional officers

9      present for security reasons, and they will not

10     be participating in the hearing.  Before we

11     begin, sir -- oh did we lose our ADA statement?

12         DEPUTY COMMISSIONER STAR:  We sure did, it

13     was right there.

14         PRESIDING COMMISSIONER ENG:  Is it on the

15     floor?

16         DEPUTY COMMISSIONER STAR:  No.

17         ATTORNEY STRINGER:  I'd be happy to

18     stipulate to it.

19         PRESIDING COMMISSIONER ENG:  All right.

20         ATTORNEY STRINGER:  Or waive it.

21         PRESIDING COMMISSIONER ENG:  Well, that's

22     all right, the Counselor has waived the right for

23     that.  But I'm still going to go through and ask

24     you some basic questions.  Okay.  The record does

25     reflect that you did sign BPT Form 1073 on

26     September 6th of this year.  And I believe on

27     that form, let me double-check it, okay, you

3

1    indicate that you do not have any disabilities as

2    defined under the ADA.  Is that true?

3           INMATE ROUSE:  Correct.

4           PRESIDING COMMISSIONER ENG:  Okay.  So

5    this information is still current and correct?

6           INMATE ROUSE:  Yes.

7           PRESIDING COMMISSIONER ENG:  Okay.  So do

8    you have any problems walking up and down stairs

9    or for distances of 100 yards or more?

10          INMATE ROUSE:  No, I do not.

11          PRESIDING COMMISSIONER ENG:  Okay.  And I

12   notice that you have some glasses, are those for

13   reading?

14          INMATE ROUSE:  Yes, ma'am.

15          PRESIDING COMMISSIONER ENG:  And will

16   those be adequate to read any documents that you

17   might have to during this hearing?

18          INMATE ROUSE:  Yes, ma'am.

19          PRESIDING COMMISSIONER ENG:  Okay.  So do

20   you have any hearing impairments?

21          INMATE ROUSE:  No, ma'am.

22          PRESIDING COMMISSIONER ENG:  Have you ever

23   been included in Triple CMS or EOP programs?

24          INMATE ROUSE:  No, I haven't.

25          PRESIDING COMMISSIONER ENG:  And you know

26   what those are?

27          INMATE ROUSE:  Yes.

4

1    **PRESIDING COMMISSIONER ENG:**  Okay.  So

2    have you taken psychotropic medication in prison

3    or on the streets?

4    **INMATE ROUSE:**  No, ma'am.

5    **PRESIDING COMMISSIONER ENG:**  Okay.  And to

6    your knowledge were you enrolled in any special

7    education classes while growing up?

8    **INMATE ROUSE:**  No, ma'am.

9    **PRESIDING COMMISSIONER ENG:**  So do you

10   suffer from any disability that would prevent you

11   from participating in today's hearing?

12   **INMATE ROUSE:**  No, I don't.

13   **PRESIDING COMMISSIONER ENG:**  Okay.  And,

14   Counselor, you are in agreement?

15   **ATTORNEY STRINGER:**  I am, Commissioner.

16   My client can meaningfully participate in this

17   hearing.

18   **PRESIDING COMMISSIONER ENG:**  Thank you.

19   This hearing is being conducted pursuant to the

20   Penal Code and the Rules and Regulations of the

21   Board of Parole Hearings governing parole

22   consideration hearings for life inmates.  The

23   purpose of today's hearing is to, once again,

24   consider your suitability for parole.  In doing

25   so, we'll consider the number and nature of the

26   crimes for which you were committed, your prior

27   criminal and social history, your behavior and

5

1   programming since your commitment, and your plans

2   if released.  You've had the opportunity to

3   review your central file, and you'll also have

4   the opportunity to correct or clarify the record.

5   So we will consider your progress since your

6   commitment, your counselor's report, and your

7   mental health evaluations.  So we will focus on

8   your progress and any new reports since your last

9   hearing.  So any changes in parole plans should

10  be brought to our attention.

11          **INMATE ROUSE:**  Okay.

12          **PRESIDING COMMISSIONER ENG:**  Okay.  We

13  will reach a decision today and inform you

14  whether or not we find you suitable for parole

15  and the reasons for our decision.  If you are

16  found suitable for parole, the length of your

17  confinement will be fully explained to you.

18  Before we recess for deliberations the District

19  Attorney's representative, your attorney, and

20  yourself, will be given an opportunity to make a

21  final statement regarding parole suitability.

22  And your statement should be limited to why you

23  feel you are suitable for parole.  We'll then

24  recess, clear the room, and deliberate.  And once

25  we have completed our deliberations we'll resume

26  the hearing and announce our decision.

27  California Code of Regulations states that

6

1    regardless of time served a life inmate shall be

2    found unsuitable for and denied parole if in the

3    judgment of the Panel the inmate would pose an

4    unreasonable risk of danger to society if

5    released from prison.  You have certain rights.

6    Those rights include the right to a timely notice

7    of this hearing, the right to review your central

8    files, and the right to present relevant

9    documents.  Counselor, have your client's rights

10   been met?

11         ATTORNEY STRINGER:  As to those rights,

12   yes.

13         PRESIDING COMMISSIONER ENG:  All right.

14   You have an additional right to be heard by an

15   impartial Panel.  You've been introduced to this

16   Panel.  Do you have any objections?

17         INMATE ROUSE:  No, I don't.

18         PRESIDING COMMISSIONER ENG:  Counsel, any

19   objections to the Panel?

20         ATTORNEY STRINGER:  Commissioner, under

21   Penal Code Section 3041, whenever possible, the

22   same Board members that sat on the previous

23   Panel, especially a granting Panel, whenever

24   possible are always to sit on the subsequent

25   Panel after a denial.  Now, the granting Panel, I

26   was here for that grant of parole for Mr. Rouse,

27   the granting Panel was Tracy St. Julian, who is

7

1    no longer on the Board, and Mr. Armenta, who is,

2    I believe, from Los Angeles.  Mr. Armenta is

3    still with the Board.  I know of no reason why

4    Mr. Armenta could not be here today for this

5    specific hearing, and I would like to know if he

6    was asked to sit on Mr. Rouse's subsequent

7    hearing, since that is certainly Mr. Rouse's

8    right under Penal Code Section 3041.

9           PRESIDING COMMISSIONER ENG:  Okay.  So you

10   would, all right, so you're objecting to the

11   Panel based on the --

12          ATTORNEY STRINGER:  I'm not objecting to

13   the Panel, I'm simply -- because I would have to

14   object to the Panel on bias or for some other

15   reason.

16          PRESIDING COMMISSIONER ENG:  Right.

17          ATTORNEY STRINGER:  And I'm not objecting

18   on that grounds.  I'm objecting, I'm invoking his

19   right under 3041 to have a prior Panel member

20   present, especially since he was granted a date.

21          PRESIDING COMMISSIONER ENG:  And I

22   understand under 15 if at all possible, and I

23   can't speak to the scheduling, and I do know that

24   St -- the Commissioner is no longer a

25   Commissioner.

26          ATTORNEY STRINGER:  Yes.

27          PRESIDING COMMISSIONER ENG:  And I had no

8

1    knowledge about Deputy Commissioner Armenta.  So

2    what I will have to do is take a brief recess and

3    check with our legal staff and have them do the

4    research and find out.  Okay.  So we're going to

5    take a brief recess.

6         **DEPUTY DISTRICT ATTORNEY KLINGE:**  Can I

7    ask a clarifying question?  Is Counsel asking for

8    a postponement if Armenta's available?

9         **PRESIDING COMMISSIONER ENG:**  What are you

10   looking for?

11        **ATTORNEY STRINGER:**  Well, I suspect I know

12   what the response is going to be from the legal

13   department, so unless --

14        **PRESIDING COMMISSIONER ENG:**  And that will

15   be?

16        **ATTORNEY STRINGER:**  That will probably be

17   to continue with the hearing.  But I'm simply

18   making a record for Mr. Rouse.  And that is in my

19   view the Board as a whole should have checked

20   with Mr. Armenta and said are you available, and

21   if he said, no, then of course that negates my

22   argument.  If they didn't even check with him

23   then they have no reason to know whether or not

24   he's available, and that's what 3041 requires, if

25   not available.

26        **PRESIDING COMMISSIONER ENG:**  I see your

27   point, but I have no way of having any idea what

9

1    the process is.

2         **ATTORNEY STRINGER:**  No, of course, every

3    time I make this argument it puts the

4    Commissioner in an awkward position, I realize

5    that.  But --

6         **PRESIDING COMMISSIONER ENG:**  But, okay,

7    I'm trying to think, regardless you would like to

8    have a response to that, to what, what happened

9    to Armenta, correct, or no?

10         **ATTORNEY STRINGER:**  I'm --

11         **PRESIDING COMMISSIONER ENG:**  Or do you

12    just want to put it on the record that --

13         **ATTORNEY STRINGER:**  No, I want to if Mr.

14    Armenta is available and wants to sit in on this

15    hearing, that's Mr. Rouse's right, and I'm

16    invoking that.

17         **PRESIDING COMMISSIONER ENG:**  Well, if --

18         **ATTORNEY STRINGER:**  I'm not challenging

19    the Panel for bias, I'm just invoking that right.

20    Because Mr. Armenta was on the granting Panel and

21    would have knowledge of this specific case.

22         **PRESIDING COMMISSIONER ENG:**  Okay.  Mr.

23    Armenta could very well be somewhere else, and

24    actually --

25         **DEPUTY COMMISSIONER STAR:**  In southern

26    California.

27         **PRESIDING COMMISSIONER ENG:**  Actually, he

10

1   is, so he would not be available.

2        ATTORNEY STRINGER:  He used to come up

3   here on a regular basis.

4        PRESIDING COMMISSIONER ENG:  Well,

5   possibly because of the lack of available other

6   Deputy Commissioners to conduct the hearings, but

7   since that time we've had a lot more Deputy

8   Commissioners coming in now so they don't have to

9   be crisscrossing all over the state.  I don't

10  know, I can't talk to that.  All I can say is

11  that Mr. Armenta is somewhere else.

12       ATTORNEY STRINGER:  But is he unavailable?

13  If he was contacted and said I'm doing revocation

14  hearings, I can't come, but if he's clearly

15  unavailable or he was never contacted or even

16  notified.

17       PRESIDING COMMISSIONER ENG:  I cannot say.

18  I do know that when it is required that specific

19  Commissioners and Deputy Commissioners attend to

20  certain hearings they are scheduled that way, and

21  that I do know, because I have seen it on our

22  schedules.  I do not know what happened with

23  this, I can't speak to that.

24       ATTORNEY STRINGER:  Well, I would if

25  possible like to get a ruling on it, because it's

26  important for my client since he was granted a

27  date.

11

1      **PRESIDING COMMISSIONER ENG:**  Okay, okay.

2    Ms. Klinge, I'm going to go ahead and take a

3    brief recess and just talk to our legal and so we

4    could put it into the record our response.  Any

5    objection to that?

6      **DEPUTY DISTRICT ATTORNEY KLINGE:**  Sure.

7    No.

8      **PRESIDING COMMISSIONER ENG:**  Okay, all

9    right.  We're in recess.  Going off the record.

10                 **(Off the record)**

11                    **-- o0o --**

12      **PRESIDING COMMISSIONER ENG:**  Okay.  We're

13   back on record.  Okay.  All parties are present

14   that were in the room prior to us having to take

15   a short recess to contact our legal.  Our

16   response to Mr. Stringer's request to find out if

17   the previous Panel had been contacted, that our

18   legal department said we were unable to take the

19   same Panel member factors into consideration in

20   scheduling the statewide lifer panels for this

21   month.  So best efforts are always made, and we

22   are going to continue on with this hearing.  So,

23   Counselor, do you have any objection to this

24   particular Panel today?

25      **ATTORNEY STRINGER:**  No, other than my 3041

26   objection, no.

27      **PRESIDING COMMISSIONER ENG:**  Okay.  Sir,

12

1  you will receive a copy of our written tentative

2  decision today.  That decision becomes final

3  within 120 days.  A copy of the decision and a

4  copy of the transcript will be sent to you.  On

5  May 1st, 2004, the regulations regarding your

6  right to appeal a decision made at this hearing

7  were repealed.  So the current policy is entitled

8  Administrative Appeals Correspondence and

9  Grievances Concerning Board of Prison Terms

10  Decisions, so you can speak with your legal

11  counsel regarding any questions you might have

12  about that policy, or you can review that at your

13  criminal law library.  You're not required to

14  admit to or discuss your offense, however this

15  Panel does accept as true the findings of the

16  court.  Do you understand what that means?

17       INMATE ROUSE:  Yes, ma'am.

18       PRESIDING COMMISSIONER ENG:  Okay.

19  Commissioner Star, is there any confidential

20  material in the file that will be used today?

21       DEPUTY COMMISSIONER STAR:  No.

22       PRESIDING COMMISSIONER ENG:  I did not do

23  this again, okay.  Here is the hearing checklist,

24  and I'm going to label as Exhibit 1.  Okay.  Mr.

25  Stringer, Ms. Klinge, you have all the regular

26  sections, did you have a hearing checklist in

27  your packet?  I think you're on mute.

13

1      DEPUTY DISTRICT ATTORNEY KLINGE:  I did

2  not have a hearing checklist.

3      PRESIDING COMMISSIONER ENG:  Okay.  I

4  didn't either, I got a copy of it.  However, were

5  you missing any blatant sections?

6      DEPUTY DISTRICT ATTORNEY KLINGE:  It

7  appears all the sections are here.

8      PRESIDING COMMISSIONER ENG:  Okay.  And

9  just to be sure, I want to be sure that everyone

10  has the same psychological evaluation dated

11  3/3/04?

12      DEPUTY DISTRICT ATTORNEY KLINGE:  That's

13  correct.

14      PRESIDING COMMISSIONER ENG:  Okay.  Okay.

15  Mr. Stringer, do you have all the pieces?

16      ATTORNEY STRINGER:  I do.

17      PRESIDING COMMISSIONER ENG:  Okay.  May I

18  have the checklist back?  Okay.  And, sir, again,

19  we do this to make sure we're all operating off

20  the same set of documents.  Okay.  So this is

21  Exhibit 1, okay, thank you.  Okay.  Counselor, do

22  you have any other additional documents to be

23  submitted to the Panel this afternoon?

24      ATTORNEY STRINGER:  Not at this time,

25  Commissioner.  I would reserve the right to

26  supplement the record.

27      PRESIDING COMMISSIONER ENG:  All right,

14

1    and, okay.  Any other preliminary objections?

2         **ATTORNEY STRINGER:**  Excuse me, one.  Do

3    you have any other documents that you wanted to

4    submit?

5         **INMATE ROUSE:**  Yeah.

6         **ATTORNEY STRINGER:**  I believe we may have

7    some additional documents, Commissioner.

8         **INMATE ROUSE:**  My counselor didn't get

9    that information (papers shuffling).

10        **PRESIDING COMMISSIONER ENG:**  Okay.  While

11   your client's looking for the documents --

12        **ATTORNEY STRINGER:**  Yes, we're going to

13   have to submit as the hearing progresses.

14        **PRESIDING COMMISSIONER ENG:**  Right, that's

15   fine.  But any other objections?

16        ~~ATTORNEY STRINGER:~~  Commissioner, it's my

17   client's view that because of the granting Panel

18   did see fit to grant my client a date, that that

19   particular -- because this is an administrative

20   hearing that particular decision has both res

21   judicata and collateral estoppel effect on what

22   subsequent Panels would do, in that they would be

23   somewhat bound by that decision, so unless

24   between the granting Panel's time and the

25   subsequent hearing time my client has either

26   incurred disciplinaries or somehow deteriorated

27   psychologically, it's our view that the

15

1    subsequent Panel must ratify what the granting

2    Panel did, since this is a hearing that's

3    administrative in nature and not penal in nature.

4           **PRESIDING COMMISSIONER ENG:**  I'm going to

5    ask Counsel to restate that.

6           **DEPUTY COMMISSIONER STAR:**  Yes.

7           **PRESIDING COMMISSIONER ENG:**  So that we

8    can understand exactly what you mean.

9           **ATTORNEY STRINGER:**  Because these are

10   administrative hearings under the executive

11   branch of government, they're administrative in

12   nature, and so in some respects they're subject

13   to the codes that govern civil proceedings and

14   not penal proceedings.  So if a previous court,

15   say makes a decision on some matter it has

16   binding effect on subsequent decision-makers.

17   That's our argument.  So if a granting Panel says

18   you are eligible for a date it's our position

19   that that decision is final unless the inmate

20   somehow has deteriorated psychologically or

21   incurred some 115s or done something in the

22   interim that would in essence be new information

23   to the Board that they consider to deny him a

24   date.  Other than that it's our belief the Board

25   has to ratify what the previous Panel did

26   regardless of what the Governor does, because the

27   Governor operates under a different section of

16

1    the Penal Code than the Board.

2          **PRESIDING COMMISSIONER ENG:**  Well, then

3    your argument would also state that if a previous

4    Panel found an inmate not suitable then the

5    subsequent Panel would have to abide by that

6    also, regardless of what information, unless

7    there were extenuating circumstances.

8          **ATTORNEY STRINGER:**  No, because --

9          **PRESIDING COMMISSIONER ENG:**  Well, I don't

10   understand what the difference is?

11         **ATTORNEY STRINGER:**  No, because a granting

12   Panel, a grant of, a grant of parole is in

13   essence a grant of a conditional freedom for the

14   person that receives the grant.  There's no -- as

15   long as the Panels deny a person parole there's

16   not a liberty interest because they're still

17   incarcerated.  Once you get that date there's a

18   whole bunch of rights the courts have said sort

19   of attach to that, and you have a, you know, a

20   higher due process right in that date.

21         **DEPUTY DISTRICT ATTORNEY KLINGE:**  If I may

22   interject, does Counsel have a case he'd like to

23   point us to?

24         **PRESIDING COMMISSIONER ENG:**  That was

25   going to be my question, too.

26         **ATTORNEY STRINGER:**  No.

27         **PRESIDING COMMISSIONER ENG:**  Okay.

17

1       ATTORNEY STRINGER:  I don't know how much

2    this issue has been litigated.  Now, to be fair,

3    if we were talking about revocations the courts

4    have ruled on that.  But I don't ever believe

5    they have ruled on this specific issue.

6       DEPUTY COMMISSIONER STAR:  There's

7    certainly been particularly under prior governors

8    such cases where the opportunity to have

9    litigated were there, and I am not aware of any

10   of any separation of the Governor's actions or

11   just one step in the entire process.  And we

12   certainly have a past practice of going back and

13   hearing it fresh.

14      PRESIDING COMMISSIONER ENG:  Exactly, and

15   there are, there are enough cases that have

16   occurred up to this date that show that, and

17   there are, there are numerous inmates that have

18   been granted dates by more than one Panel, had

19   them reversed by different governors, and then

20   eventually been granted.  So I can speak for this

21   Panel that we take a look at every single inmate

22   and hearing separately, and at any given time a

23   Panel might see things in a different way and not

24   all Panels are going to agree or see the same

25   things at any given time.  So we take, we take

26   the most objective view on everything, and every

27   inmate has a chance to present their position of

18

1   unsuitability to any Panel that they sit in front

2   of.  So are you raising an objection or are you

3   just stating and wanting to get something into

4   the record there?

5        ATTORNEY STRINGER:  Both.

6        PRESIDING COMMISSIONER ENG:  If you're

7   raising an objection then I'm overruling it.

8   Okay.  Anything else?

9        ATTORNEY STRINGER:  No.

10       PRESIDING COMMISSIONER ENG:  Okay.  And I

11  assume that you've found some documents, sir?

12       INMATE ROUSE:  Yes, job letter, and

13  support letters.

14       PRESIDING COMMISSIONER ENG:  Okay, thank

15  you.  We'll go through those.  All right.  Will

16  your client be speaking with the Panel this

17  afternoon?

18       ATTORNEY STRINGER:  He will, Commissioner.

19       PRESIDING COMMISSIONER ENG:  Okay.  In all

20  matters?

21       ATTORNEY STRINGER:  All matters.

22       INMATE ROUSE:  All matters.

23       PRESIDING COMMISSIONER ENG:  All right.

24  Please raise your right hand, I'll have to swear

25  you in.  Do you solemnly swear or affirm that the

26  testimony you give at this hearing will be the

27  truth, the whole truth, and nothing but the

19

1    truth?

2          **INMATE ROUSE:** Yes, I do.

3          **PRESIDING COMMISSIONER ENG:** Okay. I am

4    going to read into the record the statement of

5    facts, and I think I'm going to go ahead and I'm

6    going to take it from the probation officer's

7    report, page 2. I'm going to try to discern what

8    this says because the copies aren't that great.

9    So under the present offense it says,

10          "Offense summary. Briefly, on

11          March 31st, 1978, defendant and

12          codefendant, Marion, M-A-R-I-O-N,

13          Thorpe, T-H-O-R-P-E, went for a

14          test ride in a vehicle they

15          indicated interest in buying. The

16          ~~victim, automobile dealer Rooholah,~~

17          R-O-O-H-O-L-A-H, Faryabidoust, F-A-

18          R-Y-A-B-I-D-O-U-S-T, accompanied

19          them. When they had not returned

20          several hours later the police were

21          contacted. On the following day

22          defendant completed a pawn

23          transaction wherein the victim's

24          watch was pawned at the California

25          Loan Company at Oakland. On April

26          4th, 1978, the defendants were

27          arrested in King City, California,

20

1       with various items belonging to the

2       victim in their possession.  On the

3       following day defendant Rouse gave

4       a taped statement to a member of

5       the Oakland police where the

6       circumstances surrounding the

7       disposal of the victim's body were

8       obtained.  In the search victim's

9       body was discovered in a near, in a

10      field near Antioch on April 17th,

11      1978.  The hands were bound behind

12      his back with rope and tape, and

13      the head was covered with two

14      pieces of plastic secured by means

15      of electrical cords having been

16      ~~wrapped around the neck.  Cause~~ of

17      death was found to be severe blunt

18      trauma to the head and face.  And

19      the statements of both defendants,

20      defendant Rouse was said to have,

21      quote, 'struck the victim,'

22      unquote."

23      Sir, I see that you had given, you had

24  provided a rather long written, I believe it was

25  a written declaration, I'm not sure?

26      **INMATE ROUSE:**  Yes, yes, it is.

27      **PRESIDING COMMISSIONER ENG:**  A written

21

1   declaration, okay, and you did this in your

2   counselor's report, correct?

3         INMATE ROUSE:  Yes, I did.

4         PRESIDING COMMISSIONER ENG:  You did this

5   back around what, 2002 was it, or?

6         INMATE ROUSE:  Yes, it was [coughing].

7         PRESIDING COMMISSIONER ENG:  Okay, God

8   bless you.

9         INMATE ROUSE:  God bless you.

10        PRESIDING COMMISSIONER ENG:  And try to

11  elaborate for me.  Had you planned this out?

12        INMATE ROUSE:  Yes, we did.

13        PRESIDING COMMISSIONER ENG:  Okay.  So

14  this isn't just one thing just didn't lead to

15  another, you had planned to abduct the victim,

16  kill him, and --

17        INMATE ROUSE:  Take the car.

18        PRESIDING COMMISSIONER ENG:  Take the car

19  and anything else that you could get off of his

20  body at that time?

21        INMATE ROUSE:  Yes.

22        PRESIDING COMMISSIONER ENG:  I can't, is

23  it Faryabidoust, at the time, did he have any

24  idea what was coming?

25        INMATE ROUSE:  No, he didn't.

26        PRESIDING COMMISSIONER ENG:  Okay.  Did

27  you just start hitting him in the backseat?

22

1      INMATE ROUSE:  Yes, well, what we did is

2   made it seem as if he created a problem, started

3   a problem, and used it as an excuse to take his

4   life.

5      PRESIDING COMMISSIONER ENG:  I'm trying to

6   go back because in court you had a different

7   explanation?

8      INMATE ROUSE:  Yes, that's when I was

9   trying my best to avoid responsibility for taking

10  this man's life.

11     PRESIDING COMMISSIONER ENG:  Okay.  So I'm

12  assuming that you somewhat saw the light sometime

13  during your incarceration?

14     INMATE ROUSE:  Yes, ma'am.

15     PRESIDING COMMISSIONER ENG:  Okay.  And

16  about when was that?

17     INMATE ROUSE:  '84, '85.

18     PRESIDING COMMISSIONER ENG:  And what

19  precipitated that?

20     INMATE ROUSE:  These groups, getting into

21  these groups and learning about myself, and what

22  motivated me to be the type of person that I was

23  at the time of killing Mr. Faryabidoust.  It was

24  like these groups help you to recognize that you

25  took somebody's life, and in my case I took

26  somebody's life, and how it effects his family.

27  You -- Governor Gray Davis said that in his

23

1  reason for denying me the first time that, you

2  know, I didn't -- I waited until '86 in there to

3  begin to go to groups.  And I agree with him,

4  because when I first came to prison it's not

5  something that you want to admit, that you took

6  somebody's life, and you play a game with

7  yourself, I didn't do it, you know, if he hadn't

8  of did this, he hadn't of did that, you play a

9  game with yourself.  And it was time to accept

10  responsibility for my actions.  And I couldn't

11  argue with his statement because he was right,

12  when I first came I didn't, I wasn't trying to

13  clean my act up, I wasn't trying to be a better

14  person at that time, I was just doing time.  My

15  thought was, you know, lock me up, so now when I

16  get out I'm going to do this, I'm going to do

17  that, it's like me against the world opposed to

18  my accepting that I had took somebody's life.

19        PRESIDING COMMISSIONER ENG:  Can you

20  recall though when you finally came to grips and

21  openly admitted that you had planned this out?

22        INMATE ROUSE:  Yes.  In anger management,

23  and I think that was in CMC East, when we begin

24  to put labels on our emotions and how we feel

25  about the conditions, and I discovered in me that

26  you can do a hundred years and if you don't

27  accept responsibility for your crime then there's

24

1     a chance that you do if they were ever to allow

2     you out, that you could be the same person that

3     you were then.  So you have to accept that you

4     took somebody's life, man.

5           **PRESIDING COMMISSIONER ENG:**  What do you

6     think led you up to such an extreme act of

7     violence against someone?

8           **INMATE ROUSE:**  I would say as a young man,

9     and I tell this to people, and I don't know how

10    they perceive it but I have to say it this way,

11    you know, when I was a young kid, when I was 10,

12    9 or 10, the way I saw my father treat my mother

13    he didn't beat her physically but the way he did

14    treat her emotionally and psychologically I say

15    to myself I would never treat my woman that way

16    when I am older.  But I didn't realize how deep

17    that that struck a cord in me, so all my life had

18    been whatever as I grew older whatever my

19    girlfriend wanted or whatever I could do to show

20    her that I was, that the person, the man, that

21    did I know I would take someone's life in the

22    end, I didn't know that, I didn't know that that

23    was that deep in me to do that to another human

24    being until it actually happened.

25          **PRESIDING COMMISSIONER ENG:**  Because I've

26    seen your -- in terms of your prior record it

27    doesn't seem that you had a lot of criminality in

25

1   your past?

2        **INMATE ROUSE:**  No, there's never been, I

3   think I've stole a nickel ring at a department

4   store once in my life.

5        **PRESIDING COMMISSIONER ENG:**  That's what

6   this says as a juvenile.

7        **INMATE ROUSE:**  So I was never violent,

8   stealing, robbing, drugs, I was never like that.

9        **PRESIDING COMMISSIONER ENG:**  So your

10  girlfriend wanted a car?

11       **INMATE ROUSE:**  Yeah.

12       **PRESIDING COMMISSIONER ENG:**  So because

13  you don't have that type of background --

14       **INMATE ROUSE:**  It wasn't, it wasn't --

15       **PRESIDING COMMISSIONER ENG:**  -- why would

16  you go and steal this, and why wouldn't you just

17  bought one?

18       **INMATE ROUSE:**  Didn't have the money.

19       **PRESIDING COMMISSIONER ENG:**  At that given

20  time?

21       **INMATE ROUSE:**  Right, didn't have the

22  money.

23       **PRESIDING COMMISSIONER ENG:**  Were you

24  working at the time?

25       **INMATE ROUSE:**  No, I wasn't, I had just, I

26  had just came out of Job Corp.

27       **PRESIDING COMMISSIONER ENG:**  Okay.

26

1          INMATE ROUSE:  And came to California.

2          PRESIDING COMMISSIONER ENG:  So what was

3     your thought process when she says I want this?

4          INMATE ROUSE:  Okay baby, so she sat and

5     we talked about it, you know, how we was going to

6     go to the car lot, find an out-of-the-way car

7     lot, someplace that people wouldn't notice, just

8     an old place that you can get a car, and take the

9     car for a ride and then take his life.  But how,

10    you know, exactly how, like details like I'm

11    going to do this him, I'm going to do this to

12    him, that to him, that was never discussed in

13    that way.  So when he, I would say when he

14    started talking in his language that's when I

15    used that as a pretence to become violent with

16    him.

17         PRESIDING COMMISSIONER ENG:  You had from

18    the beginning you said you had intended --

19         INMATE ROUSE:  Yes.

20         PRESIDING COMMISSIONER ENG:  -- to take

21    the car and kill?

22         INMATE ROUSE:  Yes.

23         PRESIDING COMMISSIONER ENG:  Kill whoever

24    it was --

25         INMATE ROUSE:  Right.

26         PRESIDING COMMISSIONER ENG:  -- who was

27    going to take you out for the test drive?

27

1      INMATE ROUSE:  Right.

2      PRESIDING COMMISSIONER ENG:  That was your

3  intent?

4      INMATE ROUSE:  Right.

5      PRESIDING COMMISSIONER ENG:  That's a

6  giant leap from stealing a ring from a department

7  store to go out and decide that you're going to

8  steal a car and kill somebody to get it.

9      INMATE ROUSE:  Yes, it was.

10      PRESIDING COMMISSIONER ENG:  So help me

11  get to that point.  I'm trying to understand, you

12  had come out of the Job Corp, it's just, it's

13  just such a huge gap there from stealing a ring

14  in a department store to planning to murder

15  someone.

16      INMATE ROUSE:  Well, that didn't, I --

17      PRESIDING COMMISSIONER ENG:  Did you think

18  about any other ways you could possibly get an

19  automobile where for your girlfriend?

20      INMATE ROUSE:  Yeah, listen, the

21  difference is that wasn't like a department store

22  ring to then, that's a lot of years in between

23  that, you know, my lifestyle and the things I was

24  doing.  But at that time coming out of the Job

25  Corp, her and I, well, she didn't have the money

26  I thought that she had when we came from

27  (inaudible) out here, so you're dealing with --

28

1  or I was dealing with at the time frustration,

2  you know, being in this situation with this girl

3  that I was in love with her, and when that

4  particular issue was brought up the way we were,

5  as a matter of fact, it happened not -- she got

6  mad one day and left the house, went into a five

7  and dime I guess it was, but she tore up the

8  undercarriage of the car, and that's what

9  precipitated it, the car being tore up

10  (inaudible) being tore up.  And she just talked

11  me into it, man, I mean, my not wanting to be the

12  punk and I followed instructions.

13          PRESIDING COMMISSIONER ENG:  Did both, did

14  either or both of you have a drinking or drug

15  problem?

16          INMATE ROUSE:  No, ma'am.  I told them

17  that when I was first being interviewed by the

18  police that that was my effort to try to make

19  myself look less culpable as possible.

20          PRESIDING COMMISSIONER ENG:  So you didn't

21  do drugs or alcohol back then, or did?

22          INMATE ROUSE:  Oh, yeah, I smoked weed.

23          PRESIDING COMMISSIONER ENG:  Okay.

24          INMATE ROUSE:  But it wasn't like, you

25  know, laid out kind of thing.  That happened

26  because my grandmother owned like a like jib

27  joint as they call them down in North Carolina,

29

1   and I used to see people get drunk and high and

2   we would have to take them out of that place

3   because if they get robbed in her place then

4   she's liable for it.  So as a result of that I

5   never was one of those kind of guys that wanted

6   to get high and just lay around and I don't know

7   what's happening around me.  So I was never like

8   that.

9           PRESIDING COMMISSIONER ENG:  So you

10  wouldn't consider yourself an alcoholic?

11          INMATE ROUSE:  No, ma'am.

12          PRESIDING COMMISSIONER ENG:  Or a drug

13  abuser?

14          INMATE ROUSE:  No, ma'am.

15          PRESIDING COMMISSIONER ENG:  Okay.  So

16  ~~neither one of those had anything to do with --~~

17          INMATE ROUSE:  The crime.

18          PRESIDING COMMISSIONER ENG:  -- the plan

19  and execution of this life crime?

20          INMATE ROUSE:  No, ma'am.

21          PRESIDING COMMISSIONER ENG:  Okay.  I'm

22  going to ask my fellow Commissioners to jump in

23  at any time they have any question they would

24  like to ask.

25          DEPUTY COMMISSIONER STAR:  I do have some

26  questions that I would like answered.  At what

27  point in this decision to get a car did you

30

1    decide that you would kill the person involved?

2         INMATE ROUSE:  It was decided before we

3    got the car.

4         DEPUTY COMMISSIONER STAR:  Before you got

5    to the parking lot, a week before you got to the

6    car lot, or?

7         INMATE ROUSE:  Maybe a couple of days

8    before when we were sitting at the house.

9         DEPUTY COMMISSIONER STAR:  And why did you

10   decide that it was necessary to kill the person?

11        INMATE ROUSE:  No witnesses.

12        DEPUTY COMMISSIONER STAR:  Okay.  Now, you

13   decide a week ahead that you're going to kill the

14   person, did you also decide how you would kill

15   the person, what means?

16        INMATE ROUSE:  No.

17        DEPUTY COMMISSIONER STAR:  Did you bring

18   any weapons with you or anything?

19        INMATE ROUSE:  No.

20        DEPUTY COMMISSIONER STAR:  Did you talk

21   about by what means you might kill the witness?

22        INMATE ROUSE:  No, we didn't.

23        DEPUTY COMMISSIONER STAR:  And when you,

24   am I correct, when you struck him you were in the

25   backseat?

26        INMATE ROUSE:  Yes, ma'am.

27        DEPUTY COMMISSIONER STAR:  And he was in

31

1   the front passenger seat?

2        **INMATE ROUSE:** No.

3        **DEPUTY COMMISSIONER STAR:** Where was he?

4        **INMATE ROUSE:** He was in the backseat.  I

5   was driving the car and pulled over and got in

6   the backseat and she began to drive the car.

7        **DEPUTY COMMISSIONER STAR:** So you and him,

8   you and the victim were in the backseat and she

9   was driving?

10       **INMATE ROUSE:** Yes, ma'am.

11       **DEPUTY COMMISSIONER STAR:** And you just

12   began to hit him with your bare hands?

13       **INMATE ROUSE:** Fists, yes, ma'am.

14       **DEPUTY COMMISSIONER STAR:** Fists?  And

15   during this incident how many times did you hit

16   him?

17       **INMATE ROUSE:** Maybe five, six or eight, I

18   can't, I couldn't tell you.

19       **DEPUTY COMMISSIONER STAR:** On any

20   particular part of the body?

21       **INMATE ROUSE:** In his head area.

22       **DEPUTY COMMISSIONER STAR:** And he after

23   the first hit did he become unconscious?

24       **INMATE ROUSE:** No, he didn't.

25       **DEPUTY COMMISSIONER STAR:** About after how

26   many hits did he become unconscious?

27       **INMATE ROUSE:** I think he became

32

1    unconscious when his head hit, because I'm on

2    this side of him and he's on this side of me and

3    his head hit the door handle.

4         **DEPUTY COMMISSIONER STAR:**  Okay.  Did you

5    continue to hit him once his head was on the door

6    handle?

7         **INMATE ROUSE:**  No, ma'am.

8         **DEPUTY COMMISSIONER STAR:**  Did you hit him

9    after he was unconscious?

10        **INMATE ROUSE:**  No, ma'am.

11        **DEPUTY COMMISSIONER STAR:**  (Inaudible.)

12        **INMATE ROUSE:**  No, ma'am.

13        **DEPUTY COMMISSIONER STAR:**  I'm having a

14   little trouble, Mr. Rouse, in understanding how

15   your father and mother's relationship played into

16   ~~your decision-making on that day.  Can you maybe~~

17   restate it for me and see -- I understood that

18   there was some violence, you saw how your father

19   mistreated your mother.

20        **INMATE ROUSE:**  Right.

21        **DEPUTY COMMISSIONER STAR:**  But I'm not

22   seeing quite the connection to what your state of

23   mind or thinking was on the day of this life

24   crime.

25        **INMATE ROUSE:**  Okay.  My state of mind

26   was, again, I'll state it again is I said to

27   myself I would never treat my woman that way, and

33

1    I didn't understand to the depth in which that

2    was in me, which means that I would do anything

3    to show her that I wasn't like him, I wasn't that

4    type of a person.

5        DEPUTY COMMISSIONER STAR:  Including

6    killing for her?

7        INMATE ROUSE:  Apparently, yes.  But I

8    mean, I mean --

9        DEPUTY COMMISSIONER STAR:  How long had

10   you been together with her?

11       INMATE ROUSE:  I've known her all my life.

12   It's not -- don't get me wrong, it's not

13   something that I sit down and like you and I

14   discussing this issue now, it's not something

15   that I sat down and talked with her about, you

16   know, [tape beeping].

17       DEPUTY COMMISSIONER STAR:  I'm sorry, go

18   ahead.

19       INMATE ROUSE:  Like look honey, because I

20   think like this these are the things that I will

21   do.

22       DEPUTY COMMISSIONER STAR:  Okay.  You

23   didn't have that discussion ahead of time?

24       INMATE ROUSE:  No.

25       DEPUTY COMMISSIONER STAR:  But you believe

26   that played in that you needed to make your [tape

27   beeping] your partner happy?

34

1    INMATE ROUSE:  Yes, ma'am.

2    DEPUTY COMMISSIONER STAR:  And please her,

3    and she needed a car and you'd go to all lengths

4    for that?

5    INMATE ROUSE:  Yes, ma'am.

6    DEPUTY COMMISSIONER STAR:  Hang on while I

7    change the tape, okay, sir.

8         **(Off the record)**

9              **-- o0o --**

10    DEPUTY COMMISSIONER STAR:  Okay.  We're

11    back on record.  And I was asking Mr. Rouse some

12    questions about his commitment offense.  At some

13    point you said you used the belt to tie his

14    hands.

15    INMATE ROUSE:  So you had to -- how did

16    you get the belt, did you have to remove it from

17    his waistband?

18    INMATE ROUSE:  Yes, ma'am.

19    DEPUTY COMMISSIONER STAR:  Okay.  And was

20    he conscious when you were doing this?

21    INMATE ROUSE:  No, ma'am.

22    DEPUTY COMMISSIONER STAR:  You in your

23    statement you indicate you didn't know how to

24    kill a man; is that correct?

25    INMATE ROUSE:  Yes, ma'am.

26    DEPUTY COMMISSIONER STAR:  So I'd like to

27    ask you again since you'd planned to do this what

35

1    were you going to do to accomplish this?

2         **INMATE ROUSE:**  Well, just beat him is the

3    only thing I knew to do.

4         **DEPUTY COMMISSIONER STAR:**  You ended up

5    taking his credit cards and using his credit

6    cards and going on.  Where were you headed, you

7    were in King City, which is --

8         **INMATE ROUSE:**  San Diego.

9         **DEPUTY COMMISSIONER STAR:**  And why there?

10        **INMATE ROUSE:**  She has some family lives

11   there.

12        **DEPUTY COMMISSIONER STAR:**  Okay.  Did at

13   any time along the way did she or did you discuss

14   turning yourself in or going back or making this

15   right in some way?

16        **INMATE ROUSE:**  No, ma'am.

17        **DEPUTY COMMISSIONER STAR:**  Okay.  What

18   stands out for me, Mr. Rouse, is the not only the

19   planning of this for such trivial reasons, but

20   the number of steps along the way that kept

21   perpetuating it.  First you had to sort of pick a

22   lot in a remote area, then you have the ruse of

23   test driving a car, then you're changing --

24   pretending the car's not working and changing

25   seats, you know, any one of the those spots along

26   the way you could have said this is silly, I

27   don't even know how I'm planning this, but then

36

1   faking the car's not working and, you know,
2   stopping to get his belt off so you can tie his
3   hands, you know, and I -- stopping at a store and
4   getting a cord to replace the belt with a cord.
5   And then the record reflects that you were
6   continuing to hit him after you tied him, and I'd
7   like you to comment on that.

8       **INMATE ROUSE:**  What happened is we -- he
9   was unconscious and we went to a vacant gas
10  station and went behind the gas station, and
11  that's when I took him out of the car put him
12  into the trunk, and that's when he became
13  conscious and that's when I hit him.

14      **DEPUTY COMMISSIONER STAR:**  And that's the
15  only other time other than the initial beating
16  that you hit him?

17      **INMATE ROUSE:**  Yes, ma'am.

18      **DEPUTY COMMISSIONER STAR:**  Well, and that,
19  moving the body from one, from the car to the
20  trunk, retying him, putting a bag, and then I
21  mean dumping it.  I think my question is this,
22  there were the most remarkable number of steps in
23  this life crime along the way where at any point
24  you might even get scared or say enough is
25  enough, but this kept going.  And I want to ask
26  you, did at any point in these multiple steps
27  along the way which kept getting worse and worse,

37

1    including, you know, removing his credit cards

2    and using them, you know, to keep going, did you

3    ever say this isn't what I planned or we better

4    do something different?

5         INMATE ROUSE:  Yes, at least in my head.

6    I didn't say anything to her outwardly that we

7    needed to stop this, but in my head, yes.  And my

8    thoughts were we shouldn't be doing this, or I

9    shouldn't be doing this, but that did not stop me

10   from doing what I did.

11        DEPUTY COMMISSIONER STAR:  I'd like you to

12   tell the Board, too, what role you believe she

13   played in all this?

14        INMATE ROUSE:  I believe Danielle, the

15   role she played in this, to me was, you know, I

16   think it was more my decision to continue to kill

17   this person, to take this person's life.

18        DEPUTY COMMISSIONER STAR:  Did she ever

19   say stop?

20        INMATE ROUSE:  No, she never did say stop,

21   because we talked about it, and she never did say

22   stop.

23        DEPUTY COMMISSIONER STAR:  Did she assist

24   you in deciding the next step?

25        INMATE ROUSE:  No, she didn't, she didn't,

26   she didn't assist me in doing it, this was just

27   something we talked about.  So it was more me

38

1    than it was her, it's not -- what I don't want to

2    do is try to shift the blame and make her look

3    like if it totally wasn't for her then I wouldn't

4    be sitting in front of you today.  My actions in

5    this is my actions.  And the role she played was,

6    again, in my head, not wanting to be the

7    individual who let her down.  I didn't think, I

8    was 20 years old, my thought was wasn't, you

9    know, from the beginning well honey we can find

10    this or we can do that, I was just caught up in

11    my own wanting to show her.

12    **DEPUTY COMMISSIONER STAR:**  And what is

13    different about you today in a similar situation

14    of having to impress anybody or show them the

15    person that you are, or that you could take care

16    ~~of somebody, that you wouldn't resort to this~~

17    sort of thinking pattern?

18    **INMATE ROUSE:**  The difference, the

19    difference, you know, that the difference today

20    is that I understand the value of life, and most

21    importantly, I follow God.  And the love, or what

22    I thought was love, or perceived to be was love,

23    is it was sick.  I can't tell you that I love you

24    or you love me if I'm willing to take someone's

25    life, that ain't caring for someone.  Or for

26    someone to ask me to put myself in the position

27    where someone's life is in jeopardy because of

39

1   what they want or desire from me outside of the

2   frame that God has set up.  And it's his right,

3   not mine, to take someone's life, or anybody's, I

4   don't have that right, he didn't give me that

5   right.  So today, I'm going to share this with

6   you, I was married to Yvonne Rouse, name was

7   Conner, and she told me that she talked to one of

8   her friends and one of her friends told her that

9   her husband would do anything for her.  She says

10  to me, "Honey, would you do anything for me?"  I

11  said, "Hell, no."  And I guess I shouldn't have

12  said it that way, but that's the way I felt

13  because it's like you're asking me to do the same

14  thing that somebody else asked me to do, to take

15  somebody's life because of what you thinking I

16  feel for you or I should feel for you.  You know,

17  someone's dead now because of that type of

18  thinking.  That ain't going to happen again, not

19  for love, that's not going to happen again.

20       **DEPUTY COMMISSIONER STAR:**  Okay.  What

21  about your anger?

22       **INMATE ROUSE:**  No, I've been in situations

23  in the penitentiary, as far as that goes, for

24  anger, you know, this place tries you every day

25  that you're here, someone does something to cause

26  you to become upset, become mad.

27       **DEPUTY COMMISSIONER STAR:**  Do you have any

40

1   children?

2       **INMATE ROUSE:**  No, I don't.

3       **DEPUTY COMMISSIONER HERRON:**  I have just

4   one question.

5       **DEPUTY COMMISSIONER STAR:**  Oh I'm sorry,

6   go ahead.

7       **DEPUTY COMMISSIONER HERRON:**  Back in 1978

8   in the City of Berkeley when you were identified

9   as taking a used car off the parking lot, did

10  that have anything to do with the crime, your

11  commitment offense?

12      **INMATE ROUSE:**  '78?

13      **DEPUTY COMMISSIONER HERRON:**  '78, a used

14  car lot, Berkeley, you were identified?

15      **INMATE ROUSE:**  I don't remember that,

16  ~~Berkeley?~~

17      **DEPUTY COMMISSIONER HERRON:**  Then earlier

18  on in '77, when Danielle, I think you said her

19  name was?

20      **INMATE ROUSE:**  Yeah.

21      **DEPUTY COMMISSIONER HERRON:**  She rented a

22  car from the Budget Rent-A-Car in Oakland and

23  failed to return it.  Did that have anything to

24  do with your commitment offense?

25      **INMATE ROUSE:**  No, no.

26      **DEPUTY COMMISSIONER HERRON:**  Do you

27  remember the incident?

41

1    **INMATE ROUSE:**  Now you're talking about,

2    yes.  Did it have to do with the commitment

3    offense, no.

4    **DEPUTY COMMISSIONER HERRON:**  So if you go

5    back to those used car lot in Berkeley what were

6    the circumstances surrounding that that made you

7    take the car?

8    **INMATE ROUSE:**  The circumstances that made

9    me took the car?

10    **DEPUTY COMMISSIONER HERRON:**  Yeah.  Why?

11    **INMATE ROUSE:**  Oh just needed a car.

12    **DEPUTY COMMISSIONER HERRON:**  Do you recall

13    what kind of car it was?

14    **INMATE ROUSE:**  It was beige.

15    **DEPUTY COMMISSIONER HERRON:** Not a Chevy

16    Monte Carlo?

17    **INMATE ROUSE:**  No, Monte Carlo would have

18    been different.  The one I remember that I took

19    the man's life in was a Monte Carlo.

20    **DEPUTY COMMISSIONER HERRON:**  And these two

21    incidents are in no way related to?

22    **INMATE ROUSE:**  No, sir.

23    **DEPUTY COMMISSIONER HERRON:**  Okay.  That's

24    all I have.

25    **PRESIDING COMMISSIONER ENG:**  Well,

26    apparently, the life crime wasn't the first time

27    that you had decided to abscond with a car?

42

1       **INMATE ROUSE:**  No.

2       **PRESIDING COMMISSIONER ENG:**  Correct?

3       **INMATE ROUSE:**  No.

4       **PRESIDING COMMISSIONER ENG:**  Well, what I

5   was getting at before is that you didn't, it

6   didn't appear that you had direct anger towards

7   this car salesman?

8       **INMATE ROUSE:**  No, I didn't.

9       **PRESIDING COMMISSIONER ENG:**  And yet you

10  committed the life crime.  And I asked you if you

11  had children because often -- I was going to ask

12  you how would you respond if you had a son that

13  was murdered that way?

14      **INMATE ROUSE:**  You know what, I think I

15  can answer that question.  I was talking to Mr.

16  Kellum (phonetic) about two days ago, and I said

17  that there are times, you know, that you could do

18  things you say to yourself that someone do that

19  to my brother or sister or something I'm going to

20  do this to them.  But having taken a life from

21  someone, it's not as simple as that, because

22  someone did something to someone you love.

23  Because I've always thought that, you know, if I

24  was in that situation, but now I can't say that I

25  would do that because I understand how it feels

26  to have taken someone's life for something as

27  trivial as a car.

43

1    **PRESIDING COMMISSIONER ENG:**  What do you

2    know about Mr. Faryabidoust?

3       **INMATE ROUSE:**  Nothing, I know nothing,

4    absolutely nothing about him.

5       **PRESIDING COMMISSIONER ENG:**  Did you ever

6    try to find out if he was married, had children,

7    if he left any family?

8       **INMATE ROUSE:**  Yes, and they denied me

9    access, said I needed an attorney to find out

10   that information.

11      **PRESIDING COMMISSIONER ENG:**  Correct.  So

12   tell me, when you hear that name, as difficult as

13   the name is for us to pronounce, what do you

14   think about?

15      **INMATE ROUSE:**  I think about a man's life

16   that I took.

17      **PRESIDING COMMISSIONER ENG:**  What about,

18   what do you think about this particular man, not

19   in general that you took a man's life, but this,

20   this Mr. Faryabidoust?  What do you recall about

21   him and what do you think about specifically

22   about him?

23      **INMATE ROUSE:**  What I recall about him,

24   what I recall about him is his face, he's gray,

25   had gray hair, and I believe he had a moustache.

26      **PRESIDING COMMISSIONER ENG:**  So he was

27   older?

44

1        INMATE ROUSE:  Yes, he was.

2        PRESIDING COMMISSIONER ENG:  Okay.

3        INMATE ROUSE:  He was older.  And the

4    sadness in his face, that's what I remember about

5    him.

6        PRESIDING COMMISSIONER ENG:  You indicated

7    when he started to speak another language this

8    angered you?

9        INMATE ROUSE:  No, that was --

10        PRESIDING COMMISSIONER ENG:  No?

11    Frustrated you?  What did it do to you?  I

12    thought I heard?

13        INMATE ROUSE:  No, that was my excuse for

14    hitting him, that wasn't something he did to

15    cause me to become angry, that was just my excuse

16    to kill this person.

17        PRESIDING COMMISSIONER ENG:  But you also

18    said you had planned to do so because you didn't

19    want to have a witness?

20        INMATE ROUSE:  Yes, ma'am.

21        PRESIDING COMMISSIONER ENG:  So it was the

22    timing, is that what I'm hearing, that when he

23    did that you said well I'll do it right now?

24        INMATE ROUSE:  Yes, ma'am.

25        PRESIDING COMMISSIONER ENG:  Okay.  I

26    don't have any other questions.  Well, I do, I

27    want to explore.  You said you were involved in a

45

1    car thing before.  Did you have a job then?

2         INMATE ROUSE:  No, ma'am, I'd just came

3    out of Job Corps.

4         PRESIDING COMMISSIONER ENG:  You came out

5    of jail?

6         INMATE ROUSE:  Job Corps.

7         PRESIDING COMMISSIONER ENG:  Job Corps, I

8    see.

9         INMATE ROUSE:  Yes, ma'am.

10        PRESIDING COMMISSIONER ENG:  So how were

11   you supporting yourself?

12        INMATE ROUSE:  I wasn't, I just came --

13        PRESIDING COMMISSIONER ENG:  Nothing?

14        INMATE ROUSE:  No, I just came from North

15   Carolina out to California.

16        PRESIDING COMMISSIONER ENG:  Were you

17   living with this female that you were with?

18        INMATE ROUSE:  Yes, ma'am.

19        PRESIDING COMMISSIONER ENG:  And how were

20   you paying for that?

21        INMATE ROUSE:  She was.

22        PRESIDING COMMISSIONER ENG:  She was?  By?

23        INMATE ROUSE:  She worked.

24        PRESIDING COMMISSIONER ENG:  She worked?

25        INMATE ROUSE:  Yes.

26        PRESIDING COMMISSIONER ENG:  Okay.  And

27   she had a car at one point?

46

1       **INMATE ROUSE:**  Yes, ma'am.

2       **PRESIDING COMMISSIONER ENG:**  And what

3  happened to that car?

4       **INMATE ROUSE:**  It went into -- she got mad

5  at me and drove it into some type of store, and

6  the undercarriage, she broke that.

7       **PRESIDING COMMISSIONER ENG:**  The

8  undercarriage?

9       **INMATE ROUSE:**  Yes.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  And

11  when this other incident that occurred a year or

12  two before the life crime, why were you involved

13  in taking a car then?

14       **INMATE ROUSE:**  That -- we didn't have a

15  car then, that was when we first got to, when I

16  ~~first got to California she didn't have a car.~~

17  We got that car from a dealership, because all

18  you need then was just an ID and a driver's

19  license and they would let you rent the car.  We

20  didn't really steal it, we just rented and didn't

21  turn it in.

22       **PRESIDING COMMISSIONER ENG:**  Didn't return

23  it?

24       **INMATE ROUSE:**  But it wasn't like we

25  wasn't going in there and tripping and all that

26  kind of stuff, we just didn't return it, that's

27  all.

47

1   PRESIDING COMMISSIONER ENG: Can you

2   understand the Board's sort of the similarity of

3   this, although one's certainly a lot more serious

4   than the other, but the idea of taking other

5   person's cars and then escalating it on the

6   second incident?

7       INMATE ROUSE: Yes, ma'am.

8   PRESIDING COMMISSIONER ENG: Did you, do

9   you think that having property and possessions

10  were important, do you feel that that was a

11  factor?

12      INMATE ROUSE: No. Me, personally, I've

13  never been materialistic, I've never -- I didn't

14  grow up like that, I didn't never -- we've always

15  shared, my mother had us to share everything

16  we've ever had.

17  PRESIDING COMMISSIONER ENG: Let's go

18  through your personal background and family

19  history, I'll have to pull it from all over. You

20  were born on June 9th, 1957, in Newark, New

21  Jersey, correct?

22      INMATE ROUSE: Yes, ma'am.

23  PRESIDING COMMISSIONER ENG: Okay. And

24  you are number two in a total of four children

25  born to your parents Vernon and Vivian; is that

26  correct?

27      INMATE ROUSE: Yes, ma'am.

48

1      **PRESIDING COMMISSIONER ENG:** Okay. So you

2  have three siblings. Are they boys, girls,

3  mixture, what do you have?

4      **INMATE ROUSE:** Yeah, I have Craig, and I

5  have Vern, and I have Adrian, those are the four

6  that was born to my parents. And then I have

7  also --

8      **PRESIDING COMMISSIONER ENG:** Oh Vern, I

9  see here also in a previous psych evaluation,

10  Vern, is he your older brother?

11      **INMATE ROUSE:** He was, yes.

12      **PRESIDING COMMISSIONER ENG:** And he passed

13  away?

14      **INMATE ROUSE:** Yes, ma'am.

15      **PRESIDING COMMISSIONER ENG:** From HIV?

16      **INMATE ROUSE:** Yes he did.

17      **PRESIDING COMMISSIONER ENG:** How long ago

18  was that?

19      **INMATE ROUSE:** It was '80, no, it was in

20  '90s, I was in CMC East.

21      **PRESIDING COMMISSIONER ENG:** Okay. And

22  then, okay, so you have another brother?

23      **INMATE ROUSE:** Yeah, I have Craig and

24  Adrian.

25      **PRESIDING COMMISSIONER ENG:** Craig and

26  Adrian?

27      **INMATE ROUSE:** Yes, ma'am.

49

1      **PRESIDING COMMISSIONER ENG:**  Adrian's a

2  boy or girl?

3      **INMATE ROUSE:**  Adrian's a girl.

4      **PRESIDING COMMISSIONER ENG:**  A girl, okay,

5  checking because you never know.

6      **INMATE ROUSE:**  No, Adrian's a girl.

7      **PRESIDING COMMISSIONER ENG:**  Okay.  So

8  both of those are younger than you?

9      **INMATE ROUSE:**  Yes, ma'am.

10      **PRESIDING COMMISSIONER ENG:**  Okay.  And

11  where are they?

12      **INMATE ROUSE:**  Craig is in Virginia and

13  Adrian is in North Carolina.

14      **PRESIDING COMMISSIONER ENG:**  In North

15  Carolina, okay.  Are your parents still alive?

16      **INMATE ROUSE:**  My father died in '97, I

17  think '97.

18      **PRESIDING COMMISSIONER ENG:**  Okay.

19      **INMATE ROUSE:**  And my mother's still

20  alive.

21      **PRESIDING COMMISSIONER ENG:**  Your mother's

22  still alive.  And where's your mother?

23      **INMATE ROUSE:**  She's in North Carolina.

24      **PRESIDING COMMISSIONER ENG:**  Okay.  How

25  old is she now?

26      **INMATE ROUSE:**  I think she's 50 -- 58, 59

27  [sic].

50

1          PRESIDING COMMISSIONER ENG:  So you're the

2     only one that came out west?

3          INMATE ROUSE:  Yes, ma'am.

4          PRESIDING COMMISSIONER ENG:  Oh I see that

5     your parents they separated when you were nine,

6     did they divorce?

7          INMATE ROUSE:  No, never divorced.

8          PRESIDING COMMISSIONER ENG:  Okay.  So

9     they just separated?

10         INMATE ROUSE:  Yes, ma'am.

11         PRESIDING COMMISSIONER ENG:  Did they ever

12    get back together again?

13         INMATE ROUSE:  Never.

14         PRESIDING COMMISSIONER ENG:  Okay.  So

15    your mother, were they both in North Carolina,

16    they both stayed there, or?

17         INMATE ROUSE:  No.

18         PRESIDING COMMISSIONER ENG:  No?  Your

19    father moved away?

20         INMATE ROUSE:  In New Jersey, my father's

21    still in New Jersey, he was in New Jersey when he

22    passed away.

23         PRESIDING COMMISSIONER ENG:  Your mother's

24    the one that moved to North Carolina?

25         INMATE ROUSE:  Yes, ma'am.

26         PRESIDING COMMISSIONER ENG:  Okay, all

27    right.  So she, what, took the kids and moved to

51

1    North Carolina?

2         **INMATE ROUSE:**  Yes, ma'am.

3         **PRESIDING COMMISSIONER ENG:**  And your

4    father stayed in New Jersey, okay, got it. So you

5    were going to school in North Carolina?

6         **INMATE ROUSE:**  Yes, ma'am.

7         **PRESIDING COMMISSIONER ENG:**  And you

8    dropped out and then you joined the Job Corps.

9    And what did you do in Job Corps?

10        **INMATE ROUSE:**  Mechanics.

11        **PRESIDING COMMISSIONER ENG:**  They were

12   teaching you?

13        **INMATE ROUSE:**  Yeah, auto mechanics, I

14   graduated in auto mechanics.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  And

16   that was all in North Carolina, correct?

17        **INMATE ROUSE:**  Yes.

18        **PRESIDING COMMISSIONER ENG:**  All right.

19        **INMATE ROUSE:**  The Job Corps was in

20   Kentucky.

21        **PRESIDING COMMISSIONER ENG:**  That was in

22   Kentucky?

23        **INMATE ROUSE:**  Yes, ma'am.

24        **PRESIDING COMMISSIONER ENG:**  Okay, so,

25   okay.  I'm trying to piece this together.  So you

26   came out to California with, with who?

27        **INMATE ROUSE:**  Danielle.

52

1    **PRESIDING COMMISSIONER ENG:**  Danielle?

2    **INMATE ROUSE:**  Yes, ma'am.

3    **PRESIDING COMMISSIONER ENG:**  And you met

4    Danielle back in North Carolina?

5    **INMATE ROUSE:**  New Jersey.

6    **PRESIDING COMMISSIONER ENG:**  Back in New

7    Jersey?

8    **INMATE ROUSE:**  Yes, ma'am.

9    **PRESIDING COMMISSIONER ENG:**  Okay, I'm

10   trying to keep it all together, I'm sorry.

11   **INMATE ROUSE:**  Yeah, it's okay.

12   **PRESIDING COMMISSIONER ENG:**  Okay.  So the

13   two of you came out together, okay.  Did you, did

14   you guys marry, you did marry?

15   **INMATE ROUSE:**  No, ma'am.

16   **PRESIDING COMMISSIONER ENG:**  You didn't

17   marry, okay.

18   **INMATE ROUSE:**  No.

19   **PRESIDING COMMISSIONER ENG:**  But you did

20   get married to someone in 1990?

21   **INMATE ROUSE:**  That was Yvonne.

22   **PRESIDING COMMISSIONER ENG:**  Okay.  And no

23   children?

24   **INMATE ROUSE:**  Yes, ma'am.

25   **PRESIDING COMMISSIONER ENG:**  Okay.

26   **DEPUTY COMMISSIONER STAR:**  Commissioner

27   Eng?  How old did you say your mother was, sir?

53

1        **PRESIDING COMMISSIONER ENG:** She can't be

2   58 years old.

3        **DEPUTY COMMISSIONER STAR:** I know, I was

4   just, I was going to

5        **INMATE ROUSE:** I don't know, I don't know.

6        **PRESIDING COMMISSIONER ENG:** If you're 49

7   that means --

8        **INMATE ROUSE:** Yeah, I couldn't tell you

9   how old, you know what --

10        **DEPUTY COMMISSIONER HERRON:** Call the

11   Inquirer.

12        **PRESIDING COMMISSIONER ENG:** (Laughing)

13   It's okay, your mother will love you, sir.

14        **INMATE ROUSE:** Yeah.

15        **DEPUTY COMMISSIONER STAR:** It's all right.

16        ~~INMATE ROUSE: I couldn't tell you.~~

17        **DEPUTY COMMISSIONER STAR:** Make sure you

18   send her a copy of the transcript, when she hears

19   that she's only 58 or 59, and I believe you're 49

20   right now.

21        **INMATE ROUSE:** Yeah, I am.

22        **PRESIDING COMMISSIONER ENG:** So you're now

23   in the same age group.

24        **DEPUTY COMMISSIONER STAR:** That's okay.

25   Don't send her any birthday cards until you get

26   that right, okay?

27        **INMATE ROUSE:** Absolutely. The strange

54

1   thing about that is you come to prison, like even

2   my sisters and my brothers, it hurt not to be

3   there so you --

4           PRESIDING COMMISSIONER ENG:  You stop, the

5   clock stopped?

6           INMATE ROUSE:  Yeah, it stops, you push it

7   away, and you just -- I miss their birthdays all

8   the time because I got so used to.

9           PRESIDING COMMISSIONER ENG:  Do you talk

10  to your mother?

11          INMATE ROUSE:  Oh yeah, I talked to my

12  mother last week.  Fortunately, I had the

13  pleasure of leading a young lady in Squires, and

14  we -- she affords me the opportunity to speak to

15  her.

16          PRESIDING COMMISSIONER ENG:  Okay.  What

17  type of conversation did you have with your

18  mother about your life crime?

19          INMATE ROUSE:  I told her I took someone's

20  life.  Like that was, that was when I was in the

21  county jail, when I explained to her what I did,

22  and she just said, "Oh baby."  We didn't really

23  talk in the county jail, you get 15 minutes a

24  phone call, and you didn't -- somebody else

25  behind you in the line and you have to, that kind

26  of thing.

27          PRESIDING COMMISSIONER ENG:  And your

55

1  father was alive back then?

2      **INMATE ROUSE:**  Well, that was a little

3  different with him.  The difference was when she

4  told me that he was concerned I became angry,

5  because in my mind it was like now you care about

6  me, now that I'm here.

7      **PRESIDING COMMISSIONER ENG:**  Okay.

8      **INMATE ROUSE:**  To me that didn't make

9  sense to me, that was if you were in my life when

10  I was a kid then maybe I wouldn't be standing

11  here today looking through bars as cars pass,

12  getting stuff slammed in my ears, sticking my

13  fingers in my ears, I wouldn't be doing this,

14  man, if someone like that took -- I wouldn't be

15  here.  So that was --

16      **PRESIDING COMMISSIONER ENG:**  How do you

17  feel about that today?

18      **INMATE ROUSE:**  What do you mean?

19      **PRESIDING COMMISSIONER ENG:**  Well, you

20  just said you had thoughts if your father had

21  been in your life you wouldn't be here today.

22      **INMATE ROUSE:**  The difference is is doing

23  time I had a chance to get to know him.  We

24  finally started writing each other, and we became

25  friends, though I can't tell you that I love him

26  because I didn't know him in that way, but we

27  became friends with each other and we would talk.

56

1    Now, I can never, I have never discussed the

2    crime with him because it always had been my hope

3    that I could sit with him and talk to him and try

4    to share with him who I was psychologically, and

5    tell him had you been in my life, had I not seen

6    what I saw, then I don't believe I would have

7    took someone's life.  That's what I felt, and

8    I'll never get a chance to do that because he

9    passed away from emphysema, but that's how I felt

10   at the time.

11          **PRESIDING COMMISSIONER ENG:**  Any of your

12   other siblings ever have any problem with the

13   law?

14          **INMATE ROUSE:**  Craig has.

15          **PRESIDING COMMISSIONER ENG:**  Has?

16          ~~INMATE ROUSE:  Yes, he's in prison right~~

17   now in Virginia.

18          **PRESIDING COMMISSIONER ENG:**  For what?

19          **INMATE ROUSE:**  Robbery and drugs, selling

20   drugs, using crack.

21          **PRESIDING COMMISSIONER ENG:**  What about

22   your sister?

23          **INMATE ROUSE:**  None that I know of, no one

24   else except for me and Craig.

25          **PRESIDING COMMISSOINER ENG:**  Is your

26   sister in touch with you?

27          **INMATE ROUSE:**  Yes, ma'am.  But we do the

57

1  same thing, we call.

2          PRESIDING COMMISSIONER ENG:  Okay.  Have

3  any of your relatives or family been out to

4  California to see you since you've been

5  incarcerated?

6          INMATE ROUSE:  Yes, ma'am, my mother has.

7          PRESIDING COMMISSIONER ENG:  She has come

8  out to see you?

9          INMATE ROUSE:  Yes, my mother, my auntie,

10  my grandmother, and my uncle.

11          PRESIDING COMMISSIONER ENG:  Your grandma?

12          INMATE ROUSE:  Yeah.

13          PRESIDING COMMISSIONER ENG:  Did they come

14  out from -- I know your mother came from North

15  Carolina.

16          INMATE ROUSE:  Well, my grandmother's in

17  (inaudible).

18          PRESIDING COMMISSIONER ENG:  Oh okay, so

19  your mother's family is --

20          INMATE ROUSE:  She left and went to North

21  Carolina she talked to my mom and told her how I

22  was, and so she followed her down.

23          PRESIDING COMMISSIONER ENG:  Okay.  Have I

24  left anything out regarding your prior

25  criminality, or your personal history, did I

26  leave anyone out?

27          INMATE ROUSE:  No, ma'am, as far as

58

1    siblings are concerned, no.

2         **PRESIDING COMMISSIONER ENG:**  And you're

3    not married now?

4         **INMATE ROUSE:**  No, I'm not.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  I'm

6    going to pass it on to Commissioner Star to

7    review your post-conviction factors right now.

8         **DEPUTY COMMISSIONER STAR:**  Okay, sir.

9    Well, we've already established that you were

10   granted a parole date on October 5th of 2005, and

11   then the Governor reversed that on February 22nd.

12   So I went back to look at the last time you

13   appeared at a hearing before the Board with a

14   denial to look and see what the recommendations

15   were at that time, this would be the hearing

16   before the parole grant, which was March 17th of

17   '04.  And at that time the Panel told you to

18   remain disciplinary free and continue to

19   participate in self-help.  So I'm going to focus

20   on your adjustment in prison, programming since

21   that March '04, and just -- and I'll be asking

22   you to update it with anything I may be missing,

23   as well. Okay?

24        **INMATE ROUSE:**  Okay.

25        **DEPUTY COMMISSIONER STAR:**  Since that

26   March '04 appearance you've had no

27   disciplinaries, and, for the record, your entire

59

1   life term has been disciplinary free.  And you're

2   certainly commended --

3        INMATE ROUSE:  No, I've had one 115.

4        DEPUTY COMMISSIONER STAR:  How come it's

5   not in the file then?

6        INMATE ROUSE:  I don't know.  I told the

7   Board last time I had one 115.

8        DEPUTY COMMISSIONER STAR:  I appreciate

9   your being honest like that, because I saw

10  referenced in one of the psych reports that you

11  had one 115, but I looked in your file and it was

12  absent.

13       INMATE ROUSE:  Well, what happened, what

14  happened is this, the officer told me I didn't

15  have to come to work, I had to go to school that

16  particular day, so I didn't go.  I went the next

17  day and the staff member said what the teacher

18  said that you got a write-up.  Now, he didn't

19  distinguish to me whether it was a 128 or a 115.

20  So I went to the hearing and I told the officer

21  what happened, and he said to me that because I

22  went to change to try to clean this up that the

23  motive wasn't my fault, he said, "Well, I'll tell

24  you what, I won't give you this 115," he said,

25  "But if you do get another 115 I'll give you this

26  one and that one too," and I said, "Okay."

27       DEPUTY COMMISSIONER STAR:  And you didn't

60

1    get any more?

2        INMATE ROUSE:  No, I didn't get any more.

3        DEPUTY COMMISSIONER STAR:  So excepting

4    your explanation, I would say you didn't receive

5    one.

6        INMATE ROUSE:  Well --

7        DEPUTY COMMISSIONER STAR:  Why do you

8    choose to say yes I have?

9        INMATE ROUSE:  Well, because of another

10   hearing they said I had a 115, but I knew I went

11   through that with these people, so I --

12       DEPUTY COMMISSIONER STAR:  Okay.  And did

13   he end up giving you a 128, since he's not going

14   to give you a 115 I'm going to give you a

15   counseling chrono, did he give you that?

16       INMATE ROUSE:  I think that's what he

17   might have did that, because I think I had three

18   and --

19       DEPUTY COMMISSIONER STAR:  What was that

20   for?  Did the -- what did you do to cause you --

21       INMATE ROUSE:  I didn't report to class.

22       DEPUTY COMMISSIONER STAR:  You didn't

23   report to class, huh?

24       INMATE ROUSE:  Yes.

25       DEPUTY COMMISSIONER STAR:  Okay.  I'm

26   going to go over these real quick, you called

27   reference to it, I want to look at this last 128.

61

1        **ATTORNEY STRINGER:**  That was an issue at

2   the --

3        **DEPUTY COMMISSIONER STAR:**  Last hearing?

4        **ATTORNEY STRINGER:**  -- last granting

5   hearing, and the same thing came up, we talked

6   about it and we could never find it.

7        **DEPUTY COMMISSIONER STAR:**  And you did not

8   conclude it was one of the 128s that had been

9   downgraded, or 115 downgraded to a 128, or

10  anything?

11       **INMATE ROUSE:**  Maybe he didn't put it in.

12  See that's what I was told, that's what he told

13  me, that if you get a 115 I'm going to give you

14  this one and the next one.  At one of my prior

15  Board hearings they said I had a 115, so that's

16  the only thing that I can refer to was that

17  particular incident, so.

18       **DEPUTY COMMISSIONER STAR:**  Well, did you

19  go to school?

20       **INMATE ROUSE:**  Yes.

21       **DEPUTY COMMISSIONER STAR:**  Was it in '91?

22       **INMATE ROUSE:**  No, that was in when I

23  first came to the penitentiary, that was in '79.

24       **DEPUTY COMMISSIONER STAR:**  Oh huh?

25       **INMATE ROUSE:**  In '79.

26       **DEPUTY COMMISSIONER STAR:**  See it shows in

27  the Board report shows that one of your 128s, the

62

1    most recent one is on September 30th, '91, for

2    failure to report.

3         INMATE ROUSE:  Um-hmm.

4         DEPUTY COMMISSIONER STAR:  Yeah, we have,

5    we have that one, then that's, then there's

6    nothing.  And I think the place that I only saw,

7    because I didn't read the transcript from the

8    last time, that I saw 115 I think one of the

9    psych reports said one 115.

10        INMATE ROUSE:  Well, I'm glad you cleared

11   it up because I thought I had one.  Thank you.

12        DEPUTY COMMISSIONER STAR:  Well, at this

13   time I'm going to let the record reflect there's

14   nothing in the central file and move on.  Okay?

15        INMATE ROUSE:  Thank you.

16        DEPUTY COMMISSIONER STAR:  And but, you

17   know, I appreciate your forthrightness, sir, and

18   the way you're speaking to the Panel today.

19   Okay.  Let's -- and I've already covered you've

20   had three 128s with the last one being in '91, so

21   that was 15 years ago.  Your classification score

22   is 19, which is the mandatory minimum for lifers,

23   and you're Medium A Custody.  Vocationally, you

24   have a 1988 certificate in welding, is that about

25   right?

26        INMATE ROUSE:  Yes, ma'am.

27        DEPUTY COMMISSIONER STAR:  Okay.  And you

63

1    indicated that you were certified as a computer

2    operator, but from what I can tell is you

3    actually you've taken a lot of computer classes?

4         INMATE ROUSE:  Right.

5         DEPUTY COMMISSIONER STAR:  Okay.  Have you

6    been licensed in any special way or anything?

7         INMATE ROUSE:  No, no, ma'am.

8         DEPUTY COMMISSIONER STAR:  Okay.  And I've

9    seen various chronos in your assignments where

10   you can use various databases?

11        INMATE ROUSE:  Yes, ma'am.

12        DEPUTY COMMISSIONER STAR:  Did you self-

13   taught, teach yourself a lot of this?

14        INMATE ROUSE:  Yeah, a lot of it was

15   taught through the college courses, Patent

16   College.

17        DEPUTY COMMISSIONER STAR:  Because you

18   took the computer classes at Patent?

19        INMATE ROUSE:  Patent College, yes, ma'am.

20        DEPUTY COMMISSIONER STAR:  Okay.  And I

21   also saw that you were a certified literacy

22   tutor?

23        INMATE ROUSE:  Yes, ma'am.

24        DEPUTY COMMISSIONER STAR:  Certified by

25   who?

26        INMATE ROUSE:  Laubach (phonetic).

27        DEPUTY COMMISSIONER STAR:  Is that an

64

1    outside agency?

2        **INMATE ROUSE:** Yes, ma'am.

3        **DEPUTY COMMISSIONER STAR:** Laubach. Okay.

4    Was that, did that require taking classes?

5        **INMATE ROUSE:** Yes, ma'am.

6        **DEPUTY COMMISSIONER STAR:** How many?

7        **INMATE ROUSE:** It was like an intense

8    training like a three weeks training course.

9        **DEPUTY COMMISSIONER STAR:** Do you do any

10   of that now?

11       **INMATE ROUSE:** No, I haven't, there's been

12   various other groups.

13       **DEPUTY COMMISSIONER STAR:** Okay. And

14   when's the last time, when were you certified, do

15   you remember the year?

16       **INMATE ROUSE:** I was in CMC East, I had to

17   be in '92, '93 somewhere around there, because I

18   left there then.

19       **DEPUTY COMMISSIONER STAR:** Okay. Now,

20   educationally I think this thing covers you were

21   a tenth grade dropout, but in 1992 you got your

22   GED. What institution were you at then?

23       **INMATE ROUSE:** CMC East.

24       **DEPUTY COMMISSIONER STAR:** Okay. And then

25   you went on to take college courses, and you've

26   actually earned your AA degree from Patent

27   College?

65

1          INMATE ROUSE:  Yes, ma'am.

2          DEPUTY COMMISSIONER STAR:  And that was

3   while you were here in 2002?

4          INMATE ROUSE:  Yes, ma'am.

5          DEPUTY COMMISSIONER STAR:  Okay.

6   Congratulations on that.

7          INMATE ROUSE:  Thank you.

8          DEPUTY COMMISSIONER STAR:  All right.  And

9   you continued after that to take college courses,

10  correct?

11         INMATE ROUSE:  Yes.

12         DEPUTY COMMISSIONER STAR:  Are you working

13  towards a four-year degree, or?

14         INMATE ROUSE:  You know, they -- right now

15  it's on hold because they don't have the space,

16  they said they don't have the space to research,

17  for research materials.  They will be expanding

18  the library here, when I don't know, or if they

19  will.

20         DEPUTY COMMISSIONER STAR:  So Patent is no

21  longer at this point happening here?

22         INMATE ROUSE:  Oh no, you still have

23  Patent College here.

24         DEPUTY COMMISSIONER STAR:  You do?

25         INMATE ROUSE:  Yeah, you still have the

26  college here.

27         DEPUTY COMMISSIONER STAR:  Oh okay.  All

66

1    right.  You're working as the clerk in the

2    Assignment Lieutenant's Office?

3            INMATE ROUSE:  Yes, ma'am.

4            DEPUTY COMMISSIONER STAR:  And you've been

5    doing so, what, for the last six or seven years,

6    correct?

7            INMATE ROUSE:  Yes, ma'am.

8            DEPUTY COMMISSIONER STAR:  And I note

9    there is a chrono dated July '06 that gives you

10   exceptional ratings, and I again commend you on

11   that.  Hang on, this is a good time for me to

12   change the tape.  We're going to go off record.

13                    **(Off the record)**

14                       **-- oOo --**

15           DEPUTY COMMISSIONER STAR:  Okay.  This is

16   Side A of Tape Two, for Mr. Rouse, C, number

17   03721.  Okay.  I also am going to take note that

18   what you indicate to Ms. Eng to worked as an auto

19   mechanic in Job Corps, which is also another pre-

20   prison kind of skill, a marketable skill.  In

21   terms of your programming, sir, again I'm trying

22   to focus on everything since the '04 hearing, but

23   I don't, I don't want to short you, and I'm just

24   going to give a list of the programs you've

25   participated in.  You've completed Cat X, right?

26           INMATE ROUSE:  Yes, ma'am.

27           DEPUTY COMMISSIONER STAR:  Okay.  You've

67

1    been participating in -- hang on while I get

2    your, AA, you still doing AA?

3         **INMATE ROUSE:**  I never did the AA.

4         **DEPUTY COMMISSIONER STAR:**  AA/NA, you

5    never did that?

6         **INMATE ROUSE:**  No, ma'am.  There was

7    Maladi (phonetic) Islamic program, Maladi Islamic

8    program, that I helped put together, but wasn't

9    participating in.

10        **DEPUTY COMMISSIONER STAR:**  Okay, okay.  I

11   want to look at something real quick, hang on.

12   Here's the Governor's report had indicated that

13   you were doing AA and NA?

14        **INMATE ROUSE:**  Oh yeah?

15        **DEPUTY COMMISSIONER STAR:**  Yeah.  But

16   you've never participated in that?

17        **INMATE ROUSE:**  No.

18        **DEPUTY COMMISSIONER STAR:**  Okay.  All

19   right.  You've done Squires, Alternatives to

20   Violence, been a member of the Inmate Educational

21   Advisory Committee, you participate in Arts and

22   Corrections, you did Impact Sessions, Kairos,

23   Alternatives to Violence, oh I already mentioned

24   that, Anger Control, and eight week Reality In

25   Decision Making, Advanced Alternatives To

26   Violence, Communication Training, the Laubach

27   Literacy Tutor Certification, we already talked

68

1  about that.  Lots of courses, HIV Peer Education,

2  and Transcendental Medication [sic].

3         INMATE ROUSE:  Meditation.

4         DEPUTY COMMISSIONER STAR:  Meditation, I'm

5  sorry.  Medication, thank you.  Okay.  Now,

6  focusing since the more recently I see a chrono

7  of dated May 29th, '06, that you went to the

8  Kairos retreat, correct?

9         INMATE ROUSE:  Yes, ma'am.

10         DEPUTY COMMISSIONER STAR:  And your

11  attorney has handed me a December 18th, '06, that

12  you participated, from Dr. Dupree, that you

13  participated in a ten-week self-esteem

14  enhancement project, wait a minute, that was back

15  in '93.

16         INMATE ROUSE:  That was in '93, yeah.

17         DEPUTY COMMISSIONER STAR:  So he's just

18  writing a letter of reference for you, huh?

19         INMATE ROUSE:  Yes, ma'am.

20         DEPUTY COMMISSIONER STAR:  Okay, okay.

21  I'll take note of that, okay.  So currently, tell

22  the Board, currently which ones are you active in

23  right now?

24         INMATE ROUSE:  Right now I'm active in the

25  Rosemary Mothers Catholic Church Roundtable, and

26  what that is is a restorative action program, I'm

27  facilitator in impact, facilitator in the trust

69

1   fellows.  And I still facilitate the Squires

2   Program.

3           **DEPUTY COMMISSIONER STAR:**  Okay.  Now, one

4   of the patterns I've noticed, sir, and I just

5   want -- it looks like all your programming

6   started approximately ten years after you did

7   your life crime, am I reading this correctly?

8           **INMATE ROUSE:**  Right, right.

9           **DEPUTY COMMISSIONER STAR:**  Could you

10  explain that to the Board?

11          **INMATE ROUSE:**  Like I said, when I first,

12  when I first started doing time, you know, you

13  don't want to, or at least I didn't, didn't think

14  to correct myself.  After I started taking these

15  programs I found out that that's when it became

16  ~~necessary.  You can't expect to ever gain your~~

17  freedom if you can't explain to the Board what

18  happened, or you don't explain to the Board that

19  you took somebody's life.  And it's deeper than

20  just my being with you eye to eye and tell you

21  what I've done to understand how if affects the

22  victims of this crime.  That was for me the

23  catalyst that changed my life, understanding how

24  you affect society as a whole by taking someone's

25  life like this.

26          **DEPUTY COMMISSIONER STAR:**  How do you look

27  at those first ten years then, approximately?

70

1      INMATE ROUSE:  I look at the first ten

2  years as trying to adjust to prison, trying to

3  understand where I was.  I never -- it was

4  straight from the streets, straight to county

5  jail, straight to prison.  I remember being in

6  the county jail I want to tell you all I did was

7  shut up, and that was because I wanted to hear a

8  woman's voice.  So it was an adjustment for me to

9  try to get used to being confined.

10      DEPUTY COMMISSIONER STAR:  I'm struck, I

11  mean, you obviously weren't a disciplinary

12  problem because there's no disciplinaries.  But

13  the other, I'm also seeing like, you know, wow,

14  here's a person that basically could have been

15  developing himself for ten years and didn't, and

16  I'm trying to -- maybe just going along to get

17  along, you know, what was your motivation?

18      INMATE ROUSE:  And that's what it was,

19  going along to get along, I'm not used to this,

20  I'm, you know.

21      DEPUTY COMMISSIONER STAR:  Okay.  Let's

22  move on.  Was there any other programming

23  particularly since the last hearing in '04?  Or

24  anything this year you want to make sure the

25  Board takes into consider, sir, that I didn't

26  mention?

27      INMATE ROUSE:  No, no, I think that that

71

1    was all of it, that was all.  But I want to say

2    this, and let me back up, Tracy, and I'm kind of

3    upset at myself I don't have any documentation,

4    but (inaudible) in '86, Dr. Chaulan (phonetic),

5    he was a psychologist, and Tracy, and that's when

6    I began to --

7        **DEPUTY COMMISSIONER STAR:**  So you were

8    doing individual therapy with Dr. Chaulan?

9        **INMATE ROUSE:**  With Dr. Chaulan, yes.  But

10   I don't have anything to document that other than

11   just my telling you.  He used to work for Tracy

12   and then he left and went to another institution.

13       **DEPUTY COMMISSIONER STAR:**  Okay.  I'm

14   going to move on, sir, to your psychiatric

15   report.  We always review the last available

16   psychiatric report.  In your case I also looked

17   at the one before, there was one in '99 by Dr.

18   Dupree, who has also written a reference support

19   letter for you today.  At that time in '99 he

20   said your risk assessment was below average

21   compared to inmates, but average otherwise, am I

22   reading that correct?  Let me see, hang on.

23       "Violence potential is judged to be

24       below average for this population

25       of inmates.  This prognosis, his

26       prognosis appears to be above

27       average."

72

1          So that was back in '99, okay.  Then we go

2     to the next report isn't done for another five

3     years, and that's a report and it's the last and

4     most recently available by Dr. Kuo, K-U-O, a

5     psychiatrist MD.  And his Axis I diagnosis --

6          **INMATE ROUSE:**  It's a she.

7          **DEPUTY COMMISSIONER STAR:**  It's a Sue?

8          **INMATE ROUSE:**  A she.

9          **DEPUTY COMMISSIONER STAR:**  Spelled with a

10    C?

11         **INMATE ROUSE:**  No, her name, she's a

12    woman.

13         **DEPUTY COMMISSIONER STAR:**  Oh it's a she?

14         **INMATE ROUSE:**  Yes.

15         **DEPUTY COMMISSIONER STAR:**  Oh well, okay,

16    that's good, all right.  She gave you an Axis I

17    diagnosis of nothing, on Axis I.  Axis II,

18    deferred. Axis III, none.  Axis IV is

19    incarceration.  Axis V is your GAF score of 75.

20    She reviewed the life crime with you, said that

21    you demonstrated significant remorse, you

22    provided her with the explanation of the impact

23    of your father's treatment on your mother as

24    your, as explanation and/or understanding of your

25    life crime.  And she made an assessment of

26    dangerousness, I'm going to refer to page 3.  It

27    says,

73

1     "Mr. Rouse has a few risk factors

2     associated with future violence

3     including male gender and history

4     of violent behavior. However, he

5     has more protective factors that

6     reduce his risk of future

7     violence, including absence of

8     prior legal history, except for

9     one incident as a juvenile

10    involving stealing a ring.

11    Absence of childhood physical or

12    sexual abuse. Absence of

13    substance abuse. And absence of

14    mental illness."

15    He [sic] goes on to say,

16    "Mr. Rouse's participation in

17    various self-help groups including

18    anger management, Squires And

19    Impact, and his practice of the

20    Muslim religion since 1986

21    demonstrates a willingness and

22    desire to examine and change his

23    self-defeating character traits.

24    Mr. Rouse's own detailed

25    description and thought process

26    about the crime and himself

27    indicates he is remorseful and has

74

1       insight into himself and his

2       behavior.  He appears to have

3       changed some of the self-defeating

4       character traits that led to his

5       current incarceration.  He's been

6       free of disciplinary actions except

7       for," and this is in error, "one

8       128 in 1979."

9       I think we concluded you had three, and

10   the last one was 1991, so that appears to be an

11   error in his report,

12       "And he received outstanding

13       laudatory chronos for his work in

14       October '03."

15       Of course, I've updated that with more

16   current information today.

17       "Furthermore," he says, "Mr. Rouse

18       has a stable and supportive

19       extended family that will assist

20       him in dealing with life stressors.

21       If paroled he plans to live with

22       his mother-in-law and work as a

23       mechanic or welder.  He also plans

24       to continue participation in

25       Squires Impact.  Based on these

26       factors, Mr. Rouse's risk of future

27       violence is placed in the low range

75

1          as compared to average inmates."

2          I didn't see a comparison to the

3 community, I just see low as compared to average

4 inmates. He concludes, she concludes, I'm sorry,

5          "There is no evidence of psychosis,

6          major affective disorder, anxiety,

7          or cognitive deficits. His record

8          during his years of incarceration

9          reflects an inmate who has made

10          progressively positive changes in

11          maturation. He has acquired job

12          skills that he reportedly applies

13          extremely well within the workplace

14          setting. Furthermore, he has a

15          stable support system willing to

16          help him when he's released to the

17          community. As stated previously,

18          his violence potential is judged to

19          be low. Case factors other than

20          psychiatric factors should be

21          considered in granting him parole."

22          And the Doctor recommended that you

23 continue to pursue vocational, education, self-

24 help, and anything to continue the positive

25 changes. Okay. Anything you want to add or

26 comment on that report?

27          **INMATE ROUSE:** No, ma'am.

76

1    DEPUTY COMMISSIONER STAR:  Okay.  I turn

2    your attention back to Commissioner Eng.

3    PRESIDING COMMISSIONER ENG:  Okay.  Mr.

4    Rouse, let's talk about your parole plans.

5    INMATE ROUSE:  Okay.

6    PRESIDING COMMISSIONER ENG:  Okay.  I can

7    just go by what I see here in the December '06

8    Board Report, the letters.  And I did receive in

9    our packet today this letter dated October 23rd,

10   2006, and it's from Pamela Denice Williams, who

11   is your fiancé?

12   INMATE ROUSE:  Yes, ma'am.

13   PRESIDING COMMISSIONER ENG:  Okay.  And in

14   this letter she states that she's the manager at

15   T&T House of Champions, which is a group home for

16   male youths on probation.  She states that she

17   met you about four years ago, and that you were

18   engaged last year, September 17th?

19   INMATE ROUSE:  Yes, ma'am.

20   PRESIDING COMMISSIONER ENG:  And you plan

21   to be married April 6th of 2007.  She does state

22   on the last paragraph,

23       "We will live in a three bedroom,

24       two bath home with a six foot

25       cyclone fence securing the

26       property."

27   INMATE ROUSE:  She's --

77

1     **PRESIDING COMMISSIONER ENG:** And this,

2     okay, and this home is in Oakland?

3          **INMATE ROUSE:** Yes, ma'am.

4          **PRESIDING COMMISSIONER ENG:** She states

5     that you have two cars, a 2002 Mercury Sable, and

6     a 2002 Ford Explorer, reliable transportation

7     whenever needed.  I'm assuming both vehicles are

8     in working order?

9          **INMATE ROUSE:** Yes, ma'am.

10         **PRESIDING COMMISSIONER ENG:** States that I

11    guess she has four children?

12         **INMATE ROUSE:** Yes, ma'am.

13         **PRESIDING COMMISSIONER ENG:** Okay.  Three

14    living at home.  The oldest is 28 and lives on

15    her own.  The 21 year old is in the process of

16    joining the Coast Guard sometime in mid-2007, so

17    I'm guessing will be moving out?

18         **INMATE ROUSE:** Yes, well, actually he's

19    going to be moving out as of the 31st of this

20    month, actually he decided he wanted to strike

21    out on his own early, so he's going to be

22    leaving.

23         **PRESIDING COMMISSIONER ENG:** Is he joining

24    the Coast Guard?

25         **INMATE ROUSE:** Yes, ma'am.

26         **PRESIDING COMMISSIONER ENG:** So he's going

27    to move out first and get his own place?

78

1      INMATE ROUSE:  Yes.

2      PRESIDING COMMISSIONER ENG:  First?

3      INMATE ROUSE:  Yeah.

4      PRESIDING COMMISSIONER ENG:  Okay.  And

5  then there's a 14 year old and a 12 year old

6  female.  So it's --

7      INMATE ROUSE:  It's Touey (phonetic) and

8  Deshana (phonetic).

9      PRESIDING COMMISSIONER ENG:  Okay.  So I'm

10  assuming they come here to visit?

11     INMATE ROUSE:  Yes, ma'am.

12     PRESIDING COMMISSIONER ENG:  Okay, all

13  right.  So Ms. Williams, is she -- does she own

14  this home?

15     INMATE ROUSE:  Yes, ma'am.

16     ATTORNEY STRINGER:  We have pictures of

17  this home.

18     DEPUTY COMMISSIONER HERRON:  Is there an

19  address, is there an address of this home?

20     PRESIDING COMMISSIONER ENG:  Yes, there is

21  an address at 585 Douglas Avenue.

22     INMATE ROUSE:  And we have pictures of it,

23  and the vehicle.

24     PRESIDING COMMISSIONER ENG:  Okay.  We

25  will take a look at this.

26     INMATE ROUSE:  She's in Brookfield, this

27  is a brand new, this is a brand new, she's in

79

1    Brookfield.

2        **PRESIDING COMMISSIONER ENG:**  So this would

3    be the residential, okay.

4        **INMATE ROUSE:**  And my sister, too.

5        **PRESIDING COMMISSIONER ENG:**  And I do see

6    that you have a back-up plan with your, is it

7    your sister or your sister-in-law?

8        **INMATE ROUSE:**  Sister-in-law.

9        **PRESIDING COMMISSIONER ENG:**  It's your

10   sister-in-law?

11       **INMATE ROUSE:**  But I still call her my

12   sister.

13       **PRESIDING COMMISSIONER ENG:**  Jewell,

14   Jewell --

15       **INMATE ROUSE:**  Showers.

16       **PRESIDING COMMISSIONER ENG:**  Showers.

17       **INMATE ROUSE:**  Um-hmm.

18       **PRESIDING COMMISSIONER ENG:**  Okay.  And

19   your sister-in-law, and how is she your sister-

20   in-law?

21       **INMATE ROUSE:**  Through Yvonne, Yvonne,

22   they have different fathers.

23       **PRESIDING COMMISSIONER ENG:**  I'm confused.

24       **INMATE ROUSE:**  What do you mean?

25       **PRESIDING COMMISSIONER ENG:**  How is Jewell

26   your sister-in-law?

27       **INMATE ROUSE:**  Through Yvonne, Yvonne my

80

1    married, I married Yvonne.

2            **PRESIDING COMMISSIONER ENG:**  Oh I got it,

3    yeah.

4            **INMATE ROUSE:**  Yeah, she passed away in

5    '97.

6            **PRESIDING COMMISSIONER ENG:**  Okay, all

7    right.  And Ms. Showers it says lives in San Jose

8    in an apartment.  Do you know how large her

9    apartment is?

10           **INMATE ROUSE:**  Yes, I mean, she has

11   something.

12           **PRESIDING COMMISSIONER ENG:**  Okay.  So we

13   have pictures?

14           **ATTORNEY STRINGER:**  Pictures of this, too,

15   we're going on a real estate tour.

16           **PRESIDING COMMISSIONER ENG:**  Yes, well, I

17   give you credit, Mr. Rouse, you're very thorough.

18           **DEPUTY COMMISSIONER STAR:**  This is your

19   sister-in-law's place?

20           **INMATE ROUSE:**  Yes, ma'am, that's where

21   she stays, it's not her place, but it's where she

22   stays.

23           **PRESIDING COMMISSIONER ENG:**  Okay.  But

24   she has legal occupancy there?

25           **INMATE ROUSE:**  Yes, ma'am.

26           **PRESIDING COMMISSIONER ENG:**  Okay.  And

27   there you would, you would have your own bathroom

81

1    and bedroom, I'm assuming?

2        **INMATE ROUSE:**  Yes.

3        **PRESIDING COMMISSIONER ENG:**  Does she live

4    there alone?

5        **INMATE ROUSE:**  Yes, ma'am.

6        **PRESIDING COMMISSIONER ENG:**  Okay.

7    Allrighty.  Okay.  We've got the pictures, but

8    this is the only letter, correct?

9        **INMATE ROUSE:**  Yes.

10       **PRESIDING COMMISSIONER ENG:**  Okay.

11       **INMATE ROUSE:**  From Pam, yes.

12       **PRESIDING COMMISSIONER ENG:**  All right,

13    that's why I want to be sure.

14       **INMATE ROUSE:**  It's the original, this is

15    the original.

16       **PRESIDING COMMISSIONER ENG:**  This is fine,

17    this is we've received this.

18       **INMATE ROUSE:**  Okay.

19       **PRESIDING COMMISSIONER ENG:**  Then relative

20    regarding employment, it states here in the Board

21    Report that you have many options because you are

22    a certified welder, you're skilled in clerical

23    work, you do know Microsoft Excel and data entry,

24    and the fact that you are a certified literacy

25    tutor.  You do have an Associate in Liberal Arts

26    degree.  And it states that you're interested in

27    counseling youth when you're paroled.  Okay.

82

1    Now, what I do have here that I'll read into the

2    record is we have a letter of general support

3    that's dated November 30th, 2006, from R., I

4    mean, D.A. Dacanay, D-A-C-A-N-A-Y, Associate

5    Warden, Unit 5.

6          INMATE ROUSE:  Mr. Dacanay.

7          PRESIDING COMMISSIONER ENG:  Oh Dacanay?

8          INMATE ROUSE:  Dacanay.

9          PRESIDING COMMISSIONER ENG:  Okay.

10   Associate Warden here at San Quentin, and it's a

11   nice letter of reference for you, Mr. Rouse.

12         INMATE ROUSE:  Thank you.

13         PRESIDING COMMISSIONER ENG:  Okay.  And

14   then I have your Counsel provided the Panel with

15   these additional letters.  This one's dated

16   December 14th, 2006, I can't quite -- I know it's

17   building development, I can't quite make out the

18   name.  It's signed by a Stan Keller, K-E-L-L-E-R.

19         INMATE ROUSE:  Yes, that's my other job

20   reference.  He's stating, because the last Board,

21   well, I think it was Mr. Gray Davis, actually,

22   said that commuting from San Jose to northern

23   California or to Oakland would be too much of a

24   strain on me, so they suggested that I find an

25   occupation in San Jose, so I went about doing

26   that.  And Mr. Stan Keller I met him through

27   Hitlan (phonetic) Ministry, which is a ministry

83

1  that they come in and they work with the trust

2  fellows, and that's how he came (inaudible) he

3  works with that program.

4     **PRESIDING COMMISSIONER ENG:** Okay, yes.

5  He does state that he met you during his

6  involvement with the Hitlan Ministries, and that

7  he is the principal/owner of California Building

8  and Development. "I have been in the

9  construction industry for over 20 years," and it

10  states his company has projects in commercial as

11  well as residential fields, and currently working

12  on remodels, additions, and tenant improvements.

13  The office is located in San Jose, but he's

14  stating here he says that he believes you would

15  be an excellent addition to their team.

16     "As a laborer his ability to stay

17     focused, take initiative, detail-

18     oriented, work hard, as well as

19     being a smart individual, are

20     skills he looks for in an

21     employee."

22     And he states he will also teach him the

23  trade. He would be working in various parts of

24  the Bay Area, since the projects are not just in

25  one set place. Okay. So there's an offer of

26  employment, okay.

27     **INMATE ROUSE:** And the second employment

84

1    was from Impact, which is a program that is a

2    non-profit organization that we finally got it,

3    but now we're going into institutions, we're

4    going into like camps and group homes, and --

5         PRESIDING COMMISSIONER ENG:  Is that paid,

6    is that a paid position?

7         INMATE ROUSE:  Yeah, $25 an hour, yeah.

8    This group right here.

9         PRESIDING COMMISSIONER ENG:  Do you have

10   that one?

11        DEPUTY COMMISSIONER STAR:  No, I don't.

12        PRESIDING COMMISSIONER ENG:  Okay.  Let me

13   go ahead and go over these.

14        DEPUTY COMMISSIONER STAR:  Go ahead.

15        PRESIDING COMMISSIONER ENG:  I've got a

16   letter dated December 19th, 2006, from a Frank

17   Kellum, K-E-L-L-U-M, Vice-Principal, states that

18   the Robert E. Burton Adult School here at San

19   Quentin, states that Mr. Rouse has worked for the

20   education department at San Quentin from 1994

21   through 1999, and Mr. Kellum is an academic

22   teacher in the school during this same time

23   period, so he's known you for a while.  And it's

24   a general support letter, it goes on and says how

25   competent, dependable, and reliable and capable

26   you were.  I guess you were a clerical worker.

27   And then it states that you completed your AA

85

1    degree, a member of the Restorative Justice

2    Program, that's a nice support letter.  We have a

3    letter from Center Force, dated September 15th,

4    2006, signed by Lilly Harvey, H-A-R-V-E-Y, the No

5    More Tears Coordinator.  And Ms. Harvey states

6    that Mr. Rouse has been a member of No More

7    Tears, which is a violence prevention program

8    here at San Quentin for several years, and you

9    have demonstrated a clear commitment to the

10    program, and has been a constant support to other

11    programs at San Quentin.  So it's a nice general

12    support letter.  And we have a letter dated

13    December 12th, 2006, signed by Dr. Arnold Chavez,

14    C-H-A-V-E-Z, providing a letter of support for

15    Nathaniel Rouse, a member of Trust Fellowship in

16    San Quentin Prison.  He states he first met you

17    about four years ago, and I'm guessing this is a

18    general support letter, sir?

19          **INMATE ROUSE:**  Um-hmm.

20          **PRESIDING COMMISSIONER ENG:**  Okay, very

21    good, that you've been actively involved.  We

22    have a letter from Mr. John Kelly, K-E-L-L-Y,

23    dated December 7th, 2006.  This says this

24    gentleman's a long-standing volunteer at San

25    Quentin, says here about twice a week, okay, so

26    he knows you through the Intensive Spiritual

27    Weekend Retreat called Kairos, K-A-I-R-O-S,

86

1   around three years ago.  And it is a, it's a

2   general support letter for your release.  He

3   states that you played a vital role in the

4   Squires Program counseling young people at risk,

5   impact and trust.  Okay, okay.  And we have,

6   Commissioner, may I have that one?

7           **DEPUTY COMMISSIONER STAR:**  Yes.

8           **PRESIDING COMMISSIONER ENG:**  We have this

9   letter, what is this?

10          **DEPUTY COMMISSIONER STAR:**  He's been

11  offered, am I correct, you've been offered a

12  District Manager for the Impact Program, which is

13  a non-profit?

14          **INMATE ROUSE:**  District Facilitator.

15          **DEPUTY COMMISSIONER STAR:**  District

16  Facilitator, correct.  It didn't say, though, the

17  salary.  How did you know the salary?

18          **INMATE ROUSE:**  I talked to Sterling, and

19  we just got the contract, and these are inmates

20  who are also lifers who are now paroled, and

21  Chaplain Earl Smith, who was then the Chaplain

22  here when the program was created, they're out

23  there now and we just got our contracts signed.

24          **PRESIDING COMMISSIONER ENG:**  Contract with

25  who?

26          **INMATE ROUSE:**  The State.

27          **PRESIDING COMMISSIONER ENG:**  With

87

1   juveniles?

2         **INMATE ROUSE:**  Juveniles.

3         **PRESIDING COMMISSIONER ENG:**  Youth

4   Authority?

5         **INMATE ROUSE:**  Youth Authority, yes,

6   ma'am.

7         **PRESIDING COMMISSIONER ENG:**  So the Youth

8   Authority has contracted with Impact?

9         **INMATE ROUSE:**  Yes, ma'am.

10        **PRESIDING COMMISSIONER ENG:**  Providing --

11        **INMATE ROUSE:**  Yes, and we're doing --

12        **PRESIDING COMMISSIONER ENG:**  -- a

13   statewide contract, or local contract?

14        **INMATE ROUSE:**  I think it's statewide, and

15   we'll be going to different facilities to --

16        **PRESIDING COMMISSIONER ENG:**  Would that be

17   a full-time job or just like hours, part-time?

18        **INMATE ROUSE:**  I think it's like work

19   part-time, part-time.  The full-time job would be

20   with Stan Keller.

21        **PRESIDING COMMISSIONER ENG:**  Okay.  Well,

22   how will you do that, sir, is you're going to be

23   working possibly in construction and then be a

24   facilitator in Alameda and Santa Clara Counties?

25   What will this entail, what does it mean that

26   you're going to be a facilitator?

27        **INMATE ROUSE:**  Well, what the facilitator

88

1    does is we have a group which we've created with

2    different levels of understanding of these

3    programs, and we go in and we talk to the men

4    about violence, about how if affects their lives

5    and the lives of the people who they are dealing

6    with.  So, I mean, that would be predicated upon

7    the time constraints on my job, what time I'll be

8    able to actually be able to join them in the

9    facilitation aspect of this.

10          **PRESIDING COMMISSIONER ENG:**  You -- does

11   this organization have these types of meetings at

12   night, on weekends, or during the weekdays?

13          **INMATE ROUSE:**  We have them through all

14   the time, weekends, weeknights, weekdays, it's

15   according to when they can make themselves

16   available.

17          **PRESIDING COMMISSIONER ENG:**  I'm familiar

18   with it, Commissioner, it is, it's a lot of

19   weekend because of access to the institutions and

20   not to interrupt institutional life and daily

21   operations.  Just to put in the record that this

22   letter is dated November 14th, 2006.  And it does

23   state that this letter informs you that upon his

24   release Mr. Rouse will work as an Impact District

25   Facilitator in Alameda and Santa Clara Counties.

26   He'll be working closely with the following types

27   of agencies: Youth Intervention Program, domestic

89

1    violence probationers, faith-based Community

2    organizations, parole departments, law

3    enforcement agencies.  Okay.

4         **ATTORNEY STRINGER:**  And, Commissioner, we

5    have some additional letters, one from Dr.

6    Richmond of the University of San Francisco, it's

7    a support letter.  And then we have six letters

8    of support from the institution itself from

9    various watch commanders, lieutenants, and other

10   supervisors in support of my client.

11        **PRESIDING COMMISSIONER ENG:**  Okay.  This

12   letter is dated November 17th, 2006, from

13   Kimberly Richmond, Executive Advisor San Quentin

14   Trust for the Development of Incarcerated Men.

15   And she is with the Department of Sociology at

16   USF, okay, and it is as Mr. Stringer stated, a

17   general support letter.  And a letter dated

18   Friday, December 8th, 2006, from L. D. Nalls, N-

19   A-L-L-S, Correctional Lieutenant Second Watch,

20   San Quentin State Prison, general support letter.

21   November 27th, 2006, M. Thompson, T-H-O-M-P-S-O-

22   N, Third Watch Commander, San Quentin State

23   Prison, general support letter.  November 21st,

24   2006, H. Johnson, CCI or one?

25        **INMATE ROUSE:**  C C one.

26        **PRESIDING COMMISSIONER ENG:**  Okay, CC1

27   Counselor, here at San Quentin, general support

90

1    letter.  November 27th, 2006, from Lieutenant D.

2    G. Graham, G-R-A—H-A-M, Second Watch Commander,

3    listing a lot of the different programs that Mr.

4    Rouse has been involved in, the self-help groups,

5    and everything necessary to be found suitable,

6    another nice general support letter.  February

7    25th, 2006, from M. Rodesilla, R-O-D-E-S-I-L-L-A,

8    CC1, Squires Chief Sponsor.  And Dr. Gillespie,

9    Child Psychologist --

10         **INMATE ROUSE:**  Two phases, it's the two

11   phases teaching us how adolescents react.

12         **PRESIDING COMMISSIONER ENG:**  Oh okay.  So

13   I see there's yeah --

14         **INMATE ROUSE:**  Phase one and phase two.

15         **PRESIDING COMMISSIONER ENG:**  It attaches

16   the June 24th, 2005, letter, is that one of the

17   phases?

18         **INMATE ROUSE:**  That's the first phase.

19         **PRESIDING COMMISSIONER ENG:**  That's the

20   first phase, okay, training seminar adolescent

21   behavior.  And then there's phase two, adolescent

22   behavior psychology, okay, February 25th, 2006,

23   okay.  9/19/06, Linda Kellogg, K-E-L-L-O-G-G,

24   Office Technician San Quentin: "Excellent

25   candidate for parole, he'll make a positive

26   contribution."  Okay.  And October 5th, 2006,

27   from Davia, D-A-V-I-A, Moore, M-O-O-R-E, Academic

91

1    Instructor Education Department San Quentin: "I

2    enthusiastically recommend you consider him a

3    strong candidate for parole," nice support

4    letter.  Okay.  Have I missed anything?

5         INMATE ROUSE:  Yeah, these we didn't get a

6    chance to put into my, into my report.  I have

7    one from Emal R.S. Hassan (phonetic), and one

8    from Lieutenant Perez, he's a security squad

9    lieutenant, and Captain Williams.

10         PRESIDING COMMISSIONER ENG:  Sir, what are

11    the dates on those letters?

12         INMATE ROUSE:  December 4th, is for

13    Lieutenant Perez.

14         PRESIDING COMMISSIONER ENG:  Of this year?

15         INMATE ROUSE:  Of this year.

16         PRESIDING COMMISSIONER ENG:  Okay.

17         INMATE ROUSE:  '06.

18         PRESIDING COMMISSIONER ENG:  Okay.

19         INMATE ROUSE:  November 27th, '06 for R.S.

20    Hassan.  For Captain Williams, or, excuse me,

21    Lieutenant Massey, who is presently my boss in

22    Inmate Assignment, December 1st, '06.

23         PRESIDING COMMISSIONER ENG:  He's your

24    boss in where?

25         INMATE ROUSE:  In Inmate Assignment.

26         PRESIDING COMMISSIONER ENG:  Okay.

27         INMATE ROUSE:  Inmate Assignment.  And

92

1   Captain Williams, who is the Community Partner

2   Manager, San Quentin, and it's dated December

3   12th, '06.

4        PRESIDING COMMISSIONER ENG:   Okay.   I

5   think the record reflects that you have quite a

6   few support letters, okay.

7        INMATE ROUSE:   And I have a history that I

8   made myself, I don't know if you want to look at

9   that, and these are my parole plans.

10       PRESIDING COMMISSIONER ENG:   Okay.   You

11  can submit the parole plans that we could take a

12  look at when we recess, okay, okay.

13       INMATE ROUSE:   And I have --

14       PRESIDING COMMISSIONER ENG:   Okay.   Is

15  there anything else regarding your parole plans,

16  sir?

17       INMATE ROUSE:   Yeah, well, these are just

18  portfolios, this is so you'll have an

19  understanding of what the round table is about, I

20  brought this with me, as well.   The Restorative

21  Justice, so you'll understand what the round

22  table is about that we're doing or trying to do

23  with the rest of the religious communities,

24  trying to get them to come together.

25       PRESIDING COMMISSIONER ENG:   Can you

26  describe it to the Panel in about two or three

27  sentences what this Restorative Justice round

93

1      table and what you're doing with it?

2            **INMATE ROUSE:**  What we hope to do is

3      gather the rest of the religious communities on

4      the outside and create a facility where all of

5      the faiths are a part of it.  For instance, if

6      something happens like in Richmond, something

7      happens to someone according to what faith he's

8      about, what he believes in, the officer would

9      contact us and we would send someone to this

10     person of his faith to deal with him.  And I'm a

11     part of the victim program the part of it where

12     we're trying to create a retreat, where it's one

13     thing for me to go to a victim and sit and talk

14     with him and then leave, it's another thing to

15     take him someplace and let them go through the

16     healing process before they actually go back to

17     their lives and deal with everyday situations.

18     This is what we're trying to do with that.

19            **PRESIDING COMMISSIONER ENG:**  Let me ask

20     you something very quickly about the job offer in

21     construction.  Have you any idea, are you going

22     to like work to become a licensed in any way, I

23     mean do you have any idea what you would be

24     doing?  Because all the gentleman states is that

25     you would be a laborer.  What does that mean?

26            **INMATE ROUSE:**  My general idea from my

27     understanding is that the construction work is

94

1    lay bricks, and I have done that.  When I was on

2    the streets I used to do part of the in Kentucky,

3    you know, you had to train for to be a mechanic,

4    we did outside jobs where (inaudible) on the

5    outside.  So I'm thinking laying bricks, hauling

6    rubbish from one place to another.  I asked about

7    the incentive benefits, and he said well what we

8    do we work on an incentive basis, how you perform

9    as an employee, you know, your incentive is up or

10    down, and you just (inaudible).

11        PRESIDING COMMISSIONER ENG:  So you're

12    telling me that he's been rather general in his

13    description in his description of how you'd be

14    paid and be treated?

15        INMATE ROUSE:  Yes, ma'am.

16        PRESIDING COMMISSIONER ENG:  So is it your

17    understanding that you would actually be a direct

18    employee of the company, or would you be an

19    independent contractor?

20        INMATE ROUSE:  I'd be a direct employee of

21    the company.

22        PRESIDING COMMISSIONER ENG:  A direct

23    employee?

24        INMATE ROUSE:  Yes.

25        PRESIDING COMMISSIONER ENG:  So you would

26    be paid a salary?

27        INMATE ROUSE:  Yes, ma'am.

1       **PRESIDING COMMISSIONER ENG:** Would you be

2   an hourly worker?

3       **INMATE ROUSE:** Yes, hourly.

4       **PRESIDING COMMISSIONER ENG:** Hourly

5   worker, okay.

6       **INMATE ROUSE:** Well, what he asked me to

7   do is, and I did it, he asked me to on the back

8   of these give them my number and they can call me

9   and I will inform -- I got his home phone number,

10  his cell number, and his work number, he gave me

11  all of that, because I explained to him about

12  that in the letter.

13      **PRESIDING COMMISSIONER ENG:** So you

14  understand, you've been through the process

15  several times.

16      **INMATE ROUSE:** Yes, and I explained that

17  to him.

18      **PRESIDING COMMISSIONER ENG:** That the more

19  documentation that can be supplied to the Panel

20  the better.

21      **INMATE ROUSE:** The better, yes, the

22  understanding.

23      **PRESIDING COMMISSIONER ENG:** Where they

24  get very very detailed, and it's to your benefit

25  because you also need to understand, you know,

26  what is it you're going to be faced with, and

27  that you need to develop alternative plans and

96

1    you need to be able to weigh out what's going to

2    be the best choices for you for financial

3    stability, etcetera, and what's going to lead to

4    greater financial -- so okay, okay.  Did he state

5    anything about benefits?

6         INMATE ROUSE:  Yeah, that's what he told

7    me --

8         PRESIDING COMMISSIONER ENG:  Health

9    benefits, are there any health benefits?

10         INMATE ROUSE:  Yes, there are, there's

11    medical.

12         PRESIDING COMMISSIONER ENG:  Okay.  Then

13    in your best interest to get that in writing.

14         INMATE ROUSE:  Okay.

15         PRESIDING COMMISSIONER ENG:  Too often,

16    and I'm just warning too often things happen

17    where if you're working 30 hours a week and not

18    the 40 that many companies don't have to pay you

19    the benefit.

20         INMATE ROUSE:  Right.

21         PRESIDING COMMISSIONER ENG:  Health care

22    is very expensive, okay.  This parole plan, sir,

23    says you're in the process of getting your AA

24    degree?

25         INMATE ROUSE:  That was, that was old,

26    because I have my --

27         PRESIDING COMMISSIONER ENG:  Okay.  I just

97

1   want to make sure I got it right.

2        INMATE ROUSE:  Yeah.

3        PRESIDING COMMISSIONER ENG:  Okay, okay.

4   So have we missed anything else?

5        INMATE ROUSE:  No.

6        PRESIDING COMMISSIONER ENG:  Okay.

7        INMATE ROUSE:  I'll leave this with you

8   for your review.

9        PRESIDING COMMISSIONER ENG:  Okay.

10       INMATE ROUSE:  This is I served as a

11  server as well as going through the program.

12  This provided me the opportunity to understand

13  others religions and what they go through, and to

14  experience it (inaudible).

15       PRESIDING COMMISSIONER ENG:  Okay.

16       INMATE ROUSE:  And this just talks about

17  the kids that we dealt with or we deal with every

18  weekend in Kairos lives.

19       PRESIDING COMMISSIONER ENG:  Right.  Okay.

20  Do you follow a religion now, sir?

21       INMATE ROUSE:  Yes, ma'am, Islam.

22       PRESIDING COMMISSIONER ENG:  And do you

23  attend services?

24       INMATE ROUSE:  Absolutely, it's incumbent

25  upon me.

26       PRESIDING COMMISSIONER ENG:  Okay.  Well,

27  we have sent out Penal Code Section 3042 notices,

98

1    and those notices go to agencies having a direct

2    interest in your case.  I don't believe we

3    received any written notification back.  However,

4    we do have a representative from the Alameda

5    County District Attorney's Office who is present

6    via video conference, and I'm sure will be making

7    a statement regarding your parole suitability

8    prior to us taking a recess for deliberations.

9    So at this point I'm going to ask if my two

10   fellow Commissioners have any other questions to

11   ask of the inmate?

12        **DEPUTY COMMMISSIONER STAR:**  I do not.

13        **DEPUTY COMMISSIONER HERRON:**  I don't.

14        **PRESIDING COMMISSIONER ENG:**  Okay.  Then

15   I'm going to ask Ms. Klinge, do you have any

16   questions that you would like posed to Mr. Rouse

17   from the Panel?

18        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Just a

19   few.  I may have missed it, did the inmate state

20   that his construction job would offer benefits?

21        **PRESIDING COMMISSIONER ENG:**  Sir, you want

22   to elaborate on that?

23        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I don't

24   need an elaboration, just a clarification because

25   I -- is that what you said?

26        **INMATE ROUSE:**  Yes, yes.

27        **DEPUTY DISTRICT ATTORNEY KLINGE:**  So is

99

1    that a union, can you ask the inmate if that's a

2    union job?

3        PRESIDING COMMISSIONER ENG:  Do you have

4    any idea?

5        INMATE ROUSE:  No, I don't think so.

6        PRESIDING COMMISSIONER ENG:  Okay.

7        DEPUTY DISTRICT ATTORNEY KLINGE:  Okay.

8    That's unusual.  How did the inmate meet Ms.

9    Williams, his fiancé?

10        PRESIDING COMMISSIONER ENG:  Okay.  Can

11    you hang on a second before everyone answers that

12    while I change the tape.

13              (Off the record)

14              -- oOo --

15        PRESIDING COMMISSIONER ENG:  Okay.  This

16    is Side B of Tape Two for the hearing for Mr.

17    Rouse, and CDC numbers is C-03721.  We're back on

18    record.  Go ahead, repeat the question if you

19    could?

20        DEPUTY DISTRICT ATTORNEY KLINGE:  Yes.

21    Could the Panel ask the inmate how he met his

22    fiancé, Ms. Williams?

23        INMATE ROUSE:  I met Ms. Williams through

24    Squires Program.  We've been associated with each

25    other for the last four years, four, five years

26    now.  It started out professionally because she

27    had brought kids into the T&T House from her

1  place of employment.  And about September 17th of

2  last year we started talking, and I explained to

3  her if you want to go beyond the professional

4  relationship and you can't do it here, you have

5  to make, you have to make the decision to

6  (inaudible), visit me or continue coming to this

7  program.  And she made the decision that she

8  wanted to come visit me.  So what I did was wrote

9  a letter to Mrs. (inaudible) sponsor, and shared

10  that with her so she would be aware of what's

11  happening so there wouldn't be a thing as if

12  we're secretly, I'm secretly talking to someone.

13  We let her know this is how it happened, so

14  that's how I met her.

15        **PRESIDING COMMISSIONER ENG:**  So does Ms.

16  Williams no longer comes to San Quentin?

17        **INMATE ROUSE:**  No, but she does send kids.

18        **PRESIDING COMMISSIONER ENG:**  She sends

19  kids but she no longer accompanies them, or is

20  that sort of like sponsoring this program?

21        **INMATE ROUSE:**  Right.

22        **PRESIDING COMMISSIONER ENG:**  With the

23  youth thing, and we're dealing with is it usually

24  lifer inmates?

25        **INMATE ROUSE:**  All different, lifers and

26  different variations.

27        **PRESIDING COMMISSIONER ENG:**  Okay, okay.

101

1   Ms. Klinge?

2       **DEPUTY DISTRICT ATTORNEY KLINGE:** Could

3   you ask the inmate if he's familiar with the

4   Brookfield Village neighborhood currently?

5       **INMATE ROUSE:** No, I can't say that I am,

6   off my head, that I'm familiar with the area in

7   as much as what she has told me about the area,

8   explained to me.

9       **DEPUTY DISTRICT ATTORNEY KLINGE:** Ask the

10  inmate then I assume that maybe she's mentioned

11  then that it's probably one of the worst areas in

12  Oakland currently, crime-wise and violence-wise.

13      **INMATE ROUSE:** Well, I get that, I get

14  that from the news every day, of the killings and

15  the shootings in Oakland.

16      **PRESIDING COMMISSIONER ENG:** This is where

17  you would be living?

18      **INMATE ROUSE:** Yes, ma'am.

19      **DEPUTY DISTRICT ATTORNEY KLINGE:**

20  Specifically Brookfield Village area is one of

21  the worst areas.

22      **ATTORNEY SPRINGER:** Is the District

23  Attorney going to testify?

24      **DEPUTY DISTRICT ATTORNEY KLINGE:** No, I

25  was asking a question if he was aware of that

26  fact.

27      **INMATE ROUSE:** Oh yes, I am, I'm aware of

102

1    it.

2         **DEPUTY DISTRICT ATTORNEY KLINGE:**  Okay.

3         **INMATE ROUSE:**  I am aware of that.

4         **DEPUTY DISTRICT ATTORNEY KLINGE:**  Thank

5    you.  Just a couple of questions about the life

6    crime, I know it's been gone over extensively.

7    Couple questions.  The inmate stated that he

8    feels that his observations of his father's

9    relationship with his mother was what led him to

10   commit this crime.  My question would be if the

11   inmate has delved a little deeper into a lot of

12   people have observed their parents in bad

13   relationships.  What is it in his person that he

14   feels enabled him to so cold-bloodedly plan and

15   kill someone with no internal stopping mechanisms

16   whatsoever within him at that time, what cause

17   this?

18        **INMATE ROUSE:**  Again, I didn't want to be

19   seen as someone weak.  I couldn't, I can't tell

20   you that I sat down and analyzed my life before

21   that all took place, because I hadn't, I was just

22   living life as it was, as I thought then as a kid

23   that this is what it is.

24        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I meant

25   from this day looking back.

26        **INMATE ROUSE:**  Oh okay, excuse me.  From

27   this day looking back, yeah, I'm sitting in my

103

1  cell and I'm thinking myself trying to understand

2  what would cause me to act --

3       **PRESIDING COMMISSIONER ENG:**  No, you're

4  supposed to address the Panel.

5       **INMATE ROUSE:**  Okay, I'm sorry.  Myself,

6  I'm in my own head trying to understand why, what

7  would motivate me to be as callous as I was.  And

8  I say, man, I'm trying not to be like he was,

9  trying not to be the person who neglected his

10  kids, didn't do what he should have done I

11  thought as a father should do.  Now, in

12  relationship to taking someone's life, again, I

13  had no awareness that that was -- I was capable

14  of doing that to someone until it actually

15  happened, and I took someone's life as a result

16  of my trying to be what I thought as a better man

17  than my father.

18       **PRESIDING COMMISSIONER ENG:**  Thank you.  A

19  follow-up question, or more questions, Ms.

20  Klinge?

21       **DEPUTY DISTRICT ATTORNEY KLINGE:**  I'm

22  sorry, I was waiting, I'm just waiting for the

23  Commissioner.  Since you had stolen a car

24  previously without killing someone, why was it

25  that you felt that you needed to kill someone to

26  steal a car, cars are stolen every minute without

27  killing people.

104

1      **INMATE ROUSE:** The first car was done

2    through credit cards and I had no actual test

3    drive with the individual. But this time, again,

4    Danielle made mention that, you know, because we

5    intended to keep the car that we should kill this

6    person, and I agreed, I agreed, and I went with

7    her plan. We talked about it, and as an end

8    result Mr. Faryabidoust's life was taken behind a

9    car. There is no way to like explain this away,

10   it was, it was, it was stupid, there's no -- it

11   just was a stupid crime, it was a stupid crime,

12   that's the bottom line. I mean it seemed like

13   everybody is looking for this magic bullet and

14   there is none. I wanted to be who I wanted to be

15   to her, and I felt that not to go through with

16   that we talked about it would make me less than

17   who I was, and I was more if I'd have just not

18   did it, but I didn't understand that then as I do

19   today. That there's no car, there's no love,

20   there's no individual short of protecting this

21   country that I should take someone's life.

22      **DEPUTY DISTRICT ATTORNEY KLINGE:** I have

23   no further questions.

24      **PRESIDING COMMISSIONER ENG:** Okay.

25   Counselor?

26      **ATTORNEY STRINGER:** Just if the Board was

27   to reaffirm your two previous dates and impose a

105

1   number of conditions upon your parole, which I

2   assume would be five years in length, would you

3   abide by each and every one of those conditions?

4         INMATE ROUSE:  Absolutely.

5         ATTORNEY STRINGER:  I believe I asked in a

6   previous hearing about Mr. Faryabidoust, the fact

7   that he was a grandfather and was a father, and

8   you are aware of that?

9         INMATE ROUSE:  Yes, I am.

10        ATTORNEY STRINGER:  And aware of the

11  impact that this had on or probably had on his

12  extended family.

13        INMATE ROUSE:  Yes, sir, every day, his

14  life, he can't, you can't put life and the

15  vastness of it into a little circle, because you

16  don't understand what potential he could have had

17  on this world through his actions, through his

18  grandkids, what he could have taught them.  And I

19  can't imagine their loss and how they won't get a

20  chance to see his face and to hear his laughter

21  anymore, the things he could have shared with

22  them when they grew up and became adults and had

23  their children.  His life was more than a part,

24  it was more than what I thought could ever be

25  possible.  It's God's right, not man.

26        ATTORNEY STRINGER:  Thank you.

27        PRESIDING COMMISSIONER ENG:  Before we go

106

1    on any further, I just have a brief question.   I

2    had asked you before what you knew about the

3    victim and who he left behind and any family, and

4    you stated, and I'm going to ask my fellow

5    Commissioners to confirm this --

6        INMATE ROUSE:   No, that was correct.

7        PRESIDING COMMISSIONER ENG:   -- I thought

8    you stated that you didn't know anything about

9    them.

10       INMATE ROUSE:   No, I knew about him.

11       PRESIDING COMMISSIONER ENG:   Okay.

12   Because I thought I had asked you what did you

13   know about him and if he had left anyone behind

14   or any family or kids.

15       INMATE ROUSE:   Oh I'm sorry.

16       PRESIDING COMMISSIONER ENG:   I was a bit

17   I became all of a sudden when your legal counsel

18   stated that, you know, he was a grandfather and

19   blah, blah, blah, and then you're saying, yeah,

20   that's true, I was like oh.

21       DEPUTY COMMISSIONER STAR:   What I heard

22   you ask, and the way I interpreted it was you

23   asked if he knew the victim prior to the

24   incident.

25       INMATE ROUSE:   See that's what I thought.

26       PRESIDING COMMISSIONER ENG:   Oh okay,

27   okay.

107

1        INMATE ROUSE:  So, no.

2        DEPUTY COMMISSIONER STAR:  His answer was,

3    no, he did not, that's what I heard.

4        PRESIDING COMMISSIONER ENG:  Okay.  I'm

5    glad that we were able to clarify that, okay,

6    okay.  On that note then we'll --

7        DEPUTY COMMISSIONER STAR:  But along those

8    lines, have you had contacts or made any amends

9    with this family?

10       INMATE ROUSE:  No, I've tried, but I was

11   told that I had to have legal counsel.  So but

12   what I hoped to do is get out and then try to

13   hire a lawyer to find them, because as a Muslim

14   it's incumbent of me to confront these people in

15   some shape, form, or fashion, and let them know

16   did what to their loved one.  So I can't just be

17   paroled and then just -- I still got a long way

18   to go before I can and I'll never be someone's

19   life has been taken.

20       PRESIDING COMMISSIONER ENG:  Have you ever

21   written a letter even not sending it, but have

22   you ever even sat down to write a letter about

23   your feelings and what you would want to say to

24   the victim's family?

25       INMATE ROUSE:  No, I haven't, no, I

26   haven't.

27       PRESIDING COMMISSIONER ENG:  Have you

108

1    thought about doing that, possibly?

2          INMATE ROUSE:  Yes, I have, a number of

3    times.  Actually, the -- this report that Mrs.

4    Shaw had me do, you know, when she asked me to do

5    it, when she first asked me to do it to write

6    about the crime, you know, in my head I was

7    cussing her out.  I didn't want to do it.  But it

8    was the best thing that ever happened to me was

9    to sit down and write this out because it helped

10   me to understand the enormity of the crime

11   itself.

12          PRESIDING COMMISSIONER ENG:  Okay.  Any

13   other questions?  Okay.  Move on to closing

14   statements.  Ms. Klinge?

15          DEPUTY DISTRICT ATTORNEY KLINGE:  Thank

16   you.  At this time the District Attorney's Office

17   of Alameda County is opposed to parole.  We do

18   believe that the inmate is unsuitable and could

19   pose a danger to the community.  Although I am

20   well aware that the inmate has previously been

21   granted a date on two prior occasions, and that

22   the Governor has rescinded those dates, I would

23   have to agree with the factors pointed out in the

24   Governor's last denial, which I believe was this

25   year.  First, I do commend the inmate for the

26   disciplinary free time he's had, for his

27   programming, and for his willingness to discuss

109

1   this crime.  I do have to point out that the life
2   crime itself is one of the most brutal I have
3   come across in twenty years.  And that the crime
4   itself, under the case law due to the nature of
5   the crime and the facts of the crime is clearly
6   beyond the mere minimum necessary, and it is
7   clearly enough to deny parole based on the
8   commitment offense.  The commitment offense was
9   carried out in an extremely heinous, atrocious,
10  cruel and callous manner, and it exhibited a
11  callous disregard for the life and suffering of
12  the victim.  It was carried out in an extremely
13  calculated and dispassionate manner.  And the
14  victim was abused during the attack.  And the
15  motive for the crime is inexplicable, just the
16  desire for a car and to please a girlfriend.  The
17  facts of the crime have been set out quite
18  extensively even in the inmate's version.  This
19  was planned for several days, the plan was to
20  kill the owner during the test ride and steal the
21  car.  He was beaten, he was tied up, he was
22  transported numerous places.  As pointed out the
23  inmate even took the time to go to another store
24  to buy an electrical cord to tie around the
25  victim's neck, plastic was put over his head, he
26  was driven and dumped in a field, and left, while
27  the inmate and his girlfriend went out to enjoy

110

1    the fruits of their robbery, pawning the victim's

2    belongings, taking his car, and traveling towards

3    their goal of San Diego.  That's a short version

4    of al the things that were involved here.  This

5    crime stands out just for its brutality and

6    premeditation.  I know that the inmate can't

7    change the facts, and I do believe that he has as

8    the chronology sets out, 1986, eight years after

9    the crime he started to have remorse for the

10   crime.  In 1995 he had finally admitted the

11   premeditation aspect of the crime and started to

12   move away from his more self-serving statements.

13   In 1997, he spoke with the Panel about the crime

14   and they felt that he was finally being honest.

15   And in 2002 he made his admission that we're

16   currently operating on in the Board Reports where

17   he elaborated on the fact that he beat the victim

18   to death with his own hands.  He was not drunk,

19   he was not high, and he committed this horrific

20   crime.  He's explained to the Panel from his

21   programming and his self-reflection what he feels

22   led him to that crime.  It seems like there

23   should be something more, maybe we'll never get

24   there, but it seems like there should be

25   something more that he could learn from within

26   himself on why could something this horrific.

27   His gains are recent, the 2002 is the first time

111

1   that it was fully discussed to the Panel, that

2   was four years ago.  I believe there needs to be

3   more time for that to solidify and maintain over

4   a longer period of time.  His psychiatric reports

5   have been favorable, but he's only given a GAF

6   score of 75.  That is unusual to me why he would

7   have such a low GAF score at this time, you know,

8   I've seen obviously a lot higher on good reports.

9   He does have a somewhat unstable social history,

10  his parents divorced, he had an absent father,

11  and he dropped out from high school.  He was on

12  juvenile probation on one point for the theft.  I

13  would refer, and I know it's been referred to in

14  numerous reports, to the sentencing judge's

15  comment about the crime.  The judge stated that,

16  "This is one of the most brutal

17          cases that this court in its long

18          experience has ever encountered.

19          It was a particularly brutal crime,

20          it was in this court's opinion a

21          planned crime.  It is just an utter

22          and complete senseless taking of

23          the life of a good human being.

24          Now, there is a possibility of this

25          man getting a parole, and this

26          court cannot do anything about the

27          sentence of Ms. Thorp who's going

112

1            to be sentenced right after Mr.

2            Rouse.  But I am going to tell you,

3            Mr. Rouse, that if there is

4            anything I can do to prevent your

5            parole the court is going to do it.

6            There appears to be in this case no

7            mitigating circumstances

8            whatsoever."

9        So while the inmate has done a good

10    program and has been disciplinary free, and I

11    anticipate that sometime in the future he will

12    get a date.  And on that side note I would

13    remark, and take it for what you will, that

14    perhaps Brookfield Village would not be the best

15    place to try to start a new transition into

16    society.  And perhaps starting it with a woman

17    you've never lived with before would not be the

18    best way to start it.  That's tough even if you

19    dated and been together out in the outside,

20    before you jump into such a relationship.  That's

21    just an aside note.  But based on the life crime

22    and timeline of his coming to grips with his life

23    crime I would submit that the gains too recent

24    and we would be opposed to parole at this time.

25    Thank you.

26            **PRESIDING COMMISSIONER ENG:**  Thank you.

27    Mr. Stringer, closing comments?

113

1     **ATTORNEY STRINGER:** As always, the

2    relevance standard the Board must use in these

3    proceedings is whether or not Mr. Rouse as he

4    sits before you now, not as he was 20 plus years

5    ago, but as he sits before you now poses an

6    unreasonable risk of danger to society and a

7    threat to public safety.  On August 21st of '02 a

8    granting Panel stated, no, he did not pose a

9    threat to public safety.  Commissioner Welch, who

10   is well-known to this Board, and I believe is an

11   Associate Warden not two doors down the street,

12   was one of the Panel members on that particular

13   Board Panel that day.  Mr. Welch said,

14        "He has maintained," referring to

15        Mr. Rouse, "He has maintained a

16        positive institutional behavior

17        which indicates significant

18        improvement in self-control, he

19        does show signs of remorse, he

20        indicates that he understands the

21        nature and the magnitude of the

22        offense and accepts responsibility

23        for the criminal behavior, and has

24        shown a desire to change towards

25        good citizenship.  A recent

26        psychiatric report appears to be

27        supportive.  That evaluator says

114

1        violence potential is judged to be

2        below average with this inmate

3        population, his prognosis appears

4        to be above average.  However, the

5        threat the inmate poses to society

6        if paroled will need to be made on

7        grounds other than strictly

8        psychiatric facts.  And also

9        there's another psychiatric report

10       that appears also to be

11       supportive."

12       Those are some of the comments of

13   Commissioner Welch upon his granting of a date

14   for my client.  Now, Governor Gray Davis in his

15   letter of reversal, and that's dated January 17th

16   of 2003, indicates, quote,

17       "Mr. Rouse did not have a prior

18       adult criminal history and has made

19       gains during the more than 24 years

20       that he's been in prison.  He has

21       obtained his GED and an Associate

22       of Arts degree.  He has

23       participated in a number of therapy

24       and self-help programs, and has

25       received laudatory reports for his

26       work, education, and volunteer

27       activities."

115

1          And then the Governor decides to go into

2     the one area that both he, Governor

3     Schwarzenegger, and the District Attorney have

4     now gone into, and that is they want to turn a

5     first degree murder with the possibility of

6     parole into a first degree murder either with

7     the death penalty or with life without the

8     possibility of parole.  Because Governor Davis

9     in his letter again quotes this judge,

10          "This is one of the most brutal

11          cases the court in its long

12          experience has ever encountered."

13          Well, I don't know how many of these

14     hearings anybody here has sat through, but this

15     clearly, clearly is not the most brutal case

16     that has ever come before the California Board

17     of Prison Terms, far from it.  Governor Davis

18     then says,

19          "This is a situation in which the

20          circumstances of the offense are

21          clearly more aggravated or violent

22          than the minimum necessary to

23          sustain a conviction for first

24          degree murder."

25          And he talks about the fact that it was

26     premeditated, the same words the District

27     Attorney used.  When you here premeditated you

116

1   think death penalty, but they're not allowed to

2   do that.  They're not allowed under current law

3   to elevate what is established by the courts to

4   something that the courts did not decide.

5   Governor Schwarzenegger, in his letter of

6   reversal through a second date Mr. Rouse

7   received on October 5th of '05, indicates, quote,

8          "In prison Mr. Rouse has been

9          counseled a handful of times for

10         minor misconduct, the most recent

11         incident occurring in the mid-

12         1990s.  He's never been disciplined

13         for any act involving violent or

14         assaultive behavior.  He's upgraded

15         himself educationally by earning

16         his GED in 1992, and Associate of

17         Arts degree in 2002.  He's also

18         completed communications and

19         computer training, participated in

20         literary studies of the Bible,

21         completed vocational welding and a

22         certified computer operator.  He's

23         held various skilled jobs within

24         the institutional setting.  He's

25         availed himself of an array of

26         therapy and self-help, including

27         Category X, Alcoholics Anonymous,

117

1       Narcotics Anonymous, Anger Control

2       Group, Criminal Thinking Group,

3       Kairos Men's Retreat, 12-Step

4       Program, Transcendental Meditation,

5       HIV Peer Educator Training Program,

6       Advanced Alternatives to Violence

7       and Reality In Decision Making.  He

8       has actively participated in

9       working with other inmates in an

10      at-risk kids through the Squires

11      and Trust Fellows programs, and he

12      has received favorable reports and

13      evaluations from various

14      correctional and mental health

15      professionals.  He has maintained

16      family ties, has confirmed housing

17      arrangements through his sister-in-

18      law in Alameda County of which the

19      Board approved his parole.  And has

20      a viable offer of employment with

21      California Building and

22      Development.  These are all factors

23      supportive of Mr. Rouse's release

24      from prison."

25      Then the Governor goes into the world of

26  premeditation, and indicates he has committed a

27  premeditated murder that was for the purpose of

118

1    eliminating a witness, a special circumstance

2    can elevate a murder sentence to a death

3    sentence, either making the first degree murder

4    for which Mr. Rouse was convicted especially

5    grave.  And then he does the same thing Governor

6    Davis does, quotes this judge again, saying that

7    Mr. Rouse should never get a date and this judge

8    is going to do everything he can to thwart Mr.

9    Rouse's efforts to get that date.  I never saw

10   any letters from this judge in the hearing I

11   participated in, I don't see any letters from

12   this judge today.

13          Under the existing case law, and the

14   District Attorney asked me if I had any case

15   law, under McQuillan, which is a United States

16   9th Circuit Court of Appeals opinion, I'll cite

17   it as Docket No. CV-98-03680-DT, Judge William

18   A. Fletcher indicated in talking about Carl

19   McQuillan, his final remarks,

20          "Finally, without pointing to any

21          evidence in the record the warden

22          argues that McQuillan has

23          continuously been found a danger to

24          society.  The evidence belies this

25          irresponsible hyperbole.  There has

26          been no finding, let alone a

27          continuous series of findings, of

119

1     dangerousness in almost a quarter

2     of a century.  Based in part on a

3     conclusion non-dangerousness, the

4     Board in 1979 found McQuillan

5     suitable for parole and set a fixed

6     future parole date of 1998.  In six

7     subsequent progress hearings, the

8     Board advanced McQuillan's release

9     date because of credits earned

10    through good behavior.  Not until

11    1994, when McQuillan was about to

12    be released, did the Board change

13    its mind and it did so without any

14    evidence of dangerousness beyond

15    the crime for which McQuillan was

16    originally convicted, which had

17    been fully considered by the Board

18    in 1979."

19        Judge Fletcher ordered the immediate

20    release of Carl McQuillan, who is now out on

21    parole, and sent the federal marshals over to

22    CMS to facilitate that particular decision.

23    There is also additional case law in the case of

24    Konkler v. Warden, that's United States District

25    Court, the Central District of California case,

26    the Western Division, I'll cite that as CV05-

27    6473.  This opinion was authored by Terry J.

120

1    Hatter, Jr., a senior United States District

2    Judge, he is quoting the case of <u>Biggs v.</u>

3    <u>Terjone</u>, and says, quote,

4         "In that case the court reasoned

5         that over time should Biggs

6         continue to demonstrate exemplary

7         behavior and evidence of

8         rehabilitation, denying him a

9         parole date simply because of the

10         nature of Biggs' offense and prior

11         conduct would raise serious

12         questions involving his liberty

13         interests in parole."

14         As Mr. Rouse comes to you today, he again

15    has excellent residence plans, he has excellent

16    employment offers, he has marketable skills.

17    It's unquestioned that he has insight into the

18    commitment offense.  Dr. Kuo's, K-U-O, is a

19    medical doctor and a psychiatric fellow,

20    indicated in his report of March 3rd of '04 that

21    Mr. Rouse has, quote,

22         "As stated previously, his

23         violence potential is judged to be

24         low."

25         Now, one of the counselors that has done

26    many reports at San Quentin, Counselor Shaw,

27    that counselor indicated in a report of October

121

1    '05,

2          "Despite Rouse's disappointment of

3          the Governor reversing the Board of

4          Prison Terms decision to release

5          him on parole, Rouse maintains a

6          positive outlook and continues to

7          maintain his positive program of

8          exemplary behavior.  In fact, since

9          that time he's become involved in

10         more programs that interact with

11         community-based organizations.

12         Rouse has a strong support system

13         should he be released.  Rouse

14         exposes the nature of his offense

15         in attempts to help others, shows a

16         genuine interest in helping others.

17         I have observed him work with

18         troubled children in Squires and he

19         is very open, honest, and

20         straightforward with the children.

21         He is involved in Muslim

22         activities, Squires, No More Tears,

23         Trust Fellows, and the Impact

24         Program.  My recommendations

25         regarding Rouse's release remain

26         unchanged."

27         And that recommendation was made in

122

1    October of 2003 in which Counselor Shaw said,

2         "Considering the commitment

3         offense, the absence of a prior

4         criminal record, the absence of any

5         substance abuse issues, his prison

6         adjustment and his psychiatric

7         reports, I believe that Rouse would

8         pose a very little threat to the

9         community if released from prison

10        at this time.  My recommendations

11        regarding Rouse's release remain

12        unchanged."

13        So under the law, and there has been no

14   evidence supported or presented to this Board

15   that would negate the suitability factors, the

16   overwhelming suitability factors that Mr. Rouse

17   has presented to the Board, so what the Board is

18   really left with is simply the life crime.  And

19   under the existing case law continual reliance

20   on the life crime to deny a date, especially

21   when that date has been granted twice, is

22   violative of my client's due process rights.

23   Certainly, if the Board has the authority to do

24   that I would contend that that would clearly be

25   reversed in court.  Therefore, I would ask and

26   request based on the law that the Board reaffirm

27   what two previous granting Panels have concluded

123

1  and return Mr. Rouse's date to him, because he

2  has clearly earned it.  Thank you.

3        **PRESIDING COMMISSIONER ENG:**  Mr. Rouse, do

4  you, would you like to make a final statement

5  regarding suitability?

6        **INMATE ROUSE:**  Yes, I would.  Three

7  things.  First and foremost, I took a man's life

8  (inaudible) took his life.  And I can't make up

9  for that by human nature, there's nothing I can

10  do other than to change my life and really try to

11  change the life of those who I come into contact

12  with, in hopes that they by sharing what I've

13  done to this man will change how they look at

14  people and know the value of human life.  I share

15  with them how it affects, I believe it affects,

16  the families of people who have done as I have

17  done, and the loss behind a human being in that

18  person's life.  Secondly, Mr. Stringer asked me

19  did I want to come into the Board room today and

20  do this --

21        **PRESIDING COMMISSIONER ENG:**  [Tape

22  beeping]  You're okay.

23        **INMATE ROUSE:**  -- and do this, and I told

24  him yes, I do, you know, there's a District

25  Attorney here, I want to, I want to talk about

26  this.  There's no more hiding, there's no more

27  trying to beat around the bush to take away what

124

1    I did.  Secondly, she, the District Attorney has

2    never been in prison, thank God, I appreciate

3    that and hope that it never happens to her.  But

4    wait until she gets experience on Level Four,

5    it's (inaudible), but every day you walk out your

6    cell and the first thing you think of is am I

7    going to be killed today.  People getting stuck

8    in front of you.  Life in the penitentiary under

9    those conditions, you have -- well, when we're

10   over you can ask each of them, talk and explain

11   to you what it's like to be in a Level Four

12   institution where people are getting stuck every

13   day.  You don't have to be white, you don't have

14   to be black, you don't have to be gang, you just

15   people take a notion that they want to do

16   something to someone, or they make a mistake and

17   do the wrong person.  So living in a dangerous

18   area, I've been living in a dangerous area for

19   the last 28 years, been living in a dangerous

20   area because I have no control whatsoever over

21   the minds of these men to do the things they did.

22   They came in yesterday caroling, and somebody

23   decided to throw their shoes off the tier of the

24   fourth tier and hit a woman and a man in the

25   head, and these people were coming in to sing

26   Christmas songs.  So I live that life of

27   dangerousness every day.  And the only way to

125

1   fight it is to get in it and try to tell people

2   this is not right, so.

3         **PRESIDING COMMISSIONER ENG:** Anything

4   else?

5         **INMATE ROUSE:** No, ma'am.

6         **PRESIDING COMMISSIONER ENG:** Okay.  We'll

7   now recess.  The time is 4:31.

8         **INMATE ROUSE:**  I don't need this.

9         **DEPUTY COMMISSIONER HERRON:** Okay.  Just

10  put it right there and we'll look at it, sir.

11         **INMATE ROUSE:** Okay.

12                 R E C E S S

13                  --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

126

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3          **DEPUTY COMMISSIONER STAR:**  Okay.  This is

4      the Tape Three for the subsequent number fifteen

5      hearing for Mr. Rouse, R-O-U-S-E, C, number

6      03721, and we are back on record at this time.

7          **PRESIDING COMMISSIONER ENG:**  Just in case

8      she appears, I'm going to go ahead and have -- we

9      tried to leave her a message, don't have any

10     idea.  Okay.  My apologies for taking so long,

11     the heat has gotten to us.  However, let the

12     record note that everyone who was in the room

13     prior to our recess for deliberations has since

14     returned, with the exception of the Deputy DA Ms.

15     Klinge, we've not been able to reach her to

16     rejoin us via video, but we are still on.  And we

17     have an additional correctional officer in the

18     room.  The time is now 5:35.  In the matter of

19     Nathaniel Rouse, R-O-U-S-E, CDC number C-03721,

20     the Panel's reviewed all the information received

21     from the public and relied on the following

22     circumstances in concluding that the prisoner is

23     suitable for parole and would not pose an

24     unreasonable risk of danger to society or a

25     threat to public safety if released from prison.

26     The Panel finds that the prisoner does not have a

27     **NATHANIEL ROUSE   C-03721    DECISION PAGE 1    12/20/06**

127

1   juvenile record of assaulting others.  And while

2   in prison he has enhanced his ability to function

3   within the law upon release, through

4   participation in many, many programs: educational

5   programs, self-help and therapy, vocational

6   programs, and I'm going to try to see if I can

7   get a lot of these in.  In terms of your

8   educational programs, sir, the Panel recognizes -

9   oh Ms. Klinge has now resumed --

10          **DEPUTY DISTRICT ATTORNEY KLINGE**:  I can't

11   hear you.

12          **PRESIDING COMMISSIONER ENG**:  Oh I'm sorry,

13   I thought, I thought I had that off mute, I'm

14   sorry, you've just returned.  We just, we're just

15   reading into the record that the Panel has

16   reviewed all the information and we've concluded

17   that the prisoner is suitable for parole, and

18   we're just going through the factors of

19   suitability.  In concerning education, sir, that

20   you in 1992 you did receive your GED, and you

21   went on and also received your Associates in

22   Liberal Arts degree in I believe 2002.  Self-help

23   and therapy, there has been numerous chronos that

24   were listed during the regular hearing in terms

25   of self-help and therapy.  And I think most

26   notably you went through a rather detailed

27   **NATHANIEL ROUSE  C-03721    DECISION PAGE 2**    12/20/06

128

1    Category X program, I believe.

2           **INMATE ROUSE:**  Yes, it was.

3           **PRESIDING COMMISSIONER ENG:**  Right.  And

4    then you also what you stated that you went

5    through therapy while you were at DVI and, I

6    can't read my own writing, 1989, 1989.  And,

7    again, the vocational programs that you have been

8    enrolled in, you are a certified welder, and

9    you're also a certified literacy tutor.  If I've

10   missed anything I'm sure that my fellow

11   Commissioner will add that in.  You've had many

12   institutional job assignments, where I believe

13   you've had exceptional ratings, work ratings.

14   And other the other, again, we took note that you

15   did complete the Category X Impact Program,

16   Squires, which are I believe they're juvenile

17   diversion programs?

18          **INMATE ROUS:**  Yes, they are.

19          **PRESIDING COMMISSIONER ENG:**  Okay.  And so

20   it impressed the Panel that you are reaching out

21   to others --

22          **INMATE ROUSE:**  I have to.

23          **PRESIDING COMMISSIONER ENG:**  -- into the

24   community.  Okay.  We also note that you lack a

25   significant criminal history of violent crime.

26   And again, I believe that was already read into

27   **NATHANIEL ROUSE  C-03721   DECISION PAGE 3   12/20/06**

129

1    the record previously.  Because of maturation,

2    growth, greater understanding, and advanced age,

3    it's you have a reduced probability of

4    recidivism.  Basically you came into the CDC when

5    you were 20 years old.

6          **INMATE ROUSE:**  Yes, ma'am.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  You've

8    spent the last 27 years incarcerated and going

9    through a lot of different programming, you are

10    now 49 years of age, so that alone.  But it isn't

11    just that, and I want to make sure I get this all

12    in order.  And I remember that you stated, and

13    this is in the record, that somewhere around

14    1984, 1985, is when you first admitted to

15    yourself that your life crime, the life offense,

16    was premeditated.  And I think that you stated

17    that you think that it was you remember you were

18    in an anger management session or something like

19    that --

20          **INMATE ROUSE:**  Yes.

21          **PRESIDING COMMISSIONER ENG:**  -- it was the

22    first time that you admitted it to yourself.

23          **INMATE ROUSE:**  Yes, ma'am.

24          **PRESIDING COMMISSIONER ENG:**  Okay.  And

25    prior to that you did state that from the very

26    beginning from the time that you were first

27    **NATHANIEL ROUSE  C-03721   DECISION PAGE 4    12/20/06**

130

1    arrested up to the time that you had basically

2    saw the light, you were in denial and were trying

3    to protect yourself, etcetera, okay.  So that was

4    the first thing.  Then while you were at DVI you

5    sought out therapy.

6            INMATE ROUSE:  Yes, I did.

7            PRESIDING COMMISSIONER ENG:  Okay.  And

8    that was in 1989, okay.  After that you did

9    participate in the Category X Program, which was

10    pretty intensive, and you did that I believe in

11    1994.  Okay.  After that, in 1995, I believe we

12    noted that it was the first time you had admitted

13    to a counselor within the institution that the

14    life crime was in fact premeditated.

15            INMATE ROUSE:  Yes, ma'am.

16            PRESIDING COMMISSIONER ENG:  Okay.  Then

17    the next point is, what year was that, I believe

18    in 2002, is when you wrote your detailed

19    statement.

20            INMATE ROUSE:  One of the hardest things I

21    ever did.

22            PRESIDING COMMISSIONER ENG:  Okay.  And I

23    remember you stating that, it was very, very

24    difficult for you to do it but it was necessary,

25    and it was like a light shining down on you.  But

26    we do note that and it has subsequently been

27    NATHANIEL ROUSE  C-03721    DECISION PAGE 5   12/20/06

131

1   incorporated into all of the Board reports, your

2   very detailed statement about the life crime and

3   your role and your responsibility in it.   Then

4   after that, and it is notated that you admitted

5   to a Board in 2005 that in 1986 is when you

6   really began to feel remorse, and I think and

7   really understand what you had done.   I think I

8   have that in pretty much order, but I wanted to

9   get that into the record to show the evidence of

10  your maturity.   Not only did you age, and through

11  years of age, but in terms of your life crime and

12  the evolution that you have gone through in terms

13  of recognizing and accepting your role and

14  responsibility in that.   So I hope I did an

15  adequate job in that.   Okay.

16  We find that the inmate does have somewhat

17  realistic parole plans, which includes a job

18  offer even though the Panel would like to see

19  something stronger for your success and for your

20  own benefit.   And I think now you understand the

21  types of things that you need to be looking at

22  and finding out.   And on family support, you came

23  in with alternate plans for a residence, which

24  was good.   One in the county of commitment,

25  Alameda, and the other in Santa Clara.   And I'm

26  going to tell you right now that we are going to

27  **NATHANIEL ROUSE   C-03721   DECISION PAGE 6   12/20/06**

132

1    order you to parole in Santa Clara County.

2        **INMATE ROUSE:**  Okay.

3        **PRESIDING COMMISSIONER ENG:**  And this is

4    because we feel that that will enhance your

5    likelihood of success.  The Board is concerned

6    about the area and that the effect a dangerous

7    area can have on you outside of an institution.

8        **INMATE ROUSE:**  Right, I understand.

9        **PRESIDING COMMISSIONER ENG:**  So we want

10   you to succeed, and we want you to be in the best

11   environment possible for that success.  Okay.  We

12   also note that you've maintained positive

13   institutional behavior, which also is an

14   indication of significant improvement in self-

15   control.  We notate that in all these years you

16   have three 128s, you do not have any 115s.  The

17   last 128 that you had was in 1991, failure to

18   report, and I believe your two others were at

19   different time periods, different years.  You do

20   show a lot of signs of remorse.  You indicated

21   that you understand the nature and magnitude of

22   the offense and you accept full responsibility

23   for the criminal behavior, and you've had a

24   desire to change towards good citizenship.  And

25   I, this Panel believes that this is not only

26   indicated by sitting across the table from you

27   **NATHANIEL ROUSE  C-03721   DECISION PAGE 7   12/20/06**

133

1    and having these detailed discussions and the

2    questions and the answers, but also it's

3    documented by the very, very detailed statement

4    that you wrote and presented in 2002, that again

5    details your role and responsibility in the life

6    offense.  Okay.

7         **DEPUTY COMMISSIONER STAR:**  I want to add

8    too that he has participated in Restorative

9    Justice Round Table and Squires, as well as

10   expressed to the Panel his interest in making

11   amends once he's paroled in whatever manner he

12   can, which is also indicative I think of that

13   item you just covered.

14        **PRESIDING COMMISSIONER ENG:**  This is true.

15   One thing that came through loud and clear is

16   your desire to give back to the community.  I

17   think that's what you left with this Panel.  The

18   psychological factors, we find that the

19   psychological report dated March 3rd of 2004,

20   authored by Dr. A. Kuo, K-U-O, MD, is favorable

21   along with the psychological report dated

22   September 9th of 1999, authored by J. Dupree, D-

23   U-P-R-E-E, we find is also somewhat favorable.

24   Both agreed that you pose a low risk of violence,

25   they both indicate that you pose a low risk of

26   violence.

27   **NATHANIEL ROUSE  C-03721    DECISION PAGE 8    12/20/06**

134

1       Regarding the base time of confinement,

2   the base life offense of which the prisoner has

3   been convicted is murder in the first, Penal Code

4   187. The offense occurred on March 31st, 1978,

5   the term is derived from the Matrix located in

6   CCR Title 15 at 2282B, first degree murder,

7   offense committed on or before November 7th,

8   1978. The Panel finds that Category C3 is

9   appropriate -- now I have to find it, what did I

10   do with it, okay, no, I have it -- in that severe

11   trauma is the Category death resulted from severe

12   trauma inflicted with a deadly intensity like

13   beating, clubbing, stabbing, etcetera, and 3 is

14   that there was no prior relationship between the

15   victim and the prisoner. The Panel assesses 216

16   months for the base offense and notes that this

17   is the aggravated, this is the aggravated

18   category.

19       **DEPUTY COMMISSIONER STAR:** Read your

20   number one more time.

21       **PRESIDING COMMISSIONER ENG:** Did I write

22   it down wrong?

23       **DEPUTY COMMISSIONER STAR:** 216?

24       **PRESIDING COMMISSIONER ENG:** Correct.

25       **DEPUTY COMMISSIONER STAR:** Just wasn't

26   sure.

27   **NATHANIEL ROUSE  C-03721   DECISION PAGE 9   12/20/06**

135

1      **PRESIDING COMMISSIONER ENG:**  Okay.  And

2   the circumstances in aggravation that his Panel

3   chose are during the commission of the crime the

4   prisoner had a clear opportunity to cease, but

5   instead continued.  The prisoner has engaged in

6   other reliably documented criminal conduct which

7   has an integral part of the crime for which the

8   prisoner is currently committed to prison, that

9   being robbery and auto theft.

10      **INMATE ROUSE:**  Okay.

11      **PRESIDING COMMISSIONER ENG:**  Specific

12   circumstances in aggravation of first degree

13   murder include the prisoner went to great lengths

14   to hide the body or to avoid detection, and that

15   the murder was committed to prevent discovery of

16   another crime, okay, the auto theft.  We did find

17   one area of mitigation, but it could not outweigh

18   the areas of aggravation.  The one mitigating

19   area is we find that the prisoner has a minimal

20   or no history of criminal behavior.  I'm sorry, I

21   have to get through all these pages.  Okay.  I

22   have to ask my fellow Commissioners, do I need to

23   read through all of this?

24      **DEPUTY COMMISSIONER STAR:**  No.

25      **PRESIDING COMMISSIONER ENG:**  Well, I have

26   to explain to him --

27   **NATHANIEL ROUSE  C-03721   DECISION PAGE 10  12/20/06**

136

1     **DEPUTY COMMISSIONER STAR:**  The

2     calculation, he's going to get that in writing, I

3     don't know if they read it on the record, but --

4     **ATTORNEY STRINGER:**  The credits, the

5     credits.

6     **PRESIDING COMMISSIONER ENG:**  The credits,

7     okay.  Again, all right, sorry about that.

8     **INMATE ROUSE:**  That's okay.

9     **PRESIDING COMMISSIONER ENG:**  The total

10    term calculated for the base life term, again, we

11    calculated 216 months.  Okay.

12    **ATTORNEY STRINGER:**  So is that, is that

13    the middle, or is that the --

14    **PRESIDING COMMISSIONER ENG:**  No, the

15    aggravated, the aggravated.

16    **ATTORNEY STRINGER:**  So it's three

17    **PRESIDING COMMISSIONER ENG:**  I already

18    stated it's --

19    **ATTORNEY STRINGER:**  3C.

20    **PRESIDING COMMISSIONER ENG:**  3C.

21    **ATTORNEY STRINGER:**  So is it 14, 16 or 18?

22    **PRESIDING COMMISSIONER ENG:**  18.

23    **ATTORNEY STRINGER:**  18, 18, okay.

24    **PRESIDING COMMISSIONER ENG:**  Yes, because

25    it's aggravated.  Post-conviction credits.  Post-

26    conviction credits from, okay, the date your life

27    **NATHANIEL ROUSE  C-03721   DECISION PAGE 11  12/20/06**

137

1    term started, which was April 11th, 1979, okay,

2    to the date of this hearing, December 20th, 2006,

3    equates to 110 months.  Okay.  So total period of

4    confinement is approximately 106 months.  Okay.

5    This Panel is not imposing any special conditions

6    of parole except to order you to parole in Santa

7    Clara County, and as I discussed with you

8    earlier, we feel this is in your best interest.

9              **INMATE ROUSE:**  Okay.

10             **PRESIDING COMMISSIONER ENG:**  Have I left

11   anything out, Commissioner?

12             **DEPUTY COMMISSIONER STAR:**  The Board is

13   not imposing any special conditions at this time.

14             **PRESIDING COMMISSIONER ENG:**  I did, I did,

15   except for ordering him to parole in Santa Clara

16   County.

17             **DEPUTY COMMISSIONER STAR:**  Yes, okay.

18             **PRESIDING COMMISSIONER ENG:**  Okay.  I

19   believe that's it.  That concludes our reading of

20   the decision.  Any comments by either

21   Commissioner?

22             **DEPUTY COMMISSIONER HERRON:**  I have none.

23             **DEPUTY COMMISSIONER STAR:**  Good luck to

24   you, sir.

25             **PRESIDING COMMISSIONER ENG:**  Again, sir,

26   this is a tentative decision, and you already

27   **NATHANIEL ROUSE  C-03721   DECISION PAGE 12  12/20/06**

138

1    understand what the process is.

2          INMATE ROUSE:  Yes, I do.

3          PRESIDING COMMISSIONER ENG:  So needless

4    to say, remain disciplinary free.

5          INMATE ROUSE:  Absolutely.

6          PRESIDING COMMISSIONER ENG:  Be careful,

7    okay, and we wish you the best of luck.

8          INMATE ROUSE:  Thank you.

9          PRESIDING COMMISSIONER ENG:  Okay.  Time

10   is now 5:50.

11         INMATE ROUSE:  Thank you ladies and

12   gentlemen.

13                  A D J O U R N M E N T

14                      --oOo--

15

16

17

18

19

20

21

22   PAROLE GRANTED

23   THIS DECISION WILL BE FINAL ON:_____

24   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

25   DATE, THE DECISION IS MODIFIED

26   NATHANIEL ROUSE  C-03721   DECISION PAGE 13  12/20/06

139

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, V. OLIVER, a duly designated transcriber,
NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare
and certify under penalty of perjury that I have
transcribed tape(s) which total one in number and cover
a total of pages numbered 1 - 138, and which recording
was duly recorded at SAN QUENTIN STATE PRISON, SAN
QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT
PAROLE CONSIDERATION HEARING of NATHANIEL ROUSE, CDC
No. C-03721, on DECEMBER 20, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested party
in the above-captioned matter and have no interest in
the outcome of the hearing.

Dated DECEMBER 31, 2006, at Sacramento County,
California.


_____
V. Oliver
Transcriber
**Northern California Court Reporters**

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **ROUSE, NATHANIEL, In re**

No.:    **67046**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **November 5, 2007**, I served the attached

### SUPPLEMENTAL INFORMAL RESPONSE

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Nathaniel Rouse, C-03721**
**San Quentin State Prison**
**1 Main Street**
**San Quentin, CA 94964**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **November 5, 2007**, at San Francisco, California.

_____            _____
        J. Palomino                            Signature
        Declarant

20112161.wpd



$ 05.05⁰

RECEIVED

MAY 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CALIFORNIA 94102

Nathaniel R. Rouse
P.O. Box C-03721
CSP-SQ 1-N-98U
San Quentin, CA. 94974