IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL R. ROUSE,<br><br>    Petitioner,<br><br>v.<br><br>ROBERT L. AYERS, JR.,<br><br>    Respondent.<br>_____ | No. C 08-02426 SBA (PR)<br><br>**ORDER GRANTING PETITION FOR**<br>**WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Petitioner Nathaniel Rouse, an inmate at San Quentin State Prison, filed this pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in which he challenges the denial of parole by the Governor of California ("Governor") in 2007. Respondent Robert L. Ayers, Warden of San Quentin State Prison, opposes the petition. Petitioner has filed a traverse. The matter is now submitted for the Court's consideration of the merits of the petition. For the reasons discussed below, the petition is GRANTED.

## PROCEDURAL BACKGROUND

### I.   State Court Proceedings

In 1978, Petitioner was charged with murder with special circumstances, robbery, kidnapping and automobile theft. In 1979, he pled guilty in Alameda County Superior Court to one count of first-degree murder and admitted to using a firearm in the crime, and, in turn, the district attorney dropped the special circumstances, robbery, kidnapping and automobile theft charges.

The Governor's parole decision summarized the commitment offense as follows:

> On March 31, 1978, Nathaniel Rouse beat Roohola Faryabidoust to death during a test drive of a car.
>
> Mr. Rouse and his girlfriend Marion Thorpe planned to go to a car dealership, test drive a car and then kill the dealership employee riding with them so they could steal the car. On the day of the murder, Mr. Rouse and Ms. Thorpe went to Mr. Faryabidoust's used-car dealership and asked him to take them on a test drive in a Monte Carlo. Mr. Faryabidoust left with Mr. Rouse and Ms. Thorpe around 8:30 a.m. At approximately 5:30 p.m., Mr. Faryabidoust's secretary telephone police and

> reported Mr. Faryabidoust missing.
>
> Four days later, Mr. Rouse and Ms. Thorp were arrested driving the Monte Carlo. Mr. Rouse had pawned Mr. Faryabidoust's watch. In the car, police found the pawn-shop receipt. They also found Mr. Faryabidoust's license, credit card receipts, and other items.
>
> Mr. Rouse admitted to police that he "struck" Mr. Faryabidoust, and he identified where he disposed of Mr. Faryabidoust's body, which was later recovered from a field. Mr. Faryabidoust's hands had been bound behind his back with rope and tape, and his head had been covered with plastic secured by an electrical cord wrapped around his neck.

(Pet. Ex. A at 1.)

At the sentencing hearing on April 4, 1979, the Alameda County Superior Court judge made the following statement:

> This is one of the most brutal cases that this Court in its long experience in court has ever encountered. It was a particularly brutal crime. It was, in the Court's opinion, a planned crime. It is just an utter and complete senseless taking of the life of a good human being.
>
> Now there is a possibility of this man getting a parole and this Court cannot do anything about the sentence of Miss Thorpe, who is going to be sentenced right after Mr. Rouse, but I am going to tell you, Mr. Rouse, that if there is anything that I can do to prevent your parole, the Court is going to do it. There appears to be in this case no mitigating circumstances whatsoever.

(Pet. Ex. E-2 at 111-12.) On April 4, 1979, Petitioner was sentenced to a term of seven years to life in state prison. (Id. at 1.)

## II. Parole Proceedings

Petitioner has been denied parole on fourteen occasions. At his first eleven parole hearings, Petitioner was found unsuitable for parole by the Board of Prison Terms (now the Board of Parole Hearings).[1] At the twelfth parole hearing, in 2002, the Board found him suitable for parole, but the Governor reversed that decision. At Petitioner's next parole hearing, in 2005, the Board found Petitioner suitable for parole again, but the Governor reversed that decision as well. Finally, on December 20, 2006, the Board found petitioner suitable for parole for a third time. (Id. at 126). The Governor reversed the Board's decision again on April 30, 2007, at which time Petitioner had been

---

[1] For simplicity, the Board of Prison Terms and the Board of Parole Hearings are collectively referred to hereinafter as the "Board."

1  incarcerated for approximately twenty-nine years. (Pet. Ex. A.)

2  In his decision, the Governor noted that Petitioner was twenty-years old at the time of the
crime, had no criminal record, had remained discipline-free in prison for approximately 28 years, had a positive record of education and vocational training in prison, had participated in "an array" of self-help programs and community service, and had realistic plans for residence and employment if released. (Id. at 2-3.) The Governor found that the murder was "exceptionally brutal and callous" and "demonstrated an extraordinary level of calculation and dispassion." (Id. at 2.) The Governor concluded that despite the "positive factors," the "gravity of the first-degree murder" was "alone sufficient" to deny parole. (Id. at 3.)

The instant petition challenges the Governor's parole denial in 2007, claiming that the decision violated Petitioner's right to due process.[2]

### III.  State Habeas Proceedings

After the Governor's parole decision, Petitioner sought habeas corpus relief in all three levels of the state courts. On December 21, 2007, the Alameda County Superior Court denied the petition in a reasoned decision in which it concluded that there was "some evidence" to support the Governor's decision. (Resp't Ex. 6.) The California Court of Appeal summarily denied his petition on February 19, 2008. (Resp't Ex. 11.) The Supreme Court of California denied his petition for review without comment on April 30, 2008. (Resp't Ex. 13).

## STANDARD OF REVIEW

### I.  AEDPA

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

---

[2] The Governor's two prior parole denials are not challenged in this case.

3

a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### A.     Section 2254(d)(1)

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards. See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds; Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

#### 1.     Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is

4

no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### 2. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

5

unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The "objectively unreasonable" standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." Id. In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.     Section 2254(d)(2)**

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh

6

1 highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and
2 made part of the state court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A
3 district court must presume correct any determination of a factual issue made by a state court unless
4 the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. §
5 2254(e)(1).

## II.     California Law Governing Parole for Murderers

A Board panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date . . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Pen. Code § 3041(a). Significantly, that statute also provides: The panel shall set a release date,

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b).

One of the implementing regulations, Title 15 of the California Code of Regulations, section 2401 provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).

In making its determination, the Board may consider "[a]ll relevant, reliable information available," including,

7

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. § 2402(b).

Circumstances tending to show unsuitability for parole include the nature of the commitment offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2281(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

The regulations also contain a matrix of suggested base terms that prisoners with indeterminate sentences should serve before they are released on parole. The matrix provides three choices of suggested "base terms" for several categories of crimes. See 15 Cal. Code Regs. § 2403. If, as in Petitioner's case, the base offense is one count of first-degree murder with the use of a dangerous weapon (firearm), the matrix of base terms ranges from a low of 29-31 years, to a high of

30-32 years, depending on some of the facts of the crime.[3] See id. § 2403(b). Although the matrix is to be used to establish a base term, this occurs only once the prisoner has been found suitable for parole. See id. § 2403(a).

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal.4th 1061, 1070-71 (2005).

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets and parenthesis in original). Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found suitable for parole." 15 Cal. Code Regs. § 2403(a) (emphasis added). "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Dannenberg, 34 Cal. 4th at 1071 (emphasis added).

The California Supreme Court's determination of state law is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629 (1988).

## DISCUSSION

Petitioner claims that the Governor's denial of parole in 2007 violated his right to due process because there was not sufficient evidence to support that decision.

---

[3] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture." Each of the choices are further defined in the matrix. See 15 Cal. Code Regs. § 2403(b).

9

The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the absence of some evidence of his or her current dangerousness. Hayward v. Marshall, 603 F.3d 546, 555, 561 (9th Cir. 2010) (en banc). Under California law, however, "some evidence" of current dangerousness is required in order to deny parole. Id. at 562 (citing In re Lawrence, 44 Cal.4th 1181, 1205-06 (2008) and In re Shaputis, 44 Cal.4th 1241 (2008)). This requirement gives California prisoners a liberty interest, protected by the federal constitutional guarantee of due process, in release on parole in the absence of "some evidence" of their current dangerousness. Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (citing Hayward, 603 F.3d at 561-64); Pearson v. Muntz, 606 F.3d 606, 609-10 (9th Cir. 2010) (per curiam) (also citing Hayward, 603 F.3d at 562-63).

When a federal habeas court in this circuit is faced with a claim by a California prisoner that their right to due process was violated because the denial of parole was not supported by "some evidence," the court "need only decide whether the California judicial decision approving the governor's decision rejecting parole was an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); Cooke, 609 F.3d at 1209. California's "some evidence" requirement was summarized in Hayward as follows:

> As a matter of California law, 'the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety.' There must be 'some evidence' of such a threat, and an aggravated offense 'does not, in every case, provide evidence that the inmate is a current threat to public safety.' The prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state' supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, 'a current threat to public safety.'

Hayward, 603 F.3d at 562 (quoting Lawrence, 44 Cal.4th. at 1191, 1210-14); see Cooke, 609 F.3d at 1213-14 (describing California's "some evidence" requirement).

As noted, in this case the Governor denied parole because the gravity of Petitioner's first-degree murder was "alone sufficient" evidence that Petitioner's "release from prison would pose an

unreasonable public-safety risk." (Pet. Ex. A at 3.)  The Governor gave two reasons for this decision.  First, the Governor found that the murder was "exceptionally brutal and callous" because Petitioner hit the victim in the head "as hard as he could" five to eight times, bound his hands, hit him again as hard as possible when he regained consciousness, went to a nearby store and purchased a plastic bag and electrical cord, placed the bag over the victim's head and tied it with the cord, and then put the victim's "bound and beaten body in the trunk of the car and drove around looking for a place to dump him."  (Id. at 2.)  The Governor also found that the crime involved "an extraordinary level of calculation and dispassion" in that Petitioner and Ms. Thorpe planned for several days to steal a car during a test-drive and kill the salesperson so there would be no witness, they chose a remote car lot where they would not be noticed, Petitioner pretended the car was not handling well so that he could get into the backseat with the victim, and when the victim started speaking in his "own language" Petitioner used that as a pretense to start beating him.  (Id.)  The Alameda County Superior Court upheld the Governor's denial of parole, finding "some evidence" of Petitioner's current dangerousness based solely upon the circumstances of the commitment offense.  (Resp't Ex. 6 at 4-6.)[4]

The superior court's decision upholding the Governor's denial of parole, based solely on the facts of the commitment offense, was an unreasonable application of California's "some evidence" requirement.  See Hayward, 645 F.3d at 562-63.  In Lawrence, which was announced after the superior court's decision and thus not cited by that court (see Resp't Ex. 6), the California Supreme Court addressed whether the "some evidence" requirement can be met solely by the circumstances of the commitment offense,

> to the extent our decisions in Rosenkrantz and Dannenberg have been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's or the Governor's decision, this

---

[4] When, as here, there is no reasoned opinion from the highest state court to consider the petitioner's claims, the federal habeas court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).  In this case, the last reasoned state court opinion to address Petitioner's claim is that of the superior court.  (Resp't Ex. 6.)

11

> assumption is inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole that we recognized in Rosenkrantz.

Lawrence, 44 Cal. 4th at 1191 (emphasis in original). The court continued:

> In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide "some evidence" *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety.

Id. (emphasis in original); see also Cooke, 609 F.3d at 1214 (finding California's "some evidence" requires "more than the crime or its circumstances alone to justify the Board's or Governor's finding of current dangerousness").

As described by the Governor, the evidence before the Board demonstrated that Petitioner had an unusual degree of "rehabilitation and suitability for parole:"

> In addition to remaining discipline-free for approximately 28 years, [Petitioner] made efforts in prison to enhance his ability to function within the law upon release. As I noted in my 2006 decision reversing the Board, he earned a GED and an Associate of Arts degree. He also took religious-study courses related to infectious diseases. He is a certified welder, and he held institutional jobs such as data processor, clerk, teacher's aide, hospital porter, and welder, among other things. He availed himself of an array of self-help and therapy, including Impact, Kairos, Alternatives to Violence, Making It Work, Positive Support Systems, Self Esteem, Critical Thinking, Rational Behavior Training Group, Reality and Decision Making Group, Anger Control, Category X, and Millati Islami. He also participated in extracurricular activities such as Squires and Trust, working with troubled children.
>
> Furthermore, Mr. Rouse maintains seemingly solid relationships and close ties with supportive family and friends, and he received favorable evaluations from various correctional and mental-health professionals over the years. He also made plans upon his release to live with his former sister-in-law and to work for a construction company in Santa Clara County, the county to which the Board approved his parole.

(Id. at 1-2.) The Governor also noted that Petitioner had no criminal record prior to the commitment offense, and that he was twenty years old at the time of the offense and forty-nine at the time of the Governor's decision. (Id. at 1, 3.) At the parole hearing, Petitioner expressed remorse and took responsibility for his actions. (Pet. Ex. E-2 at 22-24, 38-39, 73-74, 105, 107, 123-24). This evidence "of rehabilitation and suitability for parole" is "overwhelming," and "the only evidence

related to unsuitability" in this case was "the gravity of the commitment offense." See Lawrence, 44 Cal. 4th at 1191.

Furthermore, the commitment offense was "both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur." See id. The murder was committed approximately twenty-nine years prior to the Governor's decision. (Pet. Ex. A at 1-3.) The Board found "a reduced probability of recidivism" because of Petitioner's "maturation, growth, greater understanding, and advanced age," as evidenced by his progress from initially denying the commitment offense to admitting it, to admitting that he had premeditated the murder, to expressing remorse, to participating in "intensive" therapy, and finally writing a detailed description of the crime. (Pet. Ex. E, Attachment 2 at 128-31). In addition, the Board found "significant improvement in self-control" as evidenced by Petitioner's lack of disciplinary violations. (Id. at 132.)

In addition, at the time of the Governor's decision, Petitioner had been incarcerated for approximately twenty-nine years, much longer than his suggested base term.[5] "[A]fter these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." Lawrence, 44 Cal.4th at 1211. Here, there is strong evidence of Petitioner's rehabilitation and no other evidence of his current dangerousness in the record or cited by the Board, the Governor or the state courts. Consequently, in light of the amount of time Petitioner had served at the time of the Governor's decision, the facts of the commitment offense alone no longer constituted "some evidence" of his current dangerousness under Lawrence. See also Cooke, 609 F.3d at 1214 (under California law, the facts of the commitment offense alone do not constitute "some evidence" of current dangerousness).

Under California law, as explained in Lawrence, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also

---

[5]This is also four years longer than the twenty-five-year base term that Petitioner would receive if sentenced today for his first-degree murder conviction. See Cal. Pen. Code ss 187.

13

establishes something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." 44 Cal.4th at 1214; Hayward, 603 F.3d at 562; Cooke, 609 F.3d at 1214. Petitioner had no criminal history and a virtually impeccable post-incarceration record. There was no evidence suggesting current dangerousness in Petitioner's demeanor at the hearing, which was remorseful, or his mental state, which was found by the Board and the examining psychologists not to present a threat of danger to the public if Petitioner were released. (Pet. Ex. E-2 at 71-75, 133.) In addition, the commitment offense was remote in time and committed under circumstances unlikely to recur, and Petitioner had served substantially more time than his base term. Consequently, the aggravated circumstances of the commitment offense did not on their own constitute "some evidence" of Petitioner's current dangerousness under Lawrence, and the state court, in upholding the Governor's denial of parole based solely on that offense, unreasonably applied California's "some evidence" requirement.

Pursuant to the standard announced in Hayward entitling a petitioner to habeas relief if the state court unreasonably applied California's "some evidence" requirement in upholding the Governor's denial of parole, the petition for a writ of habeas corpus in this case will be granted. See Hayward, 603 F.3d 563 (citing 28 U.S.C. 2254(d)(1)); see also Cooke, 609 F.3d at 1216 (granting petition under Hayward where parole denial rested solely on commitment because that was not a reasonable application of California's "some evidence" standard).

//
//
//

## **CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is GRANTED. Within twenty (20) days of the date of this order, the California Board of Parole Hearings must calculate a term for petitioner and set an imminent date for his release in accordance with Section 3041(a) of the California Penal Code. Within ten (10) days of petitioner's release, respondent must file a notice with the court confirming the date on which petitioner was released.

The Clerk of the Court shall enter judgment in accordance with this Order, terminate all pending motions, and close the file.

IT IS SO ORDERED.

DATED: 9/2/10

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court<br>For the Northern District of California

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>FOR THE<br>NORTHERN DISTRICT OF CALIFORNIA | |
| NATHANIEL RAY ROUSE,<br>        Plaintiff,<br>  v.<br>R. AYERS JR. et al,<br>        Defendant. | Case Number: CV08-02426 SBA<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 9, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Nathaniel Ray Rouse C-03721
California State Prison - San Quentin
San Quentin, CA 94974

Dated: September 9, 2010

                                        Richard W. Wieking, Clerk
                                        By: LISA R CLARK, Deputy Clerk